

# BEFORE THE
# JUDICIAL PANEL ON MULTIDISTRICT LITIGATION


**In re Cintas Corp.**
**Overtime Pay Arbitration Litigation**              **MDL Docket No. 1781**


**APPENDIX OF AUTHORITIES (LEGISLATIVE HISTORY MATERIALS)**
**SUBMITTED WITH RESPONSE BY CINTAS CORPORATION IN OPPOSITION TO**
**MOTION TO TRANSFER AND CONSOLIDATE PURSUANT TO 28 U.S.C. §1407**

## TABLE OF AUTHORITIES ATTACHED

House Report, H.R.Rep. No. 68-96 (1924).................................................................... Tab 1

Senate Report, S.Rep. No. 68-536 (1924) .................................................................. Tab 2

Joint Hearings before the Subcommittees of the Committees on the Judiciary on
   S.1005 and H.R.646, *Bills to Make Valid and Enforceable Written Provisions
   or Agreements for Arbitration of Disputes Arising Out of Contracts,
   Maritime Transactions, or Commerce Among the States or Territories or with
   Foreign Nations*, 68th Cong., First Sess. at 33-41 (January 9, 1924)..................... Tab 3

House Report, H.R. Rep. No. 90-1130 (1968), *reprinted in* 1968
   U.S.C.C.A.N. 1898, 1900 ..................................................................................... Tab 4

Dated: April 26, 2006

Respectfully submitted,

_____
Mark C. Dosker

SQUIRE, SANDERS & DEMPSEY L.L.P.
Mark C. Dosker
Nathan Lane III
Michael W. Kelly
Joseph A. Meckes
Angela N. O'Rourke
Y. Anna Suh
Michelle M. Full
One Maritime Plaza, Third Floor
San Francisco, California  94111
Telephone:  (415) 954-0200
Facsimile:  (415) 393-9887

Attorneys for
CINTAS CORPORATION

- 1 -

# **Tab 1**

# HOUSE REPORTS

## 68th Congress, 1st Session

(December 3, 1923–June 7, 1924)

PUBLIC

VOL. 1

WASHINGTON
GOVERNMENT PRINTING OFFICE
1924

## Left column (Report No. 95)

68TH CONGRESS,} HOUSE OF REPRESENTATIVES. { REPORT
1st Session. } No. 95.

---

### BRIDGE ACROSS COLUMBIA RIVER.

---

JANUARY 24, 1924.—Referred to the House Calendar and ordered to be printed

---

Mr. BURTNESS, from the Committee on Interstate and Foreign Commerce, submitted the following

### REPORT.

[To accompany H. R. 4120.]

The Committee on Interstate and Foreign Commerce, to whom was referred the bill (H. R. 4120), having considered the same, report thereon with a recommendation that it pass.

The bill has the approval of the War and Agriculture Departments, as will appear by the letters attached and which is made a part of this report.

Respectfully returned to the chairman Committee on Interstate and Foreign Commerce, House of Representatives, and in so far as the interests committed to this department are concerned, I know of no objection to the favorable consideration by Congress of the accompanying bill (H. R. 4120, 68th Cong., 1st sess.) granting the consent of Congress to the Greater Wenatchee Irrigation district to construct, maintain, and operate a bridge across the Columbia River.

JOHN W. WEEKS, Secretary of War.

DEPARTMENT OF AGRICULTURE,
Washington, January 5, 1924.

Hon. SAMUEL E. WINSLOW,
Chairman Committee on Interstate and Foreign Commerce,
House of Representatives.

DEAR MR. WINSLOW: Careful consideration has been given to the bill H. R. 4120, transmitted with your letter of December 31, with request for a report thereon, and such views relative thereto as the department might desire to communicate.

This bill (H. R. 4120) would authorize the Greater Wenatchee Irrigation District, a corporation organized and existing under the laws of the State of Washington, to construct and operate a bridge and approaches thereto across the Columbia River within or near section 15, township 20 north, range 23 east, Willamette meridian, State of Washington. The system of Federal-aid highways approved for the State of Washington does not cross the Columbia River in the vicinity of the site indicated for the proposed bridge, which, according to the information the department is able to obtain, is to be about 5 miles above the city of Wenatchee. This department, therefore, can see no objections to granting the authorization for constructing the bridge.

Sincerely,

HENRY C. WALLACE, Secretary.

O

## Right column (Report No. 96)

68TH CONGRESS,} HOUSE OF REPRESENTATIVES. { REPORT
1st Session. } No. 96.

---

### TO VALIDATE CERTAIN AGREEMENTS FOR ARBITRATION.

---

JANUARY 24, 1924.—Referred to the House Calendar and ordered to be printed.

---

Mr. GRAHAM of Pennsylvania, from the Committee on the Judiciary, submitted the following

### REPORT.

[To accompany H. R. 646.]

The purposes of this bill is to make valid and enforcible agreements for arbitration contained in contracts involving interstate commerce or within the jurisdiction of admiralty, or which may be the subject of litigation in the Federal courts. It was drafted by a committee of the American Bar Association and is sponsored by that association and by a large number of trade bodies whose representatives appeared before the committee on due hearing. There was no opposition to the bill before the committee.

The matter is properly the subject of Federal action. Whether an agreement for arbitration shall be enforced or not is a question of procedure to be determined by the law court in which the proceeding is brought and not one of substantive law to be determined by the law of the forum in which the contract is made. Before such contracts could be enforced in the Federal courts, therefore, this law is essential. The bill declares that such agreements shall be recognized and enforced by the courts of the United States. The remedy is founded upon the Federal control over interstate commerce and over admiralty. The control over interstate commerce reaches not only the actual physical interstate shipment of goods but also contracts relating to interstate commerce.

Arbitration agreements are purely matters of contract, and the effect of the bill is simply to make the contracting party live up to his agreement. He can no longer refuse to perform his contract when it becomes disadvantageous to him. An arbitration agreement is placed upon the same footing as other contracts, where it belongs.

The need for the law arises from an anachronism of our American law. Some centuries ago, because of the jealousy of the English courts for their own jurisdiction, they refused to enforce specific agreements to arbitrate upon the ground that the courts were thereby

COMPLETION OF APPROACHES TO BRIDGE ACROSS THE MISSISSIPPI RIVER BETWEEN ST. LOUIS, MO., AND EAST ST. LOUIS, ILL.

JANUARY 24, 1924.—Referred to the House Calendar and ordered to be printed.

Mr. WINSLOW, from the Committee on Interstate and Foreign Commerce, submitted the following

# REPORT.

[To accompany H. R. 486.]

65406, Sp 7, fol 2, Roche 61, Jan 24

The Committee on Interstate and Foreign Commerce, to whom was referred the bill H. R. 486, having considered the same, report thereon with amendment and as so amended recommend that it pass.

The bill as amended has the approval of the War Department, as will appear by the letter attached and which is made a part of this report. The report of the Department of Agriculture is also made a part of this report.

Amend the bill as follows:

At the end of section 2, to insert the following proviso:

Provided, That the city of St. Louis may construct approaches, additions, or extensions, in addition to those now existing, connecting said bridge with any railroad or highway within or through the city of East St. Louis, Ill.; but before constructing such approaches, additions, or extensions this action thereof shall first have been approved by, and a certificate of public convenience and necessity there'for shall first have been obtained from, the Interstate Commerce Commission. Full jurisdiction and authority to consider and determine such questions is hereby conferred upon the Interstate Commerce Commission, in the same manner and to the same extent as in the case of other proceeding for certificates of public convenience and necessity under paragraphs (18), (19), and (20) of section 1 of the interstate commerce act.

This bill provides for the completion of the extension approaches to a municipal bridge crossing the Mississippi River between St. Louis, Mo., and East St. Louis, Ill.

The bridge proper was completed some 10 years ago, more or less, under the provisions of an act of Congress passed on June 25, 1906, and extended several times thereafter. The approach on the Illinois side was not completed because the city of St. Louis did not have the money with which to pay for the work.

---

2 TO VALIDATE CERTAIN AGREEMENTS FOR ARBITRATION.

ousted from their jurisdiction. This jealousy survived for so long a period that the principle became firmly embedded in the common law and was adopted with it by the American courts. The courts have felt that the precedent was too strongly fixed to be overturned without legislative enactment, although they have frequently criticised the rule and recognized its illogical nature and the injustice which results from it. The bill declares simply that such agreements for arbitration shall be enforced, and provides a procedure in the Federal courts for their enforcement. The procedure is very simple, following the lines of ordinary motion procedure, reducing technicality, delay, and expense to a minimum and at the same time safeguarding the rights of the parties. There is provided a method for the summary trial of any claim that no arbitration agreement ever was made, and there is also provided a hearing if the defaulted party contends that the award was secured by fraud or other corruption or undue influence, or that some evident mistake in the arbitration on the merits exists in the award. If the parties to escape his agreement, but his rights are simply protected. At the to the courts at all. If one party is recalcitrant, he need not resort same time the party willing to perform his contract for arbitration is not subject to the delay and cost of litigation. Machinery is provided for the prompt determination of his claim for arbitration and award may then be entered as a judgment, subject to attack by the other party for fraud and corruption and similar undue influence, or for palpable error in law or form.

To secure jurisdiction for arbitration, however, service of process must be made personally, so that there is no danger than a defendant, having an honest defense, will be called upon to defend his case at a distance under a disadvantage. The proceeding will be commenced practically as any action is now commenced in the Federal courts.

In view of the strong support of commercial and legal bodies, the entire lack of opposition before the committee, the obvious justice of the result sought to be attained, and the evident propriety and necessity of Federal action, we submit that this bill should become law.

It is practically appropriate that the action bill should become law-tion when there is so much agitation against the costliness and delays of litigation. These matters can be so largely eliminated by agreements for arbitration, if arbitration agreements are made valid and enforceable.

# **Tab 2**

# SENATE REPORTS

## 68th Congress, 1st Session

### (December 8, 1923–June 7, 1924)

## PUBLIC

## VOL. 2

WASHINGTON
GOVERNMENT PRINTING OFFICE
1924

# Calendar No. 569

| 68TH CONGRESS | SENATE | REPORT |
| 1st Session | | No. 536 |

## TO MAKE VALID AND ENFORCEABLE CERTAIN AGREEMENTS FOR ARBITRATION

MAY 14, 1924.—Ordered to be printed

Mr. STERLING, from the Committee on the Judiciary, submitted the following

## REPORT

[To accompany S. 1005]

The Committee on the Judiciary, to whom was referred the bill (S. 1005) to make valid and enforceable written provisions or agreements for arbitration of disputes arising out of contracts, maritime transactions, or commerce among the States or Territories or with foreign nations, report the same back with certain amendments thereto and, as so amended, the committee recommend that the bill do pass.

The amendments are as follows:

In lines 6 and 7, page 1 of the bill, strike out the words "or interstate."

In line 6, section 2, page 2, strike out the words "contract or", and in line 7, section 2, page 2, after the word "or" insert the words "a contract evidencing a", and in line 9, on said page, strike out the words "between the parties."

In line 16, section 4, page 3, after the word "agreement" as it first occurs in said line, insert the following proviso:

*Provided,* That the hearing and proceedings under such agreement shall be within the district in which the petition for an order directing such arbitration is filed.

On page 6, strike out section 8 of the bill.

Beginning with the word "That," in line 21, section 10, page 6, strike out all down to and including the word "attorneys" in line 25.

On page 10, strike out section 14 of the bill.

On page 11, strike out section 16 of the bill.

Beginning with section 9, renumber the sections following as required by the striking out of certain designated sections.

★ S-17-24

---

CONTRACT FOR MAIL MESSENGER SERVICE

offices for mail messenger service. It may be necessary to terminate those contracts from June 30, unless legislative authority be continued.

It will be understood that this authority under which we have been acting since 1917 and which it is proposed to continue is in the nature of an exception to section 3950 of the Revised Statutes which is as follows:

"No postmaster, assistant postmaster, or clerk employed in any post office shall be a contractor, or concerned in any contract for carrying the mail."

With respect to that part of the bill authorizing special delivery messengers to contract for mail messenger service, that authority would facilitate the service and permit no economy. I may cite a recent case of this kind where a bidder offers to carry the mail to and from the railroad station as mail messenger at the rate of $994 a year, provided he be permitted to deliver special delivery letters and receive the fees therefor. Under the present law he can not be permitted to perform both services. His bid for the mail messenger service would, without the privilege of delivering special delivery letters is at the rate of $1,150 a year. I consider favorable action on this bill very important.

Very truly yours,

HARRY S. NEW,
*Postmaster General.*

The committee believes that in view of the fact that this legislation is so urgently needed by the department and that it will result in great economies and more dependable service, that it should be enacted into law.

○

2

## 2    TO MAKE VALID AGREEMENTS FOR ARBITRATION

The purpose of this bill is clearly set forth in section 2, which, as proposed to be amended, reads as follows:

Sec. 2. That a written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

The "maritime transactions or contracts," to which the bill will apply, are defined in section 1. Likewise, the definition of "commerce" in the same section, shows to what contracts in interstate or foreign commerce the bill will be applicable.

It is not contended that 'agreements to arbitrate have no validity whatever.' A party may be liable in an action for damages for the breach of an executory agreement to arbitrate; or, if an agreement has been executed according to its terms and an award made, the appropriate action may be brought at law or in equity to enforce the award. Both maritime contracts or transactions and contracts involving interstate commerce or transactions are at least valid to this extent.

But it is very old law that the performance of a written agreement to arbitrate would not be enforced in equity, and that if an action at law were brought, the contract containing the agreement to arbitrate, such agreement could not be pleaded in bar of the action; nor would such an agreement be ground for a stay of proceedings until arbitration was had. Further, the agreement was subject to revocation by either of the parties, any time before the award. With this as the state of the law, such agreements were in large part ineffectual, and the party aggrieved by the refusal of the other party to carry out the arbitration agreement was without adequate remedy. Until recently all the States of the Union, and up to the present time in nearly, if not quite all, the States of the Union, such has been the law in regard to arbitration agreements. The Federal courts have in the main been governed by the same rules and, as a consequence, have denied relief to the parties seeking to compel the performance of an obligation. If the agreement to settle and determine disputes by arbitration or transaction is found in a maritime contract for the shipment, no action in admiralty for specific performance will lie, for the simple reason that this court is without power to grant equitable relief.

Various reasons have been given for these ancient rules of English law, followed as they have been by our State and Federal courts. Among these reasons were, first, the expressed fear on the part of the courts that arbitration tribunals did not possess the means to give full or proper redress, and also the doubt they entertained as to their right to compel an unwilling party to submit his cause to such a tribunal, thus denying to him the right to submit the same to the ordinary courts of justice for hearing and determination. Second, the jealousy of their rights as courts, coupled with the fear that if arbitration agreements were to prevail and be enforced, the extent the second reason influenced the first may be difficult to say; but it is not unreasonable to suppose that a desire to retain, if not extend, their jurisdiction had much to do with inspiring the fear

## 3    TO MAKE VALID AGREEMENTS FOR ARBITRATION

that arbitration tribunals could not do justice between the parties. And third, established precedent has had its large part of course in perpetuating the old rules long after the courts themselves could no longer see that they were founded in reason or justice.

It has been said that "arrangements for avoiding the delay and expense of litigation and referring a dispute to friends or natural persons are a natural practice of which traces may be found in any state of society." The desire to avoid the delay and expense of litigation persists. The desire grows with time and, as delays and expenses increase. The settlement of disputes by arbitration appeals to big business and little business alike, to corporate interests as well as to individuals. The Arbitration Society of America, with offices in the city of New York, has, through its arbitration tribunal, settled more than 500 cases during its less than two years of existence. In the New York Times of May 11 is found a brief résumé of the work accomplished. We quote the following:

In contrast with the long time required by the courts with their congested calendars to settle a dispute where a dispute is in arbitration, the average arbitration required but a single hearing, and occupied but a few hours of the time of disputants, counsel, and witnesses. The cost to the disputants was said to be trifling as compared with the cost of litigation.

Complicated controversies involving large sums of money, which, beyond a reasonable doubt, if taken to the courts would have been fought through three years of costly litigation, have been legally determined in this tribunal whose only rule of procedure is the rule of common sense, in from two to three weeks, the report states, and the speedy adjustment thereof—just as significant as the saving of time and money—the fact that this wide satisfaction has resulted from the procedure. Winners and losers alike bear witness to the fairness at the office of the society.

The record made under the supervision of this society shows not only the great value of voluntary arbitrations but the practical justice in the enforced arbitration of disputes where written agreements for that purpose have been voluntarily and solemnly entered into.

The bill, while relating to maritime transactions and to contracts in interstate and foreign commerce, follows the lines of the New York arbitration law enacted in 1920, amended in 1921, and sustained by the decision of the Supreme Court of the United States in the matter of the Red Cross Line v. Atlantic Fruit Co., rendered February 18, 1924.

Reference has been made herein to the definitions contained in the first section of the bill. The second section is set forth in full.

Section 3 provides for a stay of proceedings and arbitration in any suit where it is contended that the issue involved is referable to arbitration under the contract.

Section 4 provides a simple method for securing the performance of an arbitration agreement. The aggrieved party may apply to the proper district court, on five days' notice, and the court will order the party to proceed. The constitutional right to a jury trial is adequately safeguarded.

Section 5 provides for the manner of naming the arbitrators in case the parties have failed to name them.

Section 6 provides for expedition in the matter of the hearing of arbitration matters by the court.

Section 7 gives the arbitrators power to summon witnesses.

# Calendar No. 573

| 68TH CONGRESS }<br>*1st Session* } | SENATE | { REPORT<br>No. 538 |

## INLAND WATERWAYS CORPORATION

MAY 14 (calendar day, MAY 16), 1924.—Ordered to be printed

## REPORT

[To accompany S. 3161]

Mr. RANSDELL, from the Committee on Commerce, submitted the following

The Committee on Commerce, to whom was referred the bill (S. 3161) to create the inland waterways corporation for the purpose of carrying out the mandate and purpose of Congress as expressed in sections 201 and 500 of the transportation act, and for other purposes, having considered the same, report favorably thereon and recommend that the bill do pass without amendment.

Under the terms of the transportation act of 1920 the Secretary of War is made the mandatory of Congress, as follows:

SEC. 201 (a). On the termination of Federal control, as provided in section 200, all boats, barges, tugs, and other transportation facilities, on the inland, canal, and coastwise waterways (hereinafter in this section called "transportation facilities") acquired by the United States in pursuance of the fourth paragraph of section 3 of the Federal control act (except the transportation facilities constituting parts of railroads or transportation systems over which Federal control was assumed) are transferred to the Secretary of War, who shall operate or cause to be operated such transportation facilities so that the lines of inland waterway transportation established by or through the President during Federal control shall be continued, and assume and carry out all contracts and agreements in relation thereto entered into by or through the President in pursuance of such paragraph prior to the time above fixed for such transfer.

These mandates refer to operations on the Mississippi River between St. Louis, Mo., and New Orleans, La., and to operations on the canals, lakes, and sound between New Orleans, La., and Mobile, Ala., thence via the Black Warrior to Birmingham; and, under certain conditions, to operations on the upper Mississippi between St. Louis and Minneapolis, as follows:

SEC. 201 (g). Any transportation facilities owned by the United States and included within any contract made by the United States for operation on the Mississippi River above Saint Louis, the possession of which reverts to the United States at or before the expiration of such contract, shall be operated by the Secretary of War so as to provide facilities for water carriage on the Mississippi River above Saint Louis.

---

TO MAKE VALID AGREEMENTS FOR ARBITRATION

Section 9 protects libels and seizures of vessels in admiralty proceedings.

Section 10 provides for the entry of a judgment where the parties have agreed thereto and for determining the appropriate court.

Section 11 provides that an award may be vacated where it was procured by corruption, fraud, or undue means, or where there was partiality or corruption on the part of the arbitrators, or where they have been guilty of misconduct or have refused to hear evidence pertinent and material to the controversy, or have been guilty of any other misbehavior prejudicial to the rights of either party, or where they have exceeded their powers.

Section 12 gives power to the court to modify or correct the award where there was evident material miscalculation of figures, or evident material mistake in the description of any person, thing, or property, or where the arbitrators have made an award upon a matter not submitted to them, or where the award is imperfect in matter of form.

O

# **<u>Tab 3</u>**

ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES

U.S. Cong. Senate. Com. on the Judiciary

JOINT HEARINGS

BEFORE THE

SUBCOMMITTEES OF THE
COMMITTEES ON THE JUDICIARY
CONGRESS OF THE UNITED STATES

SIXTY-EIGHTH CONGRESS
FIRST SESSION

ON

# S. 1005 and H. R. 646

BILLS TO MAKE VALID AND ENFORCEABLE WRITTEN
PROVISIONS OR AGREEMENTS FOR ARBITRATION OF
DISPUTES ARISING OUT OF CONTRACTS, MARITIME
TRANSACTIONS, OR COMMERCE AMONG THE STATES
OR TERRITORIES OR WITH FOREIGN NATIONS

JANUARY 9, 1924

Printed for the use of the Committee on the Judiciary

WASHINGTON
GOVERNMENT PRINTING OFFICE
1924

HF1222
U.S.A3
1924.

## COMMITTEE ON THE JUDICIARY.

FRANK B. BRANDEGEE, Connecticut, *Chairman.*

WILLIAM E. BORAH, Idaho.
ALBERT B. CUMMINS, Iowa.
LeBARON B. COLT, Rhode Island.
THOMAS STERLING, South Dakota.
GEORGE W. NORRIS, Nebraska.
RICHARD P. ERNST, Kentucky.
SAMUEL M. SHORTRIDGE, California.
SELDEN P. SPENCER, Missouri.

LEE S. OVERMAN, North Carolina.
JAMES A. REED, Missouri.
HENRY F. ASHURST, Arizona.
JOHN K. SHIELDS, Tennessee.
THOMAS J. WALSH, Montana.
AUGUSTUS O. STANLEY, Kentucky.
THADDEUS H. CARAWAY, Arkansas.

W. DON LOREY, *Clerk.*
GEORGE GORDON PAYNE, *Assistant Clerk.*

MEMBERS OF THE SUBCOMMITTEE.

THOMAS STERLING, South Dakota, *Chairman.*

RICHARD P. ERNST, Kentucky.    THOMAS J. WALSH, Montana.

## COMMITTEE ON THE JUDICIARY.

### HOUSE OF REPRESENTATIVES.

GEORGE S. GRAHAM, Pennsylvania, *Chairman.*

LEONIDAS C. DYER, Missouri.
WILLIAM D. BOIES, Iowa.
CHARLES A. CHRISTOPHERSON, South Dakota.
RICHARD YATES, Illinois.
IRA G. HERSEY, Maine.
ISRAEL M. FOSTER, Ohio.
EARL C. MICHENER, Michigan.
ANDREW J. HICKEY, Indiana.
NATHAN D. PERLMAN, New York.
OSCAR J. LARSON, Minnesota.
J. HAMPS KURTZ, Pennsylvania.

ROBERT Y. THOMAS, Jr., Kentucky.
HATTON W. SUMNERS, Texas.
ANDREW J. MONTAGUE, Virginia.
JAMES W. WISE, Georgia.
JOHN N. TILLMAN, Arkansas.
FRED H. DOMINICK, South Carolina.
SAMUEL C. MAJOR, Missouri.
ROYAL H. WELLER, New York.
PATRICK B. O'SULLIVAN, Connecticut.

GUILFORD S. JAMESON, *Clerk.*

MEMBERS OF THE SUBCOMMITTEE.

LEONIDAS C. DYER, Missouri, *Chairman.*

ISRAEL M. FOSTER, Ohio.
ANDREW J. HICKEY, Indiana.
J. BANKS KURTZ, Pennsylvania.

ANDREW J. MONTAGUE, Virginia.
JAMES W. WISE, Georgia.
FRED H. DOMINICK, South Carolina.

II

## CONTENTS.

Statement of—                   Page.
Charles I. Stengle _____ 1
John B. Kendrick _____ 5
Charles I. Bergheimer _____ 5
W. H. Platt _____ 10
Guy Silver _____ 11
R. S. French _____ 12
C. G. Woodbury _____ 12
Julius Henry Cohen _____ 13
Francis B. James _____ 18
Alexander Rose _____ 19
Henry Morse _____ 26
Henry L. Eaton _____ 28
Frank Carnahan _____ 28
Wilson J. Vance _____ 30
Thomas H. Paton _____ 30
Bruce K. Winer _____ 81
W. W. Nichols _____ 82

III

# ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES.

## WEDNESDAY, JANUARY 9, 1924.

CONGRESS OF THE UNITED STATES,
JOINT COMMITTEE OF SUBCOMMITTEES ON THE JUDICIARY,
UNITED STATES SENATE AND
HOUSE OF REPRESENTATIVES,
*Washington, D. C.*

The joint subcommittee met, pursuant to call of the chairman, at 2.30 o'clock p. m., Senator Thomas Sterling presiding.

Present: Representing Senate subcommittee, Senator Sterling (chairman). Representing House subcommittee, Representatives Dyer, Foster, Hickey, and Kurtz.

Present also: Senator Kendrick, of Wyoming, and Representatives Mills, Perlman, Sengle of New York, and Cleary of New York.

The CHAIRMAN. Gentlemen, I think we may as well proceed with our hearing. I regret that the other two members of the Senate subcommittee are not present at this time, but would like to explain that Senator Brandt, I am informed, is kept away owing to illness, and that Senator Walsh, of Montana, is detained at another hearing. Senator Walsh told me that he might be able to come a little later.

## STATEMENT OF HON. CHARLES I. STENGLE, A REPRESENTATIVE FROM THE STATE OF NEW YORK.

Mr. STENGLE. Mr. Chairman and gentlemen of the committee, I simply want to note my appearance here in behalf of what is known as H. R. 646. I think on your side the bill is known as S. 1005, which, I understand, is identically the same bill as H. R. 646.

I am here this afternoon by request of the Brooklyn Chamber of Commerce, but owing to official business which calls me into another this subcommittee is to the question of arbitration legislation, I part of the building immediately, and knowing how kindly disposed think I can do more for my country elsewhere at this time, and therefore simply want to note an appearance and express the hope that you gentlemen will report a bill out for action in Senate and House.

The CHAIRMAN. The hearing is upon S. 1005 and H. R. 646, being bills to make valid and enforceable written provisions or agreements for arbitration of disputes arising out of contracts, maritime transactions, or commerce among the State or Territories or with foreign nations.

## 2     ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES.

The bill referred to is here printed in full, as follows:

[S. 1005, Sixty-eighth Congress, first session.]

A Bill, To make valid and enforceable written provisions or agreements for arbitration of disputes arising out of contracts, maritime transactions, or commerce among the States or Territories or with foreign nations.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That "maritime transactions," as herein defined, means charter parties, bills of lading of water carriers, agreements relating to wharfage, supplies furnished vessels or repairs to vessels, collisions, or any other matters in foreign or interstate commerce which, if the subject of controversy, would be embraced within admiralty jurisdiction; that "commerce," as herein defined, means commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia, or between any such Territory and another, or between the District of Columbia and any State or Territory or foreign nation, but nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce.

Sec. 2. That a written provision in any contract or maritime transaction or transaction involving commerce to settle by arbitration a controversy thereafter arising between the parties out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

Sec. 3. That if any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

Sec. 4. That a party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any court of the United States which, save for such agreement, would have jurisdiction under the judicial code at law, in equity, or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. Five days' notice in writing of such application shall be served upon the party in default. Service thereof shall be made in the manner provided by law for the service of summons in the jurisdiction in which such suit is brought. The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default, or if the matter in dispute is within admiralty jurisdiction, the court shall hear and determine such issue. Where such an issue is raised, the party alleged to be in default may, except in cases of admiralty, on or before the return day of the notice of application, demand a jury trial of such issue, and upon such demand the court shall make an order referring the issue or issues to a jury in the manner provided by law for referring to juries issues in an action at law. If the jury find that no agreement in writing for arbitration was made or that there is a default in proceeding thereunder, the proceeding shall be dismissed. If the jury find that an agreement for arbitration was made in writing and that there is a default in proceeding thereunder, the court shall make an order summarily directing the parties to proceed with the arbitration in accordance with the terms thereof.

Sec. 5. That if in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be

## ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES.     3

followed; but if no method be provided therein, or if a method be provided and any party thereto shall fail to avail himself of such method, or if for any other reason there shall be a lapse in the naming of an arbitrator or arbitrators or umpire, or in filling a vacancy, then upon the application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators or umpire, as the case may require, who shall act under the said agreement with the same force and effect as if he or they had been specifically named therein; and unless otherwise provided in the agreement the arbitration shall be by a single arbitrator.

Sec. 6. That any application to the court hereunder shall be made and heard in the manner provided by law for the making and hearing of motions except as otherwise herein expressly provided.

Sec. 7. That the arbitrators selected either as prescribed in this act or otherwise, or a majority of them, may summon in writing any person to attend before them or any of them as a witness and in a proper case to bring with him or them any book, record, document, or paper which may be deemed material as evidence in the case. The fees for such attendance shall be the same as the fees of witnesses before masters of the United States courts. Said summons shall issue in the name of the arbitrator or arbitrators, or a majority of them, and shall be signed by the arbitrators, or a majority of them, and shall be directed to the said person and shall be served in the same manner as subpoenas to appear and testify before the court; if any person or persons so summoned to testify shall refuse or neglect to obey said summons, upon petition the United States court in and for the district in which such arbitrators, or a majority of them, are sitting may compel the attendance of such person or persons before said arbitrator or arbitrators, or punish said person or persons for contempt in the same manner now provided for securing the attendance of witnesses or their punishment for neglect or refusal to attend in the courts of the United States.

Sec. 8. That if the basis of jurisdiction be diversity of citizenship between citizens of several States or one of the parties be a foreign State, citizen, or subject, the district court or courts which would have jurisdiction, if the matter in controversy exceeded, exclusive of interest and costs, the sum or value of $3,000, shall have jurisdiction to proceed hereunder notwithstanding the amount in controversy is unascertained or is to be determined by arbitration.

Sec. 9. That if the basis of jurisdiction be a cause of action otherwise justiciable in the admiralty, then, notwithstanding anything herein to the contrary, the party claiming to be aggrieved may begin his proceeding hereunder by libel and seizure of the vessel or other property of the other party according to the usual course of admiralty proceedings, and the court shall then have jurisdiction to direct the parties to proceed with the arbitration and shall retain jurisdiction to enter its decree upon the award.

Sec. 10. That the award must be in writing and acknowledged or proved in like manner as a deed for the conveyance of real estate in the State or district where the award is made and delivered to the parties or their attorneys. If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in the next two sections. If no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made. Notice of the application shall be served upon the adverse party, and thereupon the court shall have jurisdiction of such party as though he had appeared generally in the proceeding. If the adverse party shall be a resident of the district within which the award was made, such service shall be made upon the adverse party or his attorney as prescribed by law for the service of notice of motion in an action in the same court. If the adverse party shall be a nonresident, then the notice of the application shall be served by the marshal of any district within which the adverse party may be found in like manner as other process

Sec. 11. That in either of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—

## 4 — ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES.

(a) Where the award was procured by corruption, fraud, or undue means, or either of them.

(b) Where there was evident partiality or corruption in the arbitrators, or either of them.

(c) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

(d) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

(e) Where an award is vacated and the time within which the agreement required the award to be made has not expired the court may, in its discretion, direct a rehearing by the arbitrators.

SEC. 12. That in either of the following cases the United States court in and for the district wherein the award was made may make an order modifying or correcting the award upon the application of any party to the arbitration—

(a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.

(b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matters submitted.

(c) Where the award is imperfect in matter of form not affecting the merits of the controversy.

The order may modify and correct the award, so as to effect the intent thereof and promote justice between the parties.

SEC. 13. That notice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is filed or delivered. If the adverse party is a resident of the district within which the award was made, such service shall be made upon the adverse party or his attorney as prescribed by law for service of notice of motion in an action in the same court. If the adverse party shall be a non-resident, then the notice of the application shall be served by the marshal of any district within which the adverse party may be found in like manner as other process of the court. For the purposes of the motion any judge who might make an order to stay the proceedings in an action brought in the same court may make an order, to be served with the notice of motion, staying the proceedings of the adverse party to enforce the award.

SEC. 14. That upon the granting of an order confirming, modifying, or correcting an award, judgment may be entered in conformity therewith, no exceptions shall be taken, but an appeal may be taken from such order or judgment, as hereinafter set forth.

SEC. 15. That the party moving for an order confirming, modifying, or correcting an award shall, at the time such order is filed with the clerk for the entry of judgment thereon, also file the following papers with the clerk:

(a) The agreement; the award; and each notice, affidavit, or other paper used upon an application to confirm, modify, or correct the award, and a copy of each order of the court upon such an application.

(b) The judgment.

The judgment shall be docketed as if it was rendered in an action.

The judgment so entered shall have the same force and effect, in all respects, as, and be subject to all the provisions of law relating to, a judgment in an action; and it may be enforced as if it had been rendered in an action in the court in which it is entered.

SEC. 16. That an appeal may be taken from an order vacating an award or from an order confirming, modifying, or correcting an award as from an order or judgment in an action.

SEC. 17. That this Act may be referred to as "The United States Arbitration Act."

SEC. 18. That all Acts and parts of Acts inconsistent with this Act are hereby repealed, and this Act shall take effect on and after the 1st day of January next after its enactment, but shall not apply to contracts made prior to the taking effect of this Act.

## ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES. — 5

H. R. 646 is in the identical language as S. 1005.)

The CHAIRMAN. This is practically the same bill that was before the Congress at the last session, being known as S. 4214 and H. R. 18522. With some slight changes this bill, S. 1005, is the same.

Senator Kendrick of Wyoming is here, and according to the usual custom we will accord to him first place in addressing the committee.

### STATEMENT BY HON. JOHN B. KENDRICK, A SENATOR FROM THE STATE OF WYOMING.

Senator KENDRICK. Mr. Chairman and members of the committee, it is not my purpose to detain you more than just a moment. I do say that I have not had an opportunity or occasion to study this bill closely myself, but my people in the West have been wiring and writing me indorsing the proposed legislation, and even a superficial study of it would indicate that there has been for some years not only a demand, but I might say a necessity, for some such legislation. I want only at this time, through the convictions drawn from less than a careful study on my own account but from the attitude of business men of my section of the West, to give my indorsement to the proposed legislation.

The CHAIRMAN. Your people in Wyoming are in favor of this bill, are they?

Senator KENDRICK. They are wiring and writing and asking me to indorse the proposed legislation, and even to appear before your subcommittee here and indicate to you their approval of the bill. From what I have heard about it, and from what little study I have given it, I am inclined to think there will be naturally very little opposition to the proposed legislation. I am sure that some such measure would go a long way toward harmonizing differences in connection with transactions not only as regards interstate commerce, but between citizens of this country and foreign countries. I hope your committee will act favorably upon the bill, and I thank you.

The CHAIRMAN. The committee is very glad to have heard from Senator Kendrick.

Mr. Bernheimer, do you care to make a statement at this time?

Mr. BERNHEIMER. I thank you if you will permit me to do so.

The CHAIRMAN. The committee will be glad to hear from Mr. Bernheimer.

### STATEMENT OF MR. CHARLES L. BERNHEIMER, CHAIRMAN COMMITTEE ON ARBITRATION, CHAMBER OF COMMERCE OF THE STATE OF NEW YORK, NEW YORK CITY.

Mr. BERNHEIMER. Mr. Chairman and gentlemen of the committee, it is from the business point of view that I will approach the subject of the reintroduced and slightly modified bill which is now before your committee.

Representative HICKEY. Whom do you represent?

Mr. BERNHEIMER. I represent the New York State Chamber of Commerce. I represent the Importers and Exporters' Association and the Merchants' Association of New York; and I have been, without definite appointment but so understood, representing the 73

## 6    ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES.

business men's organizations that have added their names to formal indorsement of this bill.

The CHAIRMAN. You may state your connection with the Chamber of Commerce of the State of New York and how long you have been a member.

Mr. BERNHEIMER. I have been a member of the Chamber of Commerce of the State of New York for a little more than 20 years. I have been chairman of their committee on arbitration since the year 1911, being reelected each year by formal vote. In other words, the Chamber of Commerce had an opportunity each year to get rid of me. I have been elected in a formal way because this is not an appointive office at all.

The CHAIRMAN. You may proceed with your statement.

Mr. BERNHEIMER. I have made a study of the question of arbitration ever since the panic of 1907. The difficulties merchants then met with, that of having repudiations and other business troubles, resulting in much loss and expense outside of the costly and ruinous litigation, caused me to start out on a study of the subject of arbitration, and the deeper I got into it the more I was convinced we should have legislation in State and Nation that would make arbitration a reality, that would cause an agreement or contract in writing providing for arbitration to be binding upon the parties and an irrevocable proposition.

The printed record of your hearings held last year, I believe January 31, 1924, will cover some of the details that I imagine I may omit at this time.

The CHAIRMAN. I think so.

Mr. BERNHEIMER. The most unprofitable thing that the merchant and business man, or anyone engaged in buying and selling, can have confront him is that of litigation. It is unprofitable to him and it is unprofitable to the State and it is unprofitable to the law office,

Representative FOSTER. Then do you think the bar associations indorse it?

Mr. BERNHEIMER. I think so. But I hope you will pardon me if I have answered too quickly and made my mistake about it.

The cheapest commodity that exists to-day is the fee that the lawyer charges the merchant, because in the numerous discussions with lawyers or heard by me while in the presence of lawyers, convinces me that the average legal case, involving, say $3,000, or $4,000, does not allow the law office to recoup itself the overcharges for handling the case.

But that litigation is unprofitable to the State goes without saying. I take it, because the State has to maintain courthouses. State and counties have to maintain court machinery in the form of judges, attendants, light, heat and power—and even ventilation in some courthouses, which is rather poor. I am familiar with that fact from experience.

The first expense to the State and the counties in the final analysis, comes out of taxes. Taxes are paid by the consumer, big and little. Let me exemplify it: In the seller's market the seller has the advantage, and he is able to prorate his taxes into his products. He has control. In the buyer's market the reverse holds good.

## ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES.    7

The litigant's expenses—that is, whatever is necessary to cover the annual outlay for litigation or the fear of litigation, consultations with lawyers, the possibility of cancellations, and so forth, eventually creeps into the selling price as well. It is a part of the overhead of a business, and finds its reflection in the price of the articles sold, and consequently the prices of commodities involved are correspondingly increased.

The lawyer's work, as I stated before, is an economic wastage in the everyday commercial transactions. It does not benefit the buyer and does not benefit the client.

There are four known methods based on long experience I have had by which to meet trade disputes, the ordinary everyday trade disputes, and it is for them that this legislation is proposed.

1. For the parties to settle between themselves, which is the usual method, an excellent method.

2. For the parties to settle by negotiation, with the assistance of a third party, a mutual friend in whom they have confidence. That is the next to the best way of doing it.

3. For the parties to enter into formal arbitration, which is the basis on which this bill is framed, namely, arbitration which has legal sanction, whereby arbitration once agreed upon must be seen through, so that the parties can not, as they can in the most of our States and certainly in connection with interstate business, back out at the last moment when they see the case is going against them. That should not be permitted. It is unmoral, unfair, and unsound. It

4. The last method is that of litigation, which is, of course, the worst method of them all.

Speaking for those engaged in buying and selling merchandise, what is usually called trading, whether that be the case of the farmer who buys his supplies, plows, and sells his produce, or the man who sells over the counter, or what not, it is all the same. It applies to all of them.

The CHAIRMAN. What you have in mind is that this proposed legislation relates to contracts arising in interstate commerce.

Mr. BERNHEIMER. Yes; entirely. The farmer who will sell his carload of potatoes, from Wyoming, to a dealer in the State of New Jersey, for instance.

Speaking for those who have had experience and who are engaged in business, I may say this, that arbitration saves time, saves trouble, saves money. There is no question about that. We know it. It preserves business friendships. The usual court atmosphere does not get into the arbitration hearings. For instance, at our New York State hearings we do not permit any abuse by one side or the other. Friendliness is preserved in business. It raises business standards. It maintains business honor, prevents unnecessary litigation, and eliminates the law's delay by relieving our courts.

I would dwell upon the difficulties, particularly in our State, and probably they are duplicated in other States somewhat; at any rate, I make these statements based on many years of experience, and I would not make them were I not 100 per cent convinced that all these matters are helped by arbitration, yes, to a very marked extent.

The statement I make is backed up by 73 commercial organizations in this country who have, by formal vote, approved of the

as to whether arbitration and increased since we had an enforceable arbitration law in our state or had decreased, and of course as a layman I had difficulty to answer that great lawyer's questions. Now I am in a position to answer though I did not look for it, because of an interview that was granted the Manchester Guardian, one of the best English papers, by Mr. Raymond B. Street, the secretary of the Manchester Chamber of Commerce, in which he said:

The number of arbitration clauses in our contracts is not at all in keeping with the few cases that come up for actual arbitration. The actual arbitration is done away with by the mere existence of these arbitration clauses.

This is at your disposal if you wish it.

Representative DYER. The point you wish to make is what?

Mr. BERNHEIMER. The point I wish to make is that the mere presence of an arbitration clause not only reduces controversies and litigation, but actually reduces the amount of arbitration that might otherwise take place. If I were not taking other people's time I could tell you a very pretty story of a case where an arbitration agreement was lying on the table, and two parties were sitting by, both they had agreed to sign it; and the stenographer had just brought it in, but a few words spoken by our chairman settled the matter after arbitration had been agreed upon.

I have a letter I would be glad to introduce from the president of one of the largest wholesale dry goods stores in Richmond. He wrote:

I am personally very glad that you are making this movement, because in two instances quite recently where we had an arbitration clause in contracts, we did not have to resort to it.

I have here, but maybe it is too indirect, and yet it should be worth referring to, a reference to the fact that the United States Government, through its food administration, was encouraging during the war, during the great agricultural demands, arbitration in connection with the sale of food products. I have here in my file the instructions given by Rowland W. Boyden, food administrator, to the men engaged with him in the food line, which shows that there is nothing in our Government antagonistic to arbitration.

As a rule governments do not arbitrate, but in 1920 the French Government submitted to arbitration a matter between it and a party in New York City, which was arbitrated by our chamber of commerce. As the result of that the French Government permitted its commissioners to arbitrate 17 cases between itself and the British own merchants, and 2 cases between the French Government and their own merchants. This was a reversal of policy so far as the French Government was concerned.

And we had a case between the Greek Government and a corporation in the United States. And the Italian Government has not hesitated to settle matters by arbitration.

I am afraid I have taken too much time, and there are plenty of us here who would like to be heard.

The CHAIRMAN. Any questions the members of the committee wish to ask Mr. Bernheimer? If not, who will be your next witness, Mr. Bernheimer?

Mr. BERNHEIMER. I would like to have Mr. Piatt heard.

The CHAIRMAN. The committee will be glad to hear Mr. Piatt.

---

bill before you gentlemen. And to this testimony I can add—although it may be a little indirect—that I have in my files a list of the various countries of the world which maintain committees for the handling of arbitration. There are 33 different countries that have committees for that purpose. It has been published by the International Chamber of Commerce, which is located in Paris. I leave that at your disposal.

The CHAIRMAN. How are these committees constituted?

Mr. BERNHEIMER. They are merely clearing houses to whom trouble can be sent for the purpose of seeing whether they can handle disputed matters by means of arbitration—which they do, if legal sanctions are available, otherwise by conciliation or settlement by negotiation.

The CHAIRMAN. The committees are voluntary committees?

Mr. BERNHEIMER. They are appointed by commercial bodies, chambers of commerce, and so forth. I have that list if you gentlemen desire it. It covers 33 different countries, and I think there are only 48 countries in all this world, the same as our States; so that it is a very substantial indication of the general demand for arbitration.

I might say here, fearing I may forget it later on, that during the time we have had formal arbitration in New York under the law, similar to the bill before this joint committee, I've have not had a happy with the results of the arbitrations. We handled in 1921 about 160 cases between British merchants and New York merchants, the result of the slump of 1920, when every one tried his best to get out from under by putting his load on the other fellow's shoulders if he could.

The CHAIRMAN. In those cases were there agreements between the parties to arbitrate in case there were any controversies?

Mr. BERNHEIMER. Possibly one third of them had arbitration clauses, but the difficulty of enforcing them is evident at once. We had no means of forcing the issue.

To show how will arbitration works even when not provided with the weapon necessary to bind the parties, there were formal votes of thanks to those who handled these cases in the New York Chamber of Commerce, from the Manchester, England, Chamber of Commerce and from the Bradford, England, Chamber of Commerce. In fact, I want to say that I have met either the secretaries or other men from those organizations since that time, who told me that a number of firms were prevented from going under by reason of the settlements obtained by this very weak weapon we had in our hands. The CHAIRMAN. The arbitration was conducted through committees appointed by the chamber of commerce?

Mr. BERNHEIMER. It is a committee selected by vote at each annual election of the chamber of commerce.

The CHAIRMAN. It is the chamber of commerce's regular standing committee on arbitration?

Mr. BERNHEIMER. Yes; it is one of the 10 standing committees of our chamber of commerce.

Last year, and I may refer to this at this time before I forget it, the question was raised by Senator Walsh of Montana, and I take opportunity to speak of that again as he addressed me at the time.

STATEMENT OF MR. W. H. H. PIATT, CHAIRMAN OF THE COMMITTEE ON COMMERCE, TRADE, AND COMMERCIAL LAW, AMERICAN BAR ASSOCIATION, KANSAS CITY, MO.

Mr. PIATT. Mr. Chairman and gentlemen of the committee, I am here in behalf of the American Bar Association, being chairman of the committee on commerce, trade, and commercial law of that body, before whom the subject matter of this bill has been a matter of study for something like five years, having originated in that organization at the 1918 meeting in Cleveland, where a subcommittee was appointed with direct instructions or mandate from the organization to study the subject.

Either that year or the year following an arbitration act was placed on the statutes of the State of New York, and following that a committee on commerce, trade, and commercial law, of which Francis B. James at that time was chairman, was appointed, and the first tentative draft of the measure was introduced in our committee, and later a uniform statute was recommended for consideration and adoption in the several States. In the meantime this committee was also directed to prepare a United States statute, and that was done, and Mr. Cohen, who is a member of my committee and a colaborer of mine, has had charge of the actual drafting of the work, in view of the fact that it is a New York statute. And since New York has enacted it a New Jersey act has been enacted. And a bill similar to this bill is before the Committee on the Judiciary of both the Senate and House last year, and certain hearings were held thereon. In view of questions by Senator Sterling, Senator Walsh of Montana, and other members, changes have been made, and the bill has been redrafted after being submitted to the American Bar Association meeting at Kansas City, and with the further suggestion that it be submitted to the Congress at this session.

The American Bar Association is very hopeful that the Senate and the House will see fit to enact a statute, as they believe this bill furnishes a constructive line for settling and disposing of disputes. We feel that the legislation already enacted has had the effect, not of increasing litigation, not of adding any burden to the courts, but rather of relieving the burden and of reducing controversies; that instead of creating controversies between those who might become litigants, it has created a spirit of conciliation and settlement. Men have found that if they must arbitrate at once they proceed to carry out their contracts. That we regard as morally a highly desirable thing; in fact, some of the advocates of the measure before the Bar Association have adverted to some of our modern ideas on rescission of contracts along the line that it is just as sacred to break a contract as to make it, that while that might stand a certain kind of moral philosophy, yet it will not stand for good morals generally. For that reason we favor the bill, and we hope you gentlemen will agree with us.

On behalf of the American Bar Association I want to thank you, Senator Sterling, for setting the hearing of this committee at a time when I personally could be here on other business and appear before you. The American Bar Association has no funds provided to send out members to hearings, either before the Congress or State legis-

latures. Our funds are limited, as you gentlemen know, to the slight dues we pay, $6 a year, and we represent in membership about one-sixth of the profession; and that money is taken up with furnishing the bar reports, and so forth, and we have no funds to come before congressional committees or committees of State legislatures with our committees to bring before those bodies matters we work out and send to you and ask to have considered. I very much appreciate your consideration.

I think Mr. Cohen and Mr. James, both co-laborers of mine and who have given this subject special study, should be heard, so I will refrain from taking up any more of your time in discussion.

Representative DYER. Mr. Piatt, you have gone over the bill?

Mr. PIATT. Yes; we had this bill before last year. It was not a joint hearing, but a hearing was had before the Senate subcommittee. Because of the crowded conditions, we could not have a joint hearing at that time, but we were heard before the Senate subcommittee. And we made such changes in the bill as Senator Sterling and Senator Walsh at that time suggested.

Representative DYER. Has the bar association discussed this matter to any extent with the Chief Justice.

Mr. PIATT. Not, to my knowledge, specifically, no. I would not say that we have, or have not.

Representative FOSTER. Who opposed it, if anybody?

Mr. PIATT. I may say I am also a member of what is known as the Commercial Law League of America. A large number of its members give attention to the collection of small items. A proposition of this kind has been before that association for some years, and those gentlemen, some three or four years ago, took quite a decided exception to the principle—not to this bill, but to the principle—for the reason that it might affect their collection business; but very glad to say that when I attended a convention of the association in league last summer, they unanimously approved of this measure. So were opposed to it, they finally, last summer, approved this arbitration measure, and approved the bill unanimously at their meeting.

The CHAIRMAN. We thank you, Mr. Piatt.

Who is your next witness, Mr. Bernheimer?

Mr. BERNHEIMER. The manner in which our friend from Kansas City speaks proves that the lawyers' services are the cheapest commodity that we can deal with.

Mr. Chairman, I know that the attorneys have something to say, but Mr. Silver has an appointment at half-past 8, and he asked me if he could make this statement earlier. Will you permit him to make a statement now?

The CHAIRMAN. Certainly.

STATEMENT OF GRAY SILVER, OF THE AMERICAN FARM BUREAU FEDERATION, WASHINGTON, D. C.

Mr. SILVER. Mr. Chairman, my name is Gray Silver, and I represent the American Farm Bureau Federation.

Speaking not of the language of the bill before you, Mr. Chairman, but of the objectives of the bill, we are very much in favor

12    TRATION OF INTERSTATE COMMERCIAL DISPUTES.

of the objectives of an arbitration in commercial matters, believing it will be helpful in speeding business generally.

I believe that is all I have to say, unless there are some questions.

Mr. Bernheimer. May I once more intrude, Mr. Chairman?

The Chairman. Yes.

Mr. Bernheimer. Mr. French also desires to get away early, and if he may, Mr. French will make his statement to the committee now.

The Chairman. We will be glad to hear from him.

STATEMENT OF MR. R. S. FRENCH, REPRESENTING THE NATIONAL LEAGUE OF MARINE MERCHANTS OF THE UNITED STATES, THE WESTERN FRUIT JOBBERS' ASSOCIATION OF AMERICA, AND THE INTERNATIONAL APPLE SHIPPERS' ASSOCIATION OF AMERICA, WASHINGTON, D. C.

Mr. French. Mr. Chairman, my name is R. S. French, representing the National League of Marine Merchants of the United States, the Western Fruit Jobbers' Association of America, and the International Apple Shippers' Association of America.

The Chairman. Your address, Mr. French?

Mr. French. Washington, D. C. Gentlemen of the committee, I find that the principles of this arbitration bill are substantially in accord with those principles which were adopted and made a part of the constitutions and by-laws of these respective organizations at their inception 25 or 30 years ago; and naturally those organizations are in sympathy with and lend their approval to this measure which is before this committee to-day.

It has had consideration in a prior Congress, and these principles have been discussed by the committees of Congress. The bill then before the Congress was unanimously approved by the organizations. We have had an opportunity to check this bill with the amendments, and we find that it qualified the language and clarified the language without affecting the principles, and we are here again to-day in support of this measure.

I might say to you, gentlemen, that the interests I represent here are very much concerned in this matter, because the interests I represent are large exporters and importers of perishable goods. The matter we are interested in in our own organizations, is that disputes may arise in domestic as well as in foreign commerce. We handle at home and from abroad over 600,000 carloads of freight annually, and naturally the opportunity for dispute arises frequently; and I want to say that the opportunity to use this measure has been exemplified and sustained since we have been discussing this matter, more than at any time since its inception.

The Chairman. Are there any questions? (After a pause.) If not, Mr. Bernheimer, who is your next witness?

Mr. Bernheimer. Mr. Woodbury, of the National Canners' Association and of the Canners' League of California. Mr. Woodbury also told me he had to leave early.

The Chairman. We will hear him.

ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES.    18

Mr. Woodbury. The Canners' League of California is a trade organization, comprising most of the fruit and vegetable canners of that State, and has requested us to bring to your attention the interests of this organization in the passage of Senate bill 1005. The Canners' League has gone on record in favor of this measure as recorded in the hearing on January 31, 1923, before a subcommittee of the Committee on the Judiciary of the United States Senate on S. 4214.

The Canners' League has affirmed its indorsement of the measure, now pending as approved by the American Bar Association, and urges its enactment.

The Chairman. Are there any questions? If not, who is your next witness, Mr. Bernheimer?

Mr. Bernheimer. Mr. Cohen.

The Chairman. We will hear Mr. Cohen.

STATEMENT OF MR. JULIUS HENRY COHEN, NEW YORK CITY.

Mr. Cohen. Mr. Chairman, my name is Julius Henry Cohen; I am a member of the committee on commerce, trade, and commercial law of the American Bar Association and general counsel for the New York State Chamber of Commerce. I reside in New York and have my office there. I am a lawyer.

Mr. Chairman, the question was asked: Who opposes this bill? There is no open opposition anywhere. But there is prejudice, and there is a query, and there is lack of information concerning the purposes and concerning the method of the legislation. My purpose is to aid you gentlemen in meeting that prejudice and in answering those queries as they come to you.

First of all, let me say that those of us who have been in the American Bar Association many years—and Mr. Piatt did not disclose that he was the chairman of the conference of delegates, which met to the office of president of the American Bar Association, I deem the highest office in the association, as that conference represents every bar association in the country. And I have the honor to be the vice chairman of that conference. And it is a matter of great satisfaction that we find the bar associations of the country aligned with the processes of business, so as to make the disposition of business in the commercial world less expensive and more expeditious.

My good friend Mr. Bernheimer thinks we are not making any sacrifice of professional emolument when we are advocating this bill, and those of us who have had some experience in that regard in the busy centers think otherwise, because we know that the business of arbitration does not take away any of our business. In fact, we can handle an ordinary arbitration case in our offices and make more money out of it than we can if the case goes into litigation. But that would put this matter on a narrow plane. The other plane is the one that has been expressed by the Chief Justice and others, and that it is the business of the bar so to improve the processes of justice as to make it an instrument of justice indeed.

79480—24——2

14   ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES.

Now, I think everybody to-day feels very strongly that the right of freedom of contract, which the Constitution guarantees to men, includes the right to dispose of any controversy which may arise out of the contract in their own fashion. Certainly no one would say that if anyone of the distinguished gentlemen who sit around this table had a controversy with me over a million dollars, or $500, that we could not sit down together and compromise that controversy freely, either by each giving something to the other or giving nothing. That right of the settlement of controversy is always recognized. Then what objection can there be, since we can not, perhaps, agree ourselves, to letting me pay you whatever Mr. Piatt says I owe you? You have confidence in him, and what is the use of taking the matter into court? I will leave it to him. Or we will leave it to Senator Sterling; we have confidence in his ability to understand complex commercial situations and in his sense of right and justice. In other words, we agree to settle on the terms that these gentlemen say is proper. And we sign a letter to that effect.

Now, nothing happens to you, except we go through the process of an agreement and an award is made; and we conform to it, being honorable men. This statute does not disturb us in the slightest degree. The difficulty is that men do enter into such agreements and then afterwards repudiate the agreement, and the difficulty has been that for over 300 years, for reasons which it would take me too long to undertake to explain at this time, the courts have said that that kind of an agreement was one that was revocable at any time. You go in and watch the expression on the face of your arbitrator, and you have a "hunch" that he is against you, and you withdraw and say, "I do not believe in arbitration any more."

Now, that is an unfortunate situation in the law. But you will find it is true, if you go into the history of it, and I have gone into that history in a book and I will not repeat the book here.

The CHAIRMAN. I would like to have you state the reason for that rule, as you understand it, that a contract for arbitration is not enforceable in equity.

Mr. COHEN. I will try to be very brief. There are several historical reasons for it. The decisions were misunderstood, I am sure. In a very early case, the Windgard case, I am sure the decision of Lord Coke was misunderstood; the language was misunderstood. You could make an arbitration agreement away back in the seventeenth century which was binding, but the remedies you had were limited remedies. Now, in those days you could make the penalty in your agreement, and the court held that if I broke my agreement your remedy was to sue for the penalty. Then came a statute eliminating the penalties, and they said the statutes was ineffective because it was a question of damages. But what damages could I show, because the question is what you owe me, and all I could recover was what expenses I had incurred in the arbitration, because you had encouraged me to go on with the arbitration.

And then came this ouster of jurisdiction. You could not oust the court of jurisdiction. We oust the courts of jurisdiction every day by settling, for example, a will contest. Just before I left New York my partner settled a will contest involving a large sum of money, thus ousting the court of jurisdiction and saving thousands

ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES.   15

of dollars. That was in the surrogate's court, and we ousted the court of jurisdiction, and the surrogate thoroughly approved of the action. At the present time our surrogates in New York are complimenting themselves by disposing of will cases by getting the parties to settle them, even though there may be intricate questions of law to be settled in such cases. We oust the courts of jurisdiction every day.

Of course, some of the justices have been unkind enough to their predecessors to say that there was a time when the judges were paid according to the cases they acted upon and the fees they got. I do not want to reflect on the judiciary in that way, although there is some historical basis for believing it.

But the fundamental reason for it, when you come to dig into the history of it—the real fundamental cause was that at the time this rule was made people were not able to take care of themselves in making contracts, and the stronger men would take advantage of the weaker, and the courts had to come in and protect them. And the courts said, "if you let the people sign away their rights, the powerful people will come in and take away the rights of the weaker ones." And that still is true to a certain extent. A judge told me recently—one who is in sympathy with this measure and who approves it, but in the privacy of his own chambers he told me recently—"Cohen, you understand what the difficulty in this matter is; when England is in possession of shipping, you can understand why our people do not want to go over there and arbitrate their differences over there. Now, I think I have answered your question, Mr. Chairman, as fully as it is possible in as brief a time as possible, and if I may be permitted, I will go on.

The CHAIRMAN. I just want to say this, in answer to what you have just said: There are certain contracts to-day between the railroads and the shippers in which there is an agreement to arbitrate, and the representation is made to the shipper, "You can not sue, or leave it, just as you please; but unless you sign you can not ship."

Mr. COHEN. There is nothing to that contention, Mr. Chairman, for this reason: In the first place, we have the bills of lading act, and the bills of lading act contains the terms of the bill of lading. And that is a protection to the shipper.

And then we have the regulation of the Federal Government, through its regularly constituted bodies, and they protect everybody. Railroad contracts and express contracts and insurance contracts are provided for. You can not get a provision into an insurance contract to-day unless it is approved by the insurance department. In other words, people are protected to-day as never before. I would not take up your time in discussing this if there was any doubt whatever in the minds of lawyers that it would go through; but this has been taken up in the bar association and in various committees, and while Mr. Piatt gave me the credit for drafting it, and while it is true I made the first draft, there were many others who went over it. You went over it. We have had suggestions from the Secretary of Commerce, and you have found us reasonable, I think, in accepting such amendments as would not break down the backbone of the bill. So it can be said that this bill represents the full draftsmanship, and I can say that without immodesty, because it is not my work.

What does this bill do? It destroys the anachronism in the law. The very first sentence says if a man signs a contract for arbitration, it shall be irrevocable. It changes the law. Why do we do that in the Federal courts? We have it in New York State; the chamber of commerce and the other commercial bodies got together and got it through in New York. You have got it in New Jersey. The New Jersey Bar Association and the business men there got together and had it passed last year. Why do you have to have it in the Federal law? There are several reasons.

First of all, it was held that a State statute was not binding in admiralty, even in the Federal courts. Judge Mack was most sympathetic, but he has had to follow the Federal law in admiralty. So in the case of the American Red Cross against the Fruit Co. he held—we filed a brief as amicus curiae—and he held that this statute did not help out when it came into the Federal court. And the Federal court will not be bound by any State statute. This is in three segments: The first is to get a State statute, and then to get a Federal law to cover interstate and foreign commerce and admiralty, and, third, to get a treaty with foreign countries. On that last score we have been encouraged tremendously, as the report of the committee will show, by what happened in the economic section of the League of Nations council. The most learned jurists and lawyers of France and England are at work on this matter, and it is believed that when we have this treaty we can make contracts between a merchant of this country and one in this country enforceable. Because, even though the statute says it is enforceable, as in the case of the Hongkong merchant, that it is enforceable, you can not go to China and enforce it; you can only enforce it against property you find in this country. But when we get the treaties between these countries, it will be like judgments; they will recognize our judgments and we will recognize theirs. And we will get it through.

But the great field of business—why are these merchants and these fruit shippers and those who are represented here, why are they for this? Because of interstate business. And you know that commerce is mostly interstate now. So that this is a great tonic that is needed to strengthen this patient in the field of commercial activity, because when business men know that they do not have to get a lawyer in California to enforce a case that does not involve more than four or five hundred dollars they will do more business. That is why the business men are behind this thing.

Now, in the next place, this statute involves very simple machinery by which you get two things. You get simple machinery by which you make it effective. Now, the machinery of the New York law was not machinery to make arbitration effective. It was a valid agreement in certain divisions of the law, but never followed, because the equity courts refused to specifically enforce an arbitration agreement. There are some decisions—I think by Lord Elden—that you could not enforce it; but so far as equity is concerned our courts have refused it. Now, what is it your business man wants? He goes to his lawyer and he says, "If there is any dispute about this, it has got to go to the arbitration committee of the Silk Association." Now, what does he do about it? If this be the law in the Federal statutes, as it is in the New York statute and in the New Jersey

---

statute, you make a petition and ask the court to direct the parties to proceed with this matter and the court will direct it.

Now, there is one constitutional provision which we considered, in the case of Mechum against Jamestown, holding that the arbitration law was not a remedy, wrote an opinion on the previous statute Judge Cardoza, who had written an opinion on the previous statute sustaining the constitutionality of the law. Now, how do we meet that? The one constitutional provision we have got is that you have a right of trial by jury. But you can waive that. And you can do that in advance. Ah, but the question whether you waive it or not depends on whether that is your signature to the paper, or whether you authorized that signature, or whether the paper is a valid paper or not, whether it was delivered properly. So there is a question there which you have not waived the right of trial by jury on. The CHAIRMAN. The issue there is whether there is an agreement to arbitrate or not.

Mr. COHEN. Exactly. Now, if you come in there you can demand a trial by jury, right away, summarily, and that is the issue that is passed upon. Now, there is no question about that under the New York law, because we have had administration of it, and the result is that inside of three or four days arbitration proceeds. It is rarely there is any question about it. It proceeds.

Now, what is the other difficulty? The provision here is that you name one arbitrator, and the other party names one, and those two name the third. Now, you do your job, and I do not do mine. What can we do about it? There can be no arbitration until the tribunal is provided. The legislation in New York provides, and this bill here provides, that if you do not name your arbitrator we go into the court and ask the court, and the court names the arbitrator. Or if one dies the court names another. There is the provision which gives protection to this thing. And if there has been fraud or real arbitrary action on the part of an arbitrator, the courts can set aside the award, or they can confirm it; and when it is confirmed it becomes a judgment. So what we have done, gentlemen, is that we have taken these defects which might have become a criticism and we have made it a part of our judicial machinery. That is what we have done. But it can not be done under our constitutional form of government and cover the great fields of commercial gentlemen do it, in the exercise of your power to confer jurisdiction on the Federal courts. The theory on which you do this is that you have the right to tell the Federal courts how to proceed. And you say to the judge, "You used to hold that these things were not good; now they are good. You used to say you did not have jurisdiction; now you have jurisdiction." That is all there is to it. The language is such as to make it clear. That polishing work has been done for two years. The bill has been approved twice by the American Bar Association; not a word of dissension anywhere. Just as you hold hearings here—Mr. Piatt did a great injustice to the Bar Association by saying that we are so impoverished that they did not even pay his fare here—but we held hearings in the committee on commerce, trade, and commercial law of the American Bar Association, and the lawyers were called in when those hearings were held, and the business men came in, and never once has there been

a word of criticism of the principles of this legislation, but constructive suggestions in the way of improvement of the legislation. I thank you, gentlemen.

Representative HICKEY. Without a written agreement, Mr. Cohen, where would an arbitration be held?

Mr. COHEN. It would be held in accordance with the direction of the court; by direction of the court to which you apply.

Representative HICKEY. And the application would be made to the court where the party asking for the arbitration resides?

Mr. COHEN. You would have to get jurisdiction just as you do now in a Federal court; by personal service.

Representative HICKEY. Where the defendant lives?

Mr. COHEN. Where the defendant lives. That would mean practically that you have to go to the jurisdiction where the defendant is; or wait until he comes into your jurisdiction so that process may be served upon him. The process is exactly the same as in civil procedure in the Federal courts.

Representative DYER. Mr. Cohen, has your committee estimated what would be the approximate saving? We admit, I think, all of us, that it would be a saving to the commercial and business interests to have such a law; but what would be the saving in court work?

Mr. COHEN. Who could estimate that in dollars and cents?

Representative DYER. You could not.

Mr. COHEN. No; you can not, but you can say this: that if you could get rid; in the New York calendars, both in the Federal courts and in the State courts, and in the congested centers through the country—if you could get rid of the litigation that these business concerns can prevent by their arbitration committees—you and I would be able to get along with our important litigation without waiting for a year or two for it to be reached. In other words, you would take out all these matters of business and leave the courts free to handle the business that ought to be handled with dispatch.

Representative DYER. Which is taking a considerable part of the time now.

Mr. COHEN. Undoubtedly it is taking a considerable part of the time now.

Representative KURTZ. How far are they behind?

Mr. COHEN. Something like three years in the civil courts; on the civil side. Are there any questions?

The CHAIRMAN. I think not, Mr. Cohen.

Mr. COHEN. I could go on interminably on this matter, Mr. Chairman.

The CHAIRMAN. We thank you for your statement.

Here is the provision relating to that.

Representative HICKEY. The fourth section?

The CHAIRMAN. This is on page 7, section 10, beginning with line 8 [reading]:

Then this [continuing reading]:

If no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made. Notice of the application shall be served upon the adverse party.

"If the adverse party is a resident of the district within which the award was made, such service shall be made upon the adverse party or his attorney

as prescribed by law for service of notice of motion in an action in the same court.

That makes it very clear.

Whom will you have next, Mr. Bernheimer?

Mr. BERNHEIMER. Commissioner James.

## STATEMENT OF MR. FRANCIS B. JAMES, WESTORY BUILDING, WASHINGTON, D. C.

Mr. JAMES. Mr. Chairman, I am a resident of Cincinnati, Ohio, with offices in Washington, D. C., and for a dozen or more years I have made a specialty of interstate commerce matters, and for about the same length of time I was a member of the committee on commerce, trade, and commercial law, of the American Bar Association.

This matter came before this committee by proper resolution of the American Bar Association in the summer of 1920. The committee held a public meeting in the rooms of the Merchants' Association in New York, at which they had present a tentative print of the first draft of this bill, and the bill was thoroughly discussed before the committee. The committee reported the bill, to the American Bar Association in the summer of 1921, with the recommendation that the matter go over for three years for further consideration. I ceased to be a member of that committee after 1921.

I may say that the bill received consideration by the committee from three points of view: First, from the point of view of the public interest; second, from an economic point of view; third, as a technical piece of Federal legislation.

It was the judgment of the committee that it was in the public interest; it was the judgment of the committee that from an economic point of view the measure was a sound one. With the exception of the amendments, which were suggested by two members of the Senate subcommittee, Mr. Sterling and Mr. Walsh, I believe the bill, from a technical point of view, is as perfect as a human being can make a piece of human legislation. Mr. Cohen, upon whom the burden fell of drafting the bill, devoted much time to it. He has explained the same in detail. There is nothing I can add to what he has said upon that subject.

The CHAIRMAN. At this point I think I will submit for the record some letters I have received.

The first to which I call attention is a letter addressed to the chairman of the Judiciary Committee of the Senate, Senator Brandegee, and it is from the Secretary of Commerce, Herbert Hoover, heartily indorsing the bill, and speaking of it as an emergency measure.

The second one is a letter addressed to myself, in which he calls attention to the New York Arbitration Act, on which this Federal legislation is based.

I will also submit a list of commercial organizations indorsing the United States Arbitration Act, the list being submitted by Mr. Charles L. Bernheimer.

## 20    ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES.

Also a telegram from the secretary of the National Wholesale Grocers Association of the United States, heartily indorsing the bill.

Also a telegram from J. W. Davis, chairman of the legislative committee of the American Fruit and Vegetable Shippers Association, indorsing the bill.

Representative Dyer. Where are they located, Mr. Chairman?

The Chairman. They are located at Chicago, Ill.

And a second telegram from the same association, the American Fruit and Vegetable Shippers' Association. The reason I offer both of them is that they are somewhat different in their terms.

And a letter, with a resolution accompanying it, from the general secretary of the executive committee of the Philadelphia Chamber of Commerce. The resolution is short and I will read it [reading]:

Resolved, That the executive committee of the Philadelphia Chamber of Commerce approves the amended draft of the Federal arbitration law, S. 1005, H. R. 646, and the draft of the commercial arbitration treaty adopted by the Chamber of Commerce of the State of New York, both of which have been unanimously approved by the American Bar Association.

Also a letter from Thomas B. Paton, general counsel of the American Bankers' Association.

And also a letter from the Converters' Association of New York, signed by the secretary of that association.

Representative Cleary. May I add to that list, Mr. Chairman?

The Chairman. Yes.

Representative Cleary. A letter from the New York Board of Trade and Transportation, and also one from the Brooklyn Chamber of Commerce, written to me.

The Chairman. Yes.

(The letters and telegrams referred to are as follows:)

Department of Commerce,
Office of the Secretary,
Washington, January 7, 1924.

Hon. Frank R. Brandegee,
Chairman Judiciary Committee, United States Senate, Washington, D. C.

My Dear Senator: On January 31, 1923, I addressed a letter to Senator Sterling, of which I inclose a copy. Senator Sterling headed a subcommittee of the Judiciary Committee, which held hearings in connection with the United States arbitration bill.

The chairman of the arbitration committee of the Chamber of Commerce of the State of New York, who is in Washington to-day, has handed me a list of the commercial organizations which have by formal vote expressed their support of the Federal arbitration bills which have been introduced by Senator Sterling as S. 1005, and Representative Mills as H. R. 646.

These bills were drafted and approved by the American Bar Association and introduced by the same Senator and Representative last year, but did not reach the floor. The present text contains some changes suggested by the Judiciary subcommittee, which was last year composed of Senators Sterling, Walsh, and Ernst.

The emergency to which I referred in my letter to Senator Sterling and which prompted so many important commercial bodies to ask for the prompt congressional relief of a very serious situation still exists, and I again express the earnest hope that this Congress may give an opportunity to pass the bill, and I trust that the Judiciary Committee will do what it can to speed it along.

I am also addressing a similar letter to Congressman Graham, chairman of the Judiciary Committee of the House.

Yours faithfully,
Herbert Hoover,
Secretary of Commerce.

## ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES.    21

[January 31, 1923.]

Hon. Thomas Sterling,
United States Senate, Washington, D. C.

My Dear Sir: I have been, as you know, very strongly impressed with the urgent need of a Federal commercial arbitration act. The American Bar Association has now joined hands with the business men of the country to the same effect and submitted, at its convention in San Francisco last August, a draft of a law prepared by its committee on commerce, trade and commercial law and approved of by a large number of associations of business men. It was introduced in the Senate by you as Senate bill 4214 and in the House of Representatives by Congressman Mills as House bill 13522.

The clogging of our courts is such that the delays amount to a virtual denial of justice. I append an excerpt of the American Bar Association, report, which would seem to support that statement. I believe the emergency exists for prompt action and I sincerely hope that this Congress may be able to relieve the serious situation.

If objection appears in the inclusion of workers' contracts in the law's scheme, it might be well amended by stating "but nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce."

If the bill proves to have some defect (and we know that most legislative measures do), it might well, by reason of the emergency, be passed and amended later in the light of further experience.

The New York State arbitration act, on which the Federal law is based, has been in force since April, 1920, and for it the court congestion there (28,000 civil cases in the two boroughs of Manhattan and the Bronx alone) would be still worse.

Yours faithfully,
Herbert Hoover,
Secretary of Commerce.

COMMERCIAL ORGANIZATIONS INDORSING UNITED STATES ARBITRATION ACT.

[List submitted by Mr. Charles L. Bernheimer.]

1. The Western Fruit Jobbers' Association of America, Chicago, Ill.
2. National Wholesale Grocers' Association, New York City.
3. Silk Association of America, New York City.
4. Merchants' Association of New York, New York City.
5. Musical Supply Association, New York City.
6. Raisin Institute, Wellesly Hills, Mass.
7. Sun Maid Raisin Growers (formerly California Associated Raisin Co.), Fresno, Calif.
8. Institute of American Poultry, Butter, and Egg Association, Chicago, Ill.
9. Chamber of Commerce Growers' Association, Kansas City, Mo.
10. California Peach and Fig Growers, Fresno, Calif.
11. Commer League of California, San Francisco, Calif.
12. Music Publishers' Protective Association, New York City.
13. Lake Charles Association of Commerce, Lake Charles, La.
14. American Fruit Exchange of Philippine Islands, Manila, P. I.
15. Atlantic Fruit Co., New York City.
16. Live Poultry and Dairy Shippers' Traffic Association, Chicago, Ill.
17. Silk Association of America, New York City.
18. Fruit Dispatch Co., New York City.
19. American Fruit Growers, Pittsburgh, Pa.
20. California Packing Corporation, San Francisco, Calif.
21. Chamber of Commerce of State of New York, New York City.
22. Los Angeles Chamber of Commerce, Los Angeles, Calif.
23. National Board of Trade and Transportation, New York City.
24. National League of Commission Merchants of United States, Washington, D. C.
25. Converters' Association, New York City.
26. Philadelphia Association of Credit Men, Philadelphia, Pa.
27. Philadelphia Chamber of Commerce, Philadelphia, Pa.
28. Rochester Association of Credit Men, Rochester, N. Y.
29. Broadway Board of Trade, Brooklyn, N. Y.
30. National Association of Credit Men, New York, N. Y.

## ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES. 28

CHICAGO, ILL., *January 7, 1924.*

Senator STERLING, *Washington, D. C.:*

Our association was very ... represented at hearing Wednesday, January 9, in connection with ... Senate bill 1005, House bill 646, United States arbitration act, but owing to our convention now in session impossible. We represent shippers from all sections of United States and are strongly in favor of this bill. Hope committee will give it favorable consideration.

AMERICAN FRUIT AND VEGETABLE SHIPPERS ASSOCIATION.

PHILADELPHIA CHAMBER OF COMMERCE,
*January 8, 1924.*

Hon. THOMAS STERLING,
*United States Senate, Washington, D. C.:*

MY DEAR SENATOR STERLING: The executive committee of the Philadelphia Chamber of Commerce begs that you will present the following resolution in connection with the United States arbitration act to your Committee on the Judiciary:

"*Resolved,* That the executive committee of the Philadelphia Chamber of Commerce approves the amended draft of the Federal arbitration bill (S. 1005, H. R. 646, and this draft of the commercial arbitration treaty adopted by the Chamber of Commerce of the State of New York, both of which have been unanimously approved by the American Bar Association."

Yours very truly,

... KELLY,
*General Secretary.*

THE AMERICAN BANKERS ASSOCIATION,
*New York, N. Y., January 7, 1924.*

Hon. THOMAS STERLING,
*Chairman Subcommittee Senate Committee on Judiciary, Washington, D. C.:*

DEAR SIR: S. 1005, H. R. 646, Federal arbitration act. Referring to the above bills, we are advised that S. 1005 will be given a hearing on January 9 by a subcommittee of which you are chairman in which hearing a committee from the House Judiciary Committee will probably join.

The American Bankers Association with membership of over 22,000 banks—national, State, trust companies, and savings banks—after careful consideration of similar bills which were pending in the 67th Congress (H. R. 13522, S. 4213) went on record as being thoroughly in accord with the efforts made to enact Federal legislation providing for settlement of commercial disputes and indorsing in principle the bills then pending in the 67th Congress.

The above action was the result of a careful study of these bills by the commerce and marine commission of our association whose resolution indorsing the principle was approved by the association.

It is impracticable for me to send a delegate to personally represent the Association at the hearing, therefore by this letter, we desire to present the attitude of our association in support of these measures.

Very truly yours,

THOMAS B. PATON,
*General Counsel.*

COMPTROLLERS' ASSOCIATION,
*New York, January 7, 1924.*

Senator THOMAS STERLING,
*United States Senate, Washington, D. C.*

DEAR SIR: We are to-day in receipt of advice that sub-committee meeting will take place on the 9th instant for the purpose of conducting a hearing on bill S. 1005 referring to Federal arbitration.

It is a matter of great regret to us that the chairman of our association's committee on arbitration, Mr. ..., can not on account of ... forthcoming engagements be present in town and will not return until ... With this subject matter, is not our hope that he would be able to appear before such Sub-Committee for the purpose of voicing our decided views in support of this proposed legislation.

Our association has had very large experience under the New York arbitration act and with arbitration generally and we most strongly feel that the ...

## ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES. 22

31. Crockery Board of Trade of New York, New York, N. Y.
32. Arbitration Society of America, New York, N. Y.
33. International Apple Shippers Association, Rochester, N. Y.
34. American Manufacturers Export, New York, N. Y.
35. Central Mercantile Association, New York, N. Y.
36. Building Trades Employers' Association of the City of N. Y., New York, N. Y.
37. Federated Fruit and Vegetable Growers, (Inc.) (Cooperative non-profit—National Sales Service) New York, N. Y.
48. San Antonio Chamber of Commerce, San Antonio, Tex.
39. Music Industries Chamber of Commerce, New York, N. Y.
40. American Exporters' and Importers' Association, New York, N. Y.
41. The Merchants Association of New York, New York, N. Y.
42. Tri-Boro Chamber of Commerce, Braddock, Pa.
43. The Baton Rouge Chamber of Commerce, Baton Rouge, La.
44. Merchants and Manufacturers Association of Baltimore, Baltimore, Md.
45. New York Coffee and Sugar Exchange (Inc.), New York, N. Y.
46. New York State Forestry Association (Inc.), Albany, N. Y.
47. American Fruit and Vegetable Shippers' Association, Chicago, Ill.
48. San Antonio Chamber of Commerce, San Antonio, Tex.
49. New Orleans Association ..., New Orleans, La.
50. Commercial Law League of America, Chicago, Ill.
51. New Jersey State Chamber of Commerce, Newark, N. J.
52. The Albany Chamber of Commerce, Albany, Ga.
53. The ... Chamber of Commerce, Brownsville, Tenn.
54. Portsmouth Chamber of Commerce, Portsmouth, N. H.
55. Chamber of Commerce and Business Men's Club, San Antonio, Tex.
56. The Atlanta Chamber of Commerce, Atlanta, Ga.
57. The Chamber of Commerce, Hazelton, Pa.
58. The Junction City Chamber of Commerce, Junction City, N. J.
59. Association of Commerce (for Jackson and Madison County), Jackson, Tenn.

Ind.
60. Chamber of Commerce of Michigan City (L. M.), Michigan City (L. M.).

61. The Rotary Club of Newark, N. J., Newark, N. J.
62. Massachusetts State Chamber of Commerce, Boston, Mass.
63. Winsted Chamber of Commerce, Winsted, Conn.
64. New Brunswick Board of Trade, New Brunswick, N. J.
65. Chamber of Commerce, Fort Smith, Ark.
66. Chancery Lumbermen's Association, Newark, N. J.
67. Chamber of Commerce, Houston, Tex.

NEW YORK, N. Y., *January 8, 1924.*

Hon. THOMAS STERLING,
*Senate Office Building, Washington, D. C.:*

National ... (Growers' Association) of United States heartily informs principles involved in your bill, 1005, and House 646, involving United States arbitration act. In interests economical adjustment of trade disputes and elimination expensive litigation. This association for many years has urged commercial arbitration. Respectfully urge favorable action these measures by your subcommittee at hearing to-morrow.

M. I. TOULME, *Secretary.*

CHICAGO, ILL., *January 7, 1924.*

Senator STERLING, *Washington, D. C.:*

Your committee has called hearing Wednesday, January 9, on United States arbitration act, House bill 646, Senate bill 1005. Respectfully urge committee's favorable consideration of this measure, as it is legislation that is badly needed in order to cure certain trade evils; hope you will support it.

Chairman Legislative Committee:
Chairmen Law Committee:
American Fruit and Vegetable Shippers' Association.

24

...RATION OF INTERSTATE COMMERCIAL DISPUTES.

adoption of Federal arbitration act such as is now proposed will be one of the most forward steps in commercial life. Our members have found arbitration to be expeditious, economical, and equitable, conserving business friendships and energy.

We trust that we will be granted the privilege of having our chairman enlarge on this proposition upon his return.

Very respectfully yours,

SAMUEL M. FORBES, Secretary.

NEW YORK BOARD OF TRADE AND TRANSPORTATION,
New York, January 7, 1924.

Hon. WILLIAM E. CLEARY,
House of Representatives, Washington, D. C.

DEAR CONGRESSMAN: You will probably remember that this board was quite active in supporting the Sterling bill, S. 1005, introduced in the present session in the same measure.

Mr. Charles L. Bernheimer is very anxious that the board be represented at the hearing on Wednesday next, January 9, at 2.30 p. m., in the Senate Judiciary Committee room. As Wednesday is our board meeting day, none of its officers can go over. Will you be good enough to express at this meeting that? As a former vice president of the board and a present director it would quite suitable. Mr. Bernheimer would be delighted I am sure. He will be there.

I inclose some printed matter relating to bill of last year which is good as to present.

Very truly yours,

FRANK S. GARDNER, Secretary.

BROOKLYN CHAMBER OF COMMERCE,
Brooklyn, N. Y., January 8, 1924.

Hon. WILLIAM E. CLEARY,
House Office Building, Washington, D. C.

MY DEAR CONGRESSMAN CLEARY: The Brooklyn Chamber of Commerce has been very much interested in commercial arbitration, as it believes that it is often possible by arbitration to save time, trouble and money. We have established an arbitration court in the Brooklyn Chamber of Commerce and are successfully conducting the same.

As you know, last year there was an Arbitration Law passed in the State of New York. At the present time House bill No. 646 has been introduced to give a national law on arbitration to correspond with the New York State law. The Brooklyn Chamber of Commerce believes that it would be a very good thing for the country to have this arbitration legislation passed, and we are writing you as a Member of Congress, to urge that you use your influence in supporting House bill No. 646.

There is a joint hearing on this bill at 2.30 p. m. Wednesday, January 8th in the office of the Senate Judiciary committee. Hope that you can be present.

Very truly yours,

ARTHUR S. SOMERS.

The CHAIRMAN. Who is your next witness, Mr. Bernheimer?

Mr. BERNHEIMER. Mr. Alexander Rose, of the Arbitration Society of America.

Representative DYER. Is there anybody here in opposition to the bill.

The CHAIRMAN. No one that I know of.

Representative DYER. Is there anybody who has indicated any opposition in writing, or otherwise?

The CHAIRMAN. No; I knew of no real opposition when the bill was before the Senate subcommittee at the last session.

Representative DYER. There is no question of the authority of Congress to legislate on this subject as provided in the bill, is there?

The CHAIRMAN. I do not think there is.

Representative DYER. The authority and jurisdiction is ample?

The CHAIRMAN. Yes.

---

ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES.    25

STATEMENT OF MR. ALEXANDER ROSE, REPRESENTING THE ARBITRATION SOCIETY OF AMERICA, NEW YORK CITY.

Mr. ROSE. Mr. Chairman, in speaking on this matter, before the committee I desire to express my thanks for the privilege, and, following as I do after Mr. Bernheimer and Mr. Julius Henry Cohen, those of us from New York, to witness to their untiring efforts in this cause and to extend to them a tribute of praise and our regards for the efforts that Mr. Bernheimer has always exhibited and for the great learning and erudition that Mr. Cohen has brought to this matter of arbitration.

Representative DYER. Are you, not going to include in that, my constituent, Mr. Piatt, in your eulogy?

Mr. ROSE. I thought Mr. Piatt did not lay claim to residence in New York City.

I want to speak, first of all, as I think it will be illuminative, on the question with reference to the formation of this society, known as the Arbitration Society of New York, and their functioning solely in the cause of arbitration.

That is not solely a trade organization, although it has some 60 trade organizations who affiliate with it and avail themselves of the service. That society arose out of the enactment of the law of 1920 by the New York State Legislature, which law I think Mr. Bernheimer and Mr. Cohen were primarily responsible for in that State. That law, as has been alluded to here was primarily responsible for, has two features by which it remedies two existing conditions in that law of arbitration. And it was due to the remedying of these two conditions which existed before that it had fallen into disuse.

Those two features consisted of the revocability of an arbitration, as has been pointed out, and to the fact that the courts held right straight along that it was not competent for parties to agree on an arbitration of an entire controversy. They could agree upon some incidental features—whether some work on a building contract had been properly performed; whether a payment was due; whether some matter of value was to be determined as an incidental matter, but the question of liability under the whole contract was one which the courts assumed to take away from the parties. That is, it held that the parties had no right to oust the courts of jurisdiction and refused to enforce contracts of arbitration.

When those were taken out of the statute, those seeds of destruction, it remedied the things by which the statute had fallen into disuse.

In about two years thereafter, the statute still being on the books in its present form, it had not yet attracted public notice, and a project came up to organize a society to give vitality to this statute society was organized, in which there were some 20 governors appointed, and among those governors we had a showing of the desirability of this law from every point of view, and on which were the deans of both of the great law schools of New York City, the Columbia University and the New York University sponsoring the project, and such public men as Mr. Charles M. Schwab, acting as chairman of the general committee. And we had the former chief

Case 2:06-cv-00227-WHA-DRB    Document 15-8    Filed 05/01/2006    Page 28 of 44

much more forcibly expressed by Chief Justice Taft, who expressed much more vigorously the same sentiment.

There is this advantage that appeals to the ordinary man: First of all, as Mr. Cohen pointed out, he leaves it to a man who is familiar with the subject of the controversy; he leaves it to a man who is the choice of the disputants who can hear it immediately and free from technicality. Let each man have his say unembarrassed by technicalities, so that the full truth may come out and so that no time will be lost in educating a man in the jury who is unfamiliar with the subject, and that on what may be doubtful testimony, that of the experts. So it is small wonder that arbitration is desired.

And I may say this to you, gentlemen: After our society was organized, and under the difficulties which still persist and hamper it—and which I shall point out in a moment or two, the weaknesses of it—notwithstanding that, the first six months having been devoted to missionary work, making the society known, and the statute known, that men may enter into arbitration by voluntary selection, yet in the next six months no less than 500 cases have been submitted to arbitration, and satisfactorily disposed of, and summarily disposed of, that is to say, with the least degree of delay.

After you say that, it becomes apparent at once that arbitration has some tremendous advantages in this respect: Here we jury select judges satisfactory to the parties. We have a list of some 3,000 bankers, merchants, architects, and men drawn from all walks of life who are only too happy to serve as arbitrators. Many of them work for nothing, for the mere honor of the position. There is sometimes a small charge, if the matter is complicated and takes too much time.

And I want to point this out, that it does not do away with the function of the lawyer. The lawyer is as necessary in arbitration as in a lawsuit. He may gather the facts, he may assist in the preparation of the case, and he may sit as an arbitrator. Indeed, I never now of an arbitration where questions of law were not to be passed upon, and where some retired jurist, or a lawyer could not sit and pass on them.

So that, you see you can have here a system of arbitration which is one that the people want; the public want it. They want speedy justice, and they want plain justice, in as simple terms as it can be reduced to.

Now, let me say this, however: We have a weakness in our system of arbitration. We need, and we must have the cooperation of the Federal courts. We must have the cooperation of the Federal statute, because while the dispute is a domestic one, we can merchandise to some one in a foreign jurisdiction, his arbitration law is defeated, not so much by the fact that the thing is not specific enough, but by the course of events; by the logic of the situation. He can not get jurisdiction in a foreign State, and if he does get law here, and may not be recognized as we have it here. It may be impossible to enforce it to a judgment in that State. He may not have the power to summon witnesses there. In short, he needs the aid of the Federal law in such cases, where interstate commerce is

justice of the appellate division of New York, Judge Jenks, and judges also of the supreme bench now, and the heads of great commercial organizations taking part in it in order to propagate the idea of men settling their disputes by friendly arbitration.

Now, one of the primary causes that led up to the idea that there should be aid given—and here I answer a question that has been previously put—that there were pending on January 1, 1921, upon the Supreme Court calendar 21,380 cases untried. And I may add that in 1923 there are 33,000 cases pending and untried. And the courts are only able, as shown by the official records, to dispose of 8,000 cases in round numbers, by all possible means. That is to say, by trial, discontinuance, and settlement, and every other way only 8,000 cases disappear from that calendar annually. So that you gentlemen can see that in the present state the courts are over three years behind. Nor can this well be remedied, at least in New York State, by the election of a large number of justices to aid in clearing up this congestion, because by a constitutional provision there may be only one justice of the supreme court elected to every 80,000 of the population.

Now it would be interesting, perhaps, as showing the way in which the public at large, as represented by the trades, use arbitration, that on the day this society was launched, with its board of governors, and with its officers organized, and when it held its first meeting on that day, as I show you, you [exhibiting reproduction of newspaper articles] there appeared in the New York papers, which we have gathered together here, all these editorials and news articles commendatory of the general idea of arbitration and how much the public favored it and how much they wanted it and how much good time there have been some 350 articles appeared, which we have gathered, in newspapers and magazines throughout the United States, all favoring the general idea of arbitration.

I may say that in the New York society alone almost 1,000 of the leading merchants and citizens of New York have come in as voluntary members and to support this society and to aid in its work. I may supplement that by saying that the New Jersey statute followed and improved to a certain extent upon the New York statute in respect to having arbitration supplement the courts.

Arbitration, I may say to you gentlemen, does not by any means seek to supplant the courts or work in opposition to the courts, because after all it is purely voluntary thing. It is only the idea that arbitration may now have the aid of the court to enforce these provisions which men voluntarily enter into.

As showing how far the idea is favored by the courts, I may add that at a dinner given at the home of Mrs. Vincent Astor there were 64 of our judges attending, representing the municipal courts, the county courts, the surrogate's courts, and the supreme courts, and the project was unanimously indorsed. And at a meeting held at which there were some 300 merchants also participating it was again unanimously indorsed by that other gathering. So that there is no question but the crying demand and the need of the hour is what? It is to simplify legal matters. They have become too burdensome in many respects. People are dissatisfied with the courts. I mean no disrespect to the courts, because what I may say has been very

affected, and where commerce with foreign nations is involved, or the subjects of foreign nations.

So you see how it may be possible, gentlemen, for you to aid in this important work, and I am sure I could not here and now any more heartily indorse the work of our society and those affiliated with it than I do at the present time.

Now, there is this also to be said: There is one excellent result to be achieved in the enactment of this bill, apart from the enactment itself; it will set a standard throughout the United States. There are many States which have no arbitration law. We have one in New York and one in New Jersey. So far as I know, I think there is now pending in some Western States a bill to have an arbitration statute substantially the same as in New York. The other States have no statutes whatever. In the others there is common-law arbitration. There is a good deal of confusion in the law on this subject. The difference between common law and statutory arbitration is largely unknown. The legal profession themselves are largely ignorant of the subject of arbitration and its benefits, because it has fallen so largely into disuse. And States, will have this law, extending its effect all over the United—uniform legislation on a subject of this character. I have no doubt all of the States would pattern after it. There is nothing to be lost, by this and there is everything to be gained.

I wish to say, just in closing, this one word: That I know I need hardly add to what has been said before as to the ethical importance of arbitration in avoiding bitterness. All that has been dwelt upon here and will undoubtedly be dwelt upon hereafter.

I want to thank the committee for their courtesy.

The Chairman. We are very much obliged to you for your statement. Who is next? I want to call on Mr. Henry Morse, of the Massachusetts State Chamber of Commerce.

## STATEMENT OF MR. HENRY MORSE, REPRESENTING THE MASSACHUSETTS STATE CHAMBER OF COMMERCE.

Mr. Morse. Mr. Chairman, I am a member of the Massachusetts State Chamber of Commerce, and I am a director. My residence at the present time is in Washington. I have given this bill careful consideration, and the Massachusetts Chamber of Commerce has given it careful consideration, and its executive committee has indorsed it.

Mr. Bonynman. Mr. Chairman, I introduce Mr. Eaton, of the American Fruit Growers.

## STATEMENT OF MR. HENRY L. EATON, WASHINGTON, D. C.

Mr. Eaton. Mr. Chairman, I appear for the American Fruit Growers (Inc.), of Pittsburgh, Pa. This company is a producer and shipper of vegetables and fruits in a large way; engaged in interstate commerce in almost every State in the Union.

I have nothing to say except I am instructed by the officers of the association to appear and say that they are heartily in favor of the

passage of this bill, because they believe it to be of benefit not only in their own business but to the whole country.

The Chairman. As a practical question, do you make many agreements in which there is an agreement to arbitrate?

Mr. Eaton. I think that outside of the States of New York and New Jersey it is a rare thing. In the State of Pennsylvania there is an old arbitration law which has been the law for a good many years, but I suspect it has largely fallen into disuse. It did not amount to much when it was in use. Now and then some one would arbitrate it. It saved some litigation without a doubt.

The Chairman. I would like to ask Mr. Cohen this question: Do you think, Mr. Cohen, that the fact that there is this law—if it becomes a law—that that very fact would tend to prevent men from entering into agreements to arbitrate?

Mr. Cohen. Not at all, because this is the experience. Mr. Bernheimer is more expert on that than I am. The trade organizations to-day who are represented here by these various gentlemen have a tremendous interest and influence in establishing trade customs. That is nothing new in the economic history of the world. And one trade is that if you belong to a trade you shall arbitrate your differences with them. The effect is that if you are a member you arbitrate your differences, and if you are outside you are not bound by it. Now, a trade custom may be established, and it may establish a custom in the trade, and one is that they will arbitrate. The silk association has it; the fruit association has it, and the lumber association has it. Now, all that we get through this law is not that we increase the customs, but the custom has a legal force to it. We increase against the refractory man who will not arbitrate.

So it will really encourage him; instead of discouraging him. It will mean this, however, Mr. Chairman, in the drawing of partnership articles or in the drawing of great contracts like the public service commission contract for the building of the subway the arbitration agreement will be more carefully drawn by the lawyers for the parties.

If I may take a moment further, I can give you a concrete illustration fresh from my practice. One of the leading members of the bar in New York, and now one of the justices of the supreme court, represented a banking concern, and I represented the other concern, in a matter in which there was a large sum of money involved, and two men who were interested in the concern could not get along together. The business had to be wound up, and my lawyer friend and myself got together and drew up a four-page document, and saved whatever there was to the parties without any court expenses at all. And then having some experience in that sort of thing we realized that we could not cover everything in that document, and we put in a clause that in case of any other difficulties, if any difficulties should arise between them, they should select these two lawyers as arbitrators, and if they could not agree the third man should be chosen. The ink was hardly dry on that agreement before five questions arose which required arbitration, and we are now settling those five questions.

Mr. BERNHEIMER. I will introduce Mr. Carnahan, of the New Jersey Lumbermen's Association, who has just come in to bring the word of his association.

## STATEMENT OF MR. FRANK CARNAHAN, MANAGER OF THE NATIONAL RETAIL LUMBER DEALERS' ASSOCIATION, WASHINGTON, D. C.

Mr. CARNAHAN. Mr. Chairman, my name is Frank Carnahan; I am manager of the National Retail Lumber Dealers' Association; and I also speak for the New Jersey Lumber Dealers' Association, with headquarters in Washington.

I can not think of anything that would be of more benefit to commerce than this proposed legislation, and our associations heartily indorse it.

Mr. BERNHEIMER. Mr. Chairman, I will introduce Mr. Wilson J. Vance, of the New Jersey State Chamber of Commerce.

## STATEMENT OF MR. WILSON J. VANCE, SECRETARY NEW JERSEY STATE CHAMBER OF COMMERCE, 20 CLINTON STREET, NEWARK, N. J.

Mr. VANCE. Mr. Chairman and gentleman, I wish to leave some documents for the committee, that some of the members of the committee may desire to look over at their leisure. I need not describe them. What I shall say will be very brief.

First, I want to say that Congressman Lehlbach, of New Jersey, appeared at this hearing, but found it impossible to remain, as he was called away before he was able to speak to your body. He desired me to say that he was heartily in favor of this measure, and that he would take occasion to evince his approval of it on the floor of the House when it comes up there.

Our legislature, at its last session, passed a bill which we modestly believe is a model, having had the assistance of New York lawyers, and other lawyers in its preparation. That was the culmination of three years of effort. When the question started in New Jersey it met, outside of the few who were informed, with opposition, to which Mr. Cohen alluded. And it took an elaborate system of education to convince even the business men that it was good for them. Now I think New Jersey is solidly for it. Almost every organization in the State, and every trade organization has erected a tribunal for the hearing of arbitration cases, and the trade organizations have begun to write arbitration clauses into their constitution so that their members are bound by them.

The reasons for indorsing a Federal measure have been well put forward here, and I need not dwell upon them at length. But we are so enthusiastic in favor of it that we feel that we can ask in a modest way the Congress to extend this principle to the Federal jurisdiction. We believe that arbitration is a thing for honest men. We have seen some of its workings in New Jersey; not a great deal so far, but we have noticed already a diminution in the ordinary character of business litigation that has come to the courts at the fall term. Our bill went into effect only on the 4th of July. We have reports from local bodies throughout the State to the effect

that whereas there are very few cases that have come actually to trial in the arbitration tribunals, business men have adopted the practice of getting together and settling their business differences. And we think that is a practical way of working out the matter better than in an arbitration tribunal; certainly less expensive.

With reference to the Federal legislation, we feel that if you enact a law in Congress you will at once disseminate the law of arbitration, and in bringing about the reign of peace and good will.

Mr. BERNHEIMER. I have another witness, Mr. Thomas B. Paton.

The CHAIRMAN. We will hear Mr. Paton.

## STATEMENT OF MR. THOMAS B. PATON, REPRESENTING THE AMERICAN BANKERS' ASSOCIATION.

Mr. PATON. Mr. Chairman, I represent the American Bankers' Association, and to forestall any question as to how the bankers feel about this matter, I will say that the American Bankers Association are heartily in favor of this bill. The association is composed of 22,000 banks, State, national, trust companies, and savings banks, and its committee on commerce and marine commission, headed by Fred J. Kenny, of New York, gave this matter careful study and they have adopted a resolution, which I would like to spread on the minutes. I will not take the time to read it.

The CHAIRMAN. It will be so ordered.

(The resolution is as follows:)

RESOLUTION OF AMERICAN BANKERS ASSOCIATION, ADOPTED JANUARY 15, 1924.

Whereas all merchants doing interstate and foreign business seek a method whereby disputes arising in their daily business transactions can be speedily, economically, and equitably disposed of; and

Whereas arbitration offers the best means yet devised for an efficient, expeditious, and inexpensive adjustment of such disputes; and

Whereas the arbitration laws of the various States of the Union are not in uniformity and often in conflict, and a great many States are not applicable in other States: Now, therefore, be it

Resolved, That the commerce and marine commission of the American Bankers Association is thoroughly in accord with the efforts being made to create Federal legislation legalizing the settlement of commercial disputes; and be it further

Resolved, That the commerce and marine commission of the American Bankers Association indorse in principle House bill No. 13522 and Senate bill No. 4214.

(The above was reported by the commerce and marine commission to the executive council April 27, 1923, and the report was accepted.)

Representative DYER. Would this legislation be of direct or indirect benefit to the Bankers Association?

Mr. PATON. I think it would be of indirect benefit, because their interests are linked up with the merchants and business men of the country, and later on it will probably be of direct benefit to the banks because it will put in their minds the idea of taking up their disputes through arbitration. Of course, the banks of the country have a great deal of business, and a great many business dealings with one another throughout the country, in regard to those collections, and there is a great deal of conflict in regard to those bank collections. I think this would be the best method of handling that litigation.

Mr. BERNHEIMER. That is all.

The CHAIRMAN. Is there anyone else who cares to be heard?

Mr. WIMER. I would like to be heard briefly.

The CHAIRMAN. We will hear you.

## STATEMENT OF MR. BRUCE K. WIMER, REPRESENTING THE PHILADELPHIA CHAMBER OF COMMERCE.

Mr. WIMER. Mr. Chairman, I represent the Philadelphia Chamber of Commerce, and was asked to appear here and tell your committee that the Philadelphia Chamber of Commerce approves this bill. You have received a letter from Mr. Kelly.

The CHAIRMAN. Yes; that goes into the record. Are there any others who care to be heard?

Mr. NICHOLS. Just a word, Mr. Chairman.

The CHAIRMAN. We will hear you.

## STATEMENT OF MR. W. W. NICHOLS, PRESIDENT OF THE AMERICAN MANUFACTURERS' EXPORT ASSOCIATION OF NEW YORK.

Mr. NICHOLS. Mr. Chairman, my name is W. W. Nichols; I am president of the American Manufacturers' Export Association of New York.

Mr. Chairman, my appearance here is partly accidental. I received a lengthy telegram from Mr. Bernheimer calling my attention to the holding of this hearing, and as I happened to be here on another matter I am very glad to appear on behalf of my association, which indorses very enthusiastically the principle of this legislation. It was done by formal vote of the board of directors last June. The matter was brought before us, and much has transpired since, to my mind, that the feeling in that behalf is even more pronounced to-day. Of course, our real interest in it is as exporters. We believe as a subsequent step it can not be undertaken until we get the Federal law which is engaging the attention of you gentlemen.

Representative DYER. What is that, Mr. Nichols?

Mr. NICHOLS. Until you get this law on the statute books we can not hope for the extension internationally of this idea of arbitration, which I have been very much interested, which has a direct bearing on this? I can not at all surprised in what Mr. Bernheimer discloses me on this. I wonder whether any debate we have had in expectation of finding any difference of opinion as to the establishment of this principle of arbitration in this country can not be based perhaps on a national ignorance. France, unless I am very much mistaken, has exercised this principle for 360 years in their courts of commerce. That is practically the same thing.

Mr. COHEN. It is only recently that they have modified the law of revocability in France.

Mr. NICHOLS. That may be.

Mr. COHEN. They had the same law as in England.

Mr. NICHOLS. Some seven years ago a party of business men were visiting in France, at the behest of France, and we discovered at that time the courts of commerce. We were all students; and to our

surprise it was stated that the courts had been functioning for 360 years. I became very much interested; and I have been studying the matter, and I have found that it was 360 years last October since the first court was held. Now, unless I am very much misinformed, because it has business men for settling disputes; it has business-men judges that may be people who are elected by the business community, and they serve as such. And the disputes are referred to that court.

Mr. ROSE. May I have the privilege, Mr. Chairman, as I have to mention certain names in connection with the work of arbitration, say that I do not know how much good he has done by his untiring labors in this behalf.

Mr. BERNHEIMER. Mr. Chairman, to help Mr. Nichols in what his stated, I can say that the man who first introduced the principle of arbitration was Etienne Marcel in France, but he was murdered before he succeeded in carrying it through.

Mr. COHEN. That is not very encouraging, Mr. Chairman.

The CHAIRMAN. Is there any other witness now that would like to be heard?

Mr. COHEN. I would like to put this in the record, Mr. Chairman, in view of Mr. Nichols's statement. My answer to him is not a complete disclosure of the situation. In the Galuser case the French courts have held that an award made in a foreign jurisdiction by arbitrators is binding and enforceable in the French courts, although they will not enforce every judgment of a court of a foreign jurisdiction. And their theory is regarded as most interesting. They say that since the parties themselves have selected the arbitrator, it is just exactly the same as a compromise.

Representative DYER. Mr. Cohen, I wanted to ask you if you could cite us to a few concrete cases holding that agreements for arbitration are revocable.

Mr. COHEN. Yes; I can cite some cases. Some of the cases which hold, in the absence of a statute which revocable, and that they are within the scope of proceedings of remedy, are the following: U. S. Asphalt Refining Co. v. Trinidad Lake Co., Atlanton, 232 Fed. Rep. 403; affirmed with opinion, 250 Fed. 935; P. 60, 222 Fed. 1006; Aktieselskabet K. F. K. v. Rederiktieboliaget affirmed by United States Supreme Court March 22, 1920; Meacham v. Jamestown F. & C. R. R. Co., 211 N. Y. 348; Hamilton v. Home Ins. Co., 137 U. S. 370, 385; Decision of New York Court of Appeals N. Y. 261; C. 275, laws N. Y., 1920; New York law, c. 134, 1 1923.

I also submit a brief on the proposed Federal arbitration statute, Mr. Chairman.

The CHAIRMAN. It will be received and, without objection, made a part of the record.

(The brief is as follows:)

### THE PROPOSED FEDERAL ARBITRATION STATUTE.

At the last session of Congress, there was introduced a bill which would make valid, and enforceable by the Federal courts, certain agreements for

arbitration. This bill was prepared by the committee on commerce, trade, and commercial law of the American Bar Association and approved by that association at its 1922 meeting in San Francisco. It was again approved at its 1923 meeting in Minneapolis.

Any bill—a provision for arbitration contained in any contract which involved maritime transactions (matters which would be embraced within admiralty jurisdiction) and interstate commerce as generally defined is made "valid, enforceable and irrevocable," except upon "such grounds for which any contract may be revoked. The same rules apply to a submission to arbitration of an existing controversy." (Secs. 1 and 2.)

The Federal courts are given jurisdiction to enforce such agreements whenever under the Judicial Code they would otherwise have jurisdiction of a controversy between the parties. (Although, if the basis of jurisdiction is diversity of citizenship, the usual limitation of $3,000 is removed.) (Sec. 8.) commencement of the proceeding. (Sec. 9.) There are two possible steps in such enforcement. First, any suit commenced in a Federal court upon an issue referable to arbitration may be stayed until arbitration is had, unless the party applying for the stay is in default with the arbitration. (Sec. 3.) And, the court may order the arbitration to proceed in accordance with the agreement, appointing an arbitrator itself, if appointment under the agreement cannot be had. (Secs. 4 and 5.)

The clauses governing these orders assure a prompt, speedy, and inexpensive determination of the merits of the application. The proceeding is summary in character; by order of an application for stay on order, as though it were a summary process. If the dispute is within admiralty jurisdiction, is the issue alone is summarily tried, either by filing of the agreement or on motion if the dispute is within admiralty jurisdiction, or jury trial is demanded or if the optional trial by jury by either party it arises to such issue, the court. (Sec. 10.) If there is no such issue, the court itself in heard and determined as though it were a motion before the court.

The arbitrators are given powers to secure the attendance of witnesses and to bring before them such documents as are necessary. (Sec. 7.)

The award must be in writing and acknowledged. (Sec. 7.) Federal, any party may apply to the court specified in the award, or in the district wherein the award was made, for judgment to be entered upon the award. This must be granted as a matter of course, unless the award is vacated, modified, or corrected. (Sec. 10.)

The grounds for vacating, modifying, or correcting an award are limited. If an award was procured by corruption, fraud, or undue means, if there was evident partiality or corruption upon the part of an arbitrator, if the arbitrators were guilty of misconduct, or if they exceeded their powers or failed to make a mutual, final, or definite award, then and then only the award may be vacated. (Sec. 11.) If there was an evident miscalculation or mistake in description in the award, or if the award upon a matter not submitted was imperfect in form without affecting the merits, and submitted, or if it was imperfect in form without effect the latent thereof the award may be modified or corrected to award, the court may direct a rehearing. (Sec. 12.) Upon vacating an award, the court may direct a rehearing, if the time within which the award is assured. (Secs. 13, 14, 15.) The judgment upon an award is treated like any other judgment of the court. (Secs. 15, 16.)

This bill is taken from the New York statute (ch. 275, Laws of 1920), reviewed favorably by the courts of New York. Matter of Berkovitz v. Arbib & Houlber, (1921) (230 N. Y. 261, 130 N. E. 288), and the New Jersey statute (ch. 134, Laws of 1923).

#### THE EVIL TO BE CORRECTED.

The evils at which arbitration agreements in general are directed are three in number. (1) The long delay usually incident to a proceeding at law, in equity or in admiralty, especially in recent years in centers of commercial activity, where there has arisen great congestion of the court calendars. It is the entry upon a long period of waiting from the time a case awaiting its turn for consideration of the preliminary motions and other steps taken by litigants, appeals therefrom, which delay

consideration of the merits, and appeals from decisions upon the merits which regularly follow the decision of any one or the other of such importance. (2) The expense of litigation. (3) The failure, through lack of competence, of one or the other in regard to the subject matter measured by the standards of the business world. This failure may result not always at absolute which do not always fit a specific case, but because the courts necessarily apply general rules, the parties do not have the benefit of the judgment of persons familiar with the particular class, either in the ordinary jury trial, the peculiarities of the given controversy.

The mere mutuality of an arbitration agreement, however, does not assure freedom from these evils. This is due to the fact that, following any such sanction in the English law, arbitration agreements have not been enforced by our courts in the United States. The result is that a party who has at an absolute liberty to disregard his engagement to enter into or to proceed with an arbitration, at any time before the arbitration award is actually made in such manner or whenever the arbitration is handed down. Thus liberty still subsists throughout which have been making such engagement in the States of New York and New Jersey, which refuse to proceed with arbitration or have been, in the interim before to arbitrate. Yet, in good faith, that for one reason or another, desires either because the party agreement or that it intended to cover the particular case or the such or because the party, having resorted for his obligation solemnly assumed, take advantage in the delay and trouble which his opponent will be put and remittiness through the courts, or believes that he may have the part on the merits of the dispute.

Because of the fact that in ... New York and New Jersey, in the United States ber of many foreign countries with whom the United States has a large amount reside in the jurisdictions of these States they are not enforceable, while enforce commerce with those making arbitration agreements are at a large amount now faulty in the jurisdiction where they are not enforceable. The party residing in the jurisdiction where they are not to respond, by stating that in the ordinary course of business, this class of jurisdiction is bound court. His captive, either voluntarily in the second class of jurisdiction is bound as arbitrarily or disinterested in his pleases to carry out his agreement, and unless the other party has no remedy against him, except through an ordinary action in the courts.

#### THE REMEDY.

To meet the situation where, through dishonesty or mistake or otherwise, one party to an arbitration agreement refuses to perform it, statutes such as those adopted in New York and New Jersey are advocated and have met the parties to correct the same defect and also to assure justice where one of Federal statute is ... either in a State not recognizing arbitration agreements, the present

The adoption of the statute does not mean that parties who have agreed to noble intent, and, after the controversy arises, are still willing to arbitrate and whatever. This reenlists must come into court or submit to legal interference. There is no interference in any case court in any case where the statute were nonexistent.

Where one party refuses to carry out the agreement, however, the other party gested, a remedy formerly denied him. This remedy is simple, as has been suggested... it voluntarily in combrance with the old actions at law, as has been suggested to the ordinary motions before the arbitrate becomes so. At the outset the party to business be given as though party in assured by the requirement that notice of the application him to arbitrate, or that the good faith that his agreement does not apply to protected by the provision of the law which requires the court to examine into the meaning of each a claim. Such examination, however, made summarily, so that there is a minimum of delay and expense.

The procedure for the enforcement of arbitration agreements is very simple. It reduces technically and formality of arbitration agreements is very simple. it conform to the usages of commercial arbitration. It follows the same course to the arbitration party is assured by the requirement that notice of the application the case where the existence of an arbitration agreement or its applicability to in question, the question whether any arbitration agreement or its applicability to in question, the question whether arbitration should be ordered is decided upon

Case 2:06-cv-00227-WHA-DRB    Document 15-8    Filed 05/01/2006    Page 33 of 44

Neither is it true that such a statute, when it declares arbitration agreements to be valid, declares their existence as a matter of substantive law. The courts have uniformly held that such agreements were existent but have refused to enforce them. It was often said that arbitration agreements were void, even under the common-law rule. This statement was not accurate. While the courts refused to enforce arbitration agreements specifically, they recognized their existence because they gave another remedy. From the earliest times it was held that for a breach of arbitration agreement the aggrieved party was entitled to damages. (Hamilton v. Home Ins. Co., 137 U. S. 370, 385; Miller v. Canal Co., 41 N. Y. 98; Hutton Co. v. Central Trust Co., 107 N. Y. 633; Haggart v. Morgan, 5 N. Y. 422, 427; Firestone Co. v. Board of Education, 100 N. Y. 76, 83.)

In no proper sense, therefore, was the arbitration agreement void. It was valid in the same sense that most contracts are valid, i. e., while specific performance would not be given, a remedy for a breach existed in the right to recover damages.

So far as the present law declares simply the policy of recognizing and enforcing arbitration agreements in the Federal courts it does not encroach upon the province of the individual States. It seems probable, however, that Congress has ample power to declare that all arbitration agreements considered as valid and enforcible even in both cases ... shall be recognized as valid and enforcible even by ... in such transactions shall be recognized whether in the courts of the State or regulation of a State inconsistent with the congressional act can be given any force or effect even in the courts of the State itself. They are as much subject to question as to legislation. This rule is so well settled that it is no longer open to question. (Northern Securities Co. v. U. S., 193 U. S. 197; Olsen, etc., Co. v. Iowa, 196 U. S. 131, 143.)

It is not only the actual and physical interstate shipment of goods which is subject to the interstate commerce powers of the Federal Government, but these powers govern every agency or act which bears so close a relationship to interstate commerce that they can reasonably be said to affect it. Contracts relating to interstate commerce are within the regulatory powers of Congress. (Board of Trade v. Olsen, 262 U. S. 1; Swift v. U. S. ...; American Express Co. v. Iowa, 196 U. S. 133, 143.)

The only questions which apparently can be raised in this connection are whether the failure to enforce an agreement for arbitration imposes such a hardship upon interstate commerce as seriously to hamper it or whether the enforcement of the laws of the several States ... If either of these questions can be answered in the affirmative. It should stand but be to be beyond question that Congress can legislate concerning the matter.

Even if, however, it should be held that Congress has no power to declare generally that in all contracts relating to interstate commerce arbitration agreements shall be valid, the present statute is not materially affected. The statute is designed to regulate and to make enforcible in the Federal courts such agreements for arbitration as the courts ... regulates tests solely upon its power to prescribe the jurisdiction and duties of the Federal courts.

### PUBLIC POLICY AND THE HISTORY OF ARBITRATION STATUTES.

Sound public policy demands the enforcement of arbitration agreements by the law. To argue that such agreements should receive only the sanction of business opinion and should remain extra legal is unsound. An agreement for arbitration is in its essence a business contract. It differs in no essential from other commercial agreements. It should stand upon the same plane and be regulated by the law in the same light.

No one in this day could argue that the ordinary contract of sale or that commercial paper should not be recognized by the law and that obligations assumed thereby should be enforced only so far as the obligor felt the force of business opinion. Such, indeed, was once the case. Before Lord Mansfield's day the courts of England were ignorant of the mercantile law and they should treat questions respecting the buying and selling of goods or marine insurance or promissory notes or, indeed, any mercantile question.

But, if the contract for sale or promissory note is to be recognized and enforced by the courts, why should a contract for arbitration stand upon a

different plane? Why should one be entitled to legal sanction and the other to a sanction of opinion only? The treatment of arbitration agreements on one legal certainly has no tendency to accomplish abstract justice, as we have shown before. It leaves a broad path by which the dishonest party may escape from his obligations. Public policy, surely, does not require that this continue. Our courts, in holding that arbitration agreements are unenforcible, have been most insistent that the policy of arbitration was wise and should be encouraged. (D. & H. Canal Co. v. Pennsylvania Coal Co., ...; Red Jacket Refining Co. v. Trinidad Lake Petroleum Co., 222 Fed. 1006.)

It may be asked why, if the courts were so certain that arbitration agreements ought to be enforced, they did not permit such enforcement. The explanation is to be found in our English system of jurisprudence. For many centuries there has been established a rule, rooted originally in the jealousy of courts for their jurisdiction, that parties might not by their agreement, oust the jurisdiction of the courts. This rule was as firmly established as ... American courts did not feel themselves free to change the rule. When they deemed it to be the duty of the legislature to make this change. When the change was made in the United States by the New York Legislature (chap. 275, Laws of 1920) the change was accepted whole-heartedly by the New York courts. (Matteo of Berkovitz, 230 N. Y. 261.)

Said Cardozo, J., writing the opinion, for unanimous court: "We are told that the promise to arbitrate when made was illegal and a nullity. ... the statute, this was not wholly true. Public policy was thought to forbid that the promise be specifically enforced. Public policy did not forbid, when differences arose, that it be violated ... is to be measured by the public policy ... * * * A promise that differences will be settled by ... is not illegal and a nullity. ... when the promise is repealed. Public policy speaks of the hour and occasion, ... in deference to early precedents, etc. ... we think there is no departure from constitutional restrictions in this legislative declaration of the public policy of the State. The ancient rule, with its exceptions and refinements, was criticized by many judges as anomalous and ... (Haley v. Coal Co., supra, at p. 268; Pudicker v. Guardian Mutual Life Ins. Co., 121 N. Y. 202, 306; U. S. Asphalt Refining Co. v. Trinidad Lake Petroleum Co., 222 Fed. Rep. 1006.) It was criticized, when followed with frequent protest, in deference to early precedents. ... upon the common law was hesitating and feeble. We are now asked to declare it so embedded in the very foundations of our jurisprudence that power is competent to change it ... nothing less than an amendment of the Constitution is competent to change the law. Public policy might have changed the rule themselves if they had abandoned some early ... at all times competent to change it. They might have whittled it down by distinctions, as was done, in England, by distinctions between promises that are collateral and those that are conditions. (Scott v. Avery, supra; London, Bd. of Wardens, Exley, L. R. 3 Q. B. D. 217, 221; Spackman v. Plumstead L. T. Rep. 825.) No one would have imagined that public policy was under a duty to preserve. Not different is the effect of like change when wrought by legislation. (Alexander v. Bennett, 60 N. Y. 204, 200, 207.)"

States Department of Commerce has recently made a most significant declaration regarding the business world in relation to arbitration. In its publication, entitled "... devotes an entire chapter (chap. VII, p. 96), to "Trade disputes and ..." This entire chapter is largely a plea for arbitration and a suggestion of methods which trade bodies may follow to make their services more effective. ... lines of business.

Nor can it be said that the Congress of the United States, directing its own courts no longer to recognize this anachronism in the law, would infringe upon the provinces or prerogatives of the States. As we have already shown and as the Berkovitz case, supra, declares again, the question of the enforcement

## 40    ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES.

related to the law of remedies and not to substantive law. The rule must be changed for the jurisdiction in which the agreement is sought to be enforced, and if the change in the jurisdiction in which it is sought to be enforced, one of the jurisdictions in the Union might declare such agreement to be void and unenforceable, and still the Supreme Court of the United States felt at liberty to itself to reverse a rule recognized for centuries. Thus, in the absence of a congressional declaration, it is so far felt itself unable to do so.

The statute can not have the effect that the Federal Government shall declare the validity of arbitration agreements in the field where necessarily it is supreme and where without this action in the provinces of the Federal Government. It is peculiarly within the province of the Federal Government, we submit, to assure the citizens of different States that in dealing with each other they shall stand upon an equal footing. If one of them is bound to arbitrate because he has solemnly morally agreed to arbitrate, the other should equally be bound and surely that moral obligation he should not solemnly abandon all his obligations.

Nor would it be a sufficient objection to the proposed statute to urge that the men the very technicalities and details to which controversies between business men... the arbitration agreements. This argument we have sought to escape by some length... both parties are willing to arbitrate, the arbitration machinery can proceed without the interference of my court. If one may, on the contrary, unfairly wishes to repudiate his agreement, he is held at law, but the enforcement proceeds with a minimum of legal intervention and the matters are given the speedy and expert hearing which they originally desired...

...best answer to the argument of possible danger and weakness lies in the jeopardy of those jurisdictions where such a statute already exists. The rule against the enforceability of arbitration agreements was originally founded in the jealousy of the courts... many years ago the English courts, together with the bulk of the English common law. Many years ago the English Parliament officially recognized the change and gradually the doctrine was whittled away. [Mather v. Eckervitz, supra.] At the end of the nineteenth century making enforceable arbitration agreements, it... by its statute validating and it may be said without fear of challenge that the administration of the new English policy... arbitration law has been eminently satisfactory and that, with the reduction in the litigation, English business has taken thorough advantage of its provisions and urges for its... support.

New York was the first American State to adopt such a law. This statute (chap. 275, Laws of 1920) was drawn by a committee representing clients and lawyers of the New York State Bar Association and received active support of that association.

Following the... successful administration of the New York statute, the State of New Jersey passed a law almost in identical language. (Chap. 134, Laws of 1923.) This statute received the support both of the New Jersey State Chamber of Commerce and of the New Jersey State Bar Association.

The proposed Federal statute follows the form of the successful New York and New Jersey statutes with only such changes as seem necessary for the Federal statute.

The arbitration law has now been in effect in New York for three years. It has been highly satisfactory. It has not yet reached its highest usefulness only because the process of education is not yet complete. A novel remedy is offered to business houses with which they are not familiar, which is not imposed upon them by law as most remedies are, and which, to be available, they must select in advance of any controversies. Despite the inertia which lead to be overcome before the statute could become properly effective, phenomenal progress has already resulted, and the attitude of the courts toward the new law and toward proceedings under it has been most encouraging. Almost without exception the courts, have upheld the utmost to facilitate procedure by the support of the act, have upheld such agreements, have recognized their duty to abide by them, giving the finding of the arbitrators thereunder any... support to the powers of the arbitrators... and have refused to permit the invasion of technicalities in the application of the law or the determination of rights under it.

## ARBITRATION OF INTERSTATE COMMERCIAL DISPUTES.    41

there is no less reason to believe that the Federal courts will give equally sincere support in the application of a similar Federal statute. If business men desire to submit their disputes to speedy and expert decision, why should they not be enabled to do so? If one party is willing to abide by the agreement, why should the other escape? In what respect does an arbitration agreement differ from any other commercial contract, and, if such agreements ought to be enforced, why should not the national power be exerted in their support in the provinces in which it alone is supreme? We submit that there is no single argument respecting either considerations of morality or policy which can soundly be urged against the proposed statute.

Mr. BERNHEIMER. Mr. Chairman, I would like to present a letter from Mr. Toulme, secretary of the National Wholesale Grocers' Association, which I would like to have made a part of the record.

The CHAIRMAN. It will be so ordered.

(The letter referred to is as follows:)

New York, *December 29, 1923.*

Mr. CHARLES L. BERNHEIMER,
*Chairman Chamber of Commerce of the State of New York,*
*New York, N. Y.*

MY DEAR SIR: I want to acknowledge receipt of your kind letter of December 27 regarding the proposed United States arbitration act. Our association is on record in favor of this legislation, and within the next few days we will send a circular to our members throughout the country urging them to express their favorable views to their Congressmen.

We have used the arbitration system in our industry for a number of years with notable success, and we are exceedingly anxious that everything possible be done to strengthen the results.

Yours very truly,

M. L. TOULME, *Secretary.*

(Thereupon the hearing on S. 1005 was concluded, and the committee proceeded to the consideration of other business.)

# **Tab 4**

## LEGISLATIVE HISTORY

## COURTS—MULTIDISTRICT LITIGATION—TRANSFER

*P.L. 90-296, see page 133*

Senate Report (Judiciary Committee) No. 454,
July 27, 1968 [To accompany S. 159]

House Report (Judiciary Committee) No. 1130,
Feb. 28, 1968 [To accompany S. 159]

Cong. Record Vol. 113 (1967)

Cong. Record Vol. 114 (1968)

## DATES OF CONSIDERATION AND PASSAGE

Senate Aug. 9, 1967, Apr. 10, 1968

House Mar. 4, 1968

The House Report is set out.

## HOUSE REPORT NO. 1130

THE Committee on the Judiciary, to whom was referred the bill (S. 159) to provide for the temporary transfer to a single district for coordinated or consolidated pretrial proceedings of civil actions pending in different districts which involve one or more common questions of fact, and for other purposes, having considered the same, report favorably thereon without amendment and recommend that the bill do pass.

### PURPOSE

The bill adds a new section 1407 to title 28, United States Code, to provide judicial machinery to transfer, for coordinated or consolidated pretrial proceedings, civil actions, having one or more common questions of fact, pending in different judicial districts.

### LEGISLATIVE HISTORY

A predecessor measure, H.R. 8276, introduced upon the request of the Judicial Conference of the United States, was the subject of hearings in the last Congress ("Judicial Administration," hearings before Subcommittee No. 5 of the House Committee on the Judiciary, 89th Cong., second sess., Serial No. 21). Senate hearings were held on a similar measure, S. 3815, in the 89th Congress and on S. 159 in the present Congress ("Multidistrict Litigation," hearings before Subcommittee on Improvements in Judicial Machinery, Senate Committee on the Judiciary, 89th Cong., second sess.; 90th Cong., first sess., pts. 1 and 2). S. 159 passed the Senate on August 9, 1967, without objection.

## MULTIDISTRICT LITIGATION

### STATEMENT

S. 159 was originally drafted by the Coordinating Committee for Multiple Litigation of the U. S. District Courts, established by the Judicial Conference of the United States and its enactment is recommended by the Conference.

The bill is based on the experience of the Coordinating Committee in supervising nationwide discovery proceedings in the electrical equipment cases which flooded the Federal courts in the early 1960's.

Following the successful Government prosecution of electrical equipment manufacturers for antitrust law violations, more than 1,800 separate damage actions were filed in 33 Federal district courts. This wave of litigation threatened to engulf the courts. Unless coordinated action was undertaken it was feared that conflicting pretrial discovery demands for documents and witnesses would disrupt the functions of the Federal courts. Through the consent and cooperation of all parties and the numerous presiding judges and the labors of the Coordinating Committee joint pretrial proceedings were conducted. The procedures worked successfully and today all of the electrical cases have been finally disposed of. The steps taken by the Coordinating Committee to restore order to the litigation are outlined in the Senate Report on S. 159 (S.Rept. 454) as follows:

 1. The Coordinating Committee recommended a schedule of pretrial discovery proceedings and a series of uniform pretrial and discovery orders covering common issues of fact. This recommended schedule was accepted by the district courts involved and, after consultation with the lawyers for the parties, the judges of the district courts entered the uniform orders.

 2. National depositions were held, attended by large numbers of plaintiffs' and defendants' counsel. Lead counsel, chosen by the lawyers for the plaintiffs and defendants, propounded questions on behalf of all the parties. Other attorneys present, however, were given the opportunity to ask additional questions to protect their particular interests. Arrangements were made for the additional deposition of any witness if the need arose.

 3. Central document depositories were established, one for plaintiffs and another for defendants. Close to 1 million documents were filed at the depositories, and made available for copying by the parties. This arrangement minimized inconvenience and expense.

The purpose of S. 159 is to furnish statutory authority for the kind of pretrial consolidation and coordination successfully implemented in the electrical cases but which, in that situation, entirely depended on the voluntary agreement of all the parties as well as presiding judges.

The objective of the legislation is to provide centralized management under court supervision of pretrial proceedings of multidistrict litigation to assure the "just and efficient conduct" of such actions. The committee believes that the possibility for conflict and duplication in discovery and

## LEGISLATIVE HISTORY

other pretrial procedures in related cases can be avoided or minimized by such centralized management. To accomplish this objective the bill provides for the transfer of venue of an action for the limited purpose of conducting coordinated pretrial proceedings. The proposed statute affects only the pretrial stages in multidistrict litigation. It would not affect the place of trial in any case or exclude the possibility of transfer under other Federal statutes.

Existing law is inadequate for such pretrial consolidation, since under 28 U.S.C. 1404(a) transfer is restricted to a district where the action "might have been brought." Moreover, the present statute does not permit or provide for transfer of related cases for pretrial purposes only. Under the Federal Rules of Civil Procedure (rule 42(a)), consolidation for pretrial purposes is authorized only when multiple actions are pending in a single district court.

The proposed new section 1407 establishes a Judicial Panel on Multidistrict Litigation which is empowered to: (i) initiate transfer proceedings and hold hearings thereon; (ii) transfer civil actions for consolidated pretrial proceedings; (iii) assign a judge or judges to conduct such proceedings and request the Chief Justice to make intercircuit assignments for this purpose; (iv) act as and designate other judges as deposition judges in any district, and (v) remand transferred actions to the districts from which they were transferred.

By the term "pretrial proceedings" the committee has reference to the practice and procedure which precede the trial of an action. These generally involve deposition and discovery, and, of course, are governed by the Federal Rules of Civil Procedure. See, e. g., rule 16 and rules 26–37. Under the Federal rules the transferee district court would have authority to render summary judgment, to control and limit pretrial proceedings, and to impose sanctions for failure to make discovery or comply with pretrial orders.

To qualify for pretrial transfer under the proposed section 1407, civil actions would have to meet certain general requirements: first, they must involve one or more common questions of fact; second, they must be pending in more than one district, and third, pretrial consolidation must promote the "just and efficient conduct" of such actions and be for "the convenience of parties and witnesses." It is expected that such transfer is to be ordered only where significant economy and efficiency in judicial administration may be obtained. The types of cases in which massive filings of multidistrict litigation are reasonably certain to occur include not only civil antitrust actions but also, common disaster (air crash) actions, patent and trademark suits, products liability actions and securities law violation actions, among others.

As noted earlier, the Judicial Conference of the United States recommends enactment of this legislation. The Department of Justice also supports the bill. At hearings in the 89th Congress on a predecessor measure, this committee was advised of the opposition of the section of antitrust law of the American Bar Association. Subsequently, however, the

1900

## MULTIDISTRICT LITIGATION

section altered its position and now recommends enactment of S. 159. On February 20, 1968, the house of delegates of the American Bar Association adopted the recommendation and it now urges approval of the measure.

The committee believes that the legislation will provide desirable improvements in judicial administration and will assure uniform and expeditious treatment in the pretial procedures in multidistrict litigation. It accordingly recommends favorable consideration of S. 159.

### SECTIONAL ANALYSIS

The bill would add a new section 1407 to chapter 87 of title 28, United States Code.

**Subsection (a)** of the proposed section 1407 authorizes the transfer of civil actions, pending in different districts, that share one or more common questions of fact upon a determination by the Judicial Panel on Multidistrict Litigation, created by the bill, that transfer would be for the "convenience of the parties and witnesses" and will promote the "just and efficient conduct" of the actions transferred. If only one question of fact is common to two or three cases pending in different districts there probably will be no order for transfer, since it is doubtful that transfer would enhance the convenience of parties and witnesses, or promote judicial efficiency. It is possible, however, that a few exceptional cases may share unusually complex questions of fact, or that many complex cases may share a few questions of fact. In either of these instances substantial benefit may accrue to courts and litigants through consolidated or coordinated pretrial proceedings.

Likewise, a number of factors should be weighed in the selection of a transferee district: the state of its docket, the availability of counsel, sufficient courtroom facilities, etc. These factors do not lend themselves to precise measurement. Consequently, the committee believes that the informed discretion of the judiciary is the best method for resolving questions as to when and where cases should be transferred for pretrial.

The subsection further authorizes the panel to separate any claim, cross-claim, counterclaim, or third party claim unrelated to the questions common to the transferred actions and to remand such claims prior to the remand of the remainder of the action. The subsection requires that transferred cases be remanded to the originating district at the close of coordinated pretrial proceedings. The bill does not, therefore, include the trial of cases in the consolidated proceedings. The experience of the Coordinating Committee was limited to pretrial matters, and the committee consequently considers it desirable to keep this legislative proposal within the confines of that experience. Additionally, trial in the originating district is generally preferable from the standpoint of the parties and witnesses, and from the standpoint of the courts it may be impracticable to have all cases in mass litigation tried in one district. Additionally, the committee recognizes that in most cases there will be a need for local

**1901**

# LEGISLATIVE HISTORY

discovery proceedings to supplement coordinated discovery proceedings, and that consequently remand to the originating district for this purpose will be desirable. Of course, 28 U.S.C. 1404, providing for changes of venue generally, is available in those instances where transfer of a case for all purposes is desirable.

If proposed section 1407 should be enacted and future experience justifies extending it to include consolidation and coordination for trial purposes as well, only minor amendments to the present language of the bill will be necessary.

**Subsection (b)** provides for the conduct of the consolidated pretrial proceedings by a judge or judges assigned by the Judicial Panel on Multidistrict Litigation. It also authorizes temporary assignment of judges from one district or circuit to another to supervise the pretrial proceedings. This is designed to allow for the most efficient allocation of available judicial manpower.

**Subsection (c)** authorizes the initiation of proceedings for the transfer of any action by the Judicial Panel on Multidistrict Litigation itself or upon motion of a party and requires a hearing upon notice to all parties to determine whether a transfer shall be ordered. The experience of the Judicial Conference indicates that frequently it is the judges who are first aware of multidistrict litigation, but it also seems desirable to permit the parties to institute transfer proceedings as well.

**Subsection (d)** authorizes the Chief Justice of the United States to appoint the Judicial Panel on Multidistrict Litigation to be comprised of seven circuit and district judges, no two of whom can be from the same circuit. It provides that the concurrence of four of seven members shall be necessary to any panel action.

**Subsection (e)** limits review of transfer and subsequent decisions of the panel to mandamus in the Federal Court of Appeals for the transferee district. This procedure is more expeditious than appeal, and is consistent with the overall purposes of the proposed statute. The subsection makes clear that review is unavailable for an order of the panel denying transfer. Since such an order would not affect the ordinary course of legal proceedings, review is neither necessary nor desirable.

**Subsection (f)** authorizes the panel to prescribe rules for the conduct of its business not inconsistent with acts of Congress and the Federal Rules of Civil Procedure.

**Subsection (g)** excludes from the operation of the bill antitrust actions in which the United States is complainant. This limitation was requested by the Department of Justice and concurred in by the Coordinating Committee and the Judicial Conference of the United States, on the basis that consolidation might induce private plaintiffs to file actions merely to ride along on the Government's cases. Government suits would then almost certainly be delayed, often to the disadvantage of those injured competitors who would predicate damage actions on the outcome of the Gov-

## MULTIDISTRICT LITIGATION

ernment's suit. Furthermore, since section 5(b) of the Clayton Act (15 U.S.C. 16(b)) tolls the statute of limitations during the pendency of the Government's action, there is no need for injured competitors to join in the Government's suit. However, the subsection does not exclude Government damage suits. In such cases the Government is suing in a proprietary capacity and its posture is the same as a private party.

### COMMUNICATIONS

Attached hereto and made a part hereof is a letter from the Deputy Director of the Administrative Office of the United States Courts, dated April 12, 1965, to the Speaker of the House of Representatives requesting introduction of a predecessor measure on behalf of the Judicial Conference of the United States.

Also attached and made a part hereof is a letter, dated January 7, 1966, from the then Deputy Attorney General to the chairman of the House Committee on the Judiciary supporting the predecessor bill (H.R. 8276, 89th Cong.) and recommending amendments which have been incorporated in the instant measure.

ADMINISTRATIVE OFFICE OF THE U. S. COURTS,
SUPREME COURT BUILDING,
*Washington, D. C., April 12, 1965.*

Hon. JOHN W. McCORMACK,
*Speaker, House of Representatives,*
*Washington, D. C.*

DEAR MR. SPEAKER: On behalf of the Judicial Conference of the United States there is transmitted herewith a draft bill, approved by the Conference, to provide for the temporary transfer to a single district for coordinated or consolidated pretrial proceedings of civil actions pending in different districts which involve one or more common questions of fact, and for other purposes.

This proposed legislation would add a new section numbered 1407 to title 28, United States Code, to provide for the temporary transfer to a single district for coordinated or consolidated pretrial proceedings of civil actions pending in different districts which involve one or more common questions of fact. Such transfer would be made by a judicial panel on multidistrict litigation consisting of seven circuit and district judges, each from a different circuit, to be designated by the Chief Justice. The panel would have general supervision over such consolidated pretrial proceedings and would be empowered to request the temporary assignment under existing law of circuit or district judges to conduct the proceedings. At or before the completion of the pretrial proceedings the panel would remand each case to the district from which it has originally been transferred, unless it had previously been terminated in the course of the pretrial proceeding.

This proposal has grown out of the practical experience of the Judicial Conference Co-Ordinating Committee for Multiple Litigation in conducting pretrial proceedings in the current electrical equipment antitrust litigation and would provide appropriate procedure to meet the problems involved in conducting pretrial deposition and discovery proceedings efficiently and economically in the event of the filing of similar connected actions in diverse districts in the future. Under the express terms of the proposed legislation, the procedure would be invoked only if the judicial panel determined that its use would promote the just and efficient conduct of such actions. A comment by the Co-Ordinating Committee for Multiple Litigation on this proposed legislation is appended hereto.

# LEGISLATIVE HISTORY

At its session on March 18–19, the Conference voted to submit the enclosed draft bill. We shall be glad to provide any additional information. Sincerely yours,

WILLIAM E. FOLEY,
*Deputy Director.*

———

OFFICE OF THE DEPUTY ATTORNEY GENERAL,
*Washington, D. C.*

Hon. EMANUEL CELLER,
*Chairman, Committee on the Judiciary,*
*House of Representatives, Washington, D. C.*

DEAR MR. CHAIRMAN: This is in response to your request for the views of the Department of Justice concerning H.R. 8276, a bill to provide for the temporary transfer to a single district for coordinated or consolidated pretrial proceedings of civil actions pending in different districts which involve one or more common questions of fact, and for other purposes.

The bill would add a new section 1407 to title 28, United States Code, which would permit the transfer to a single district for coordinated or consolidated pretrial proceedings of civil actions pending in different districts which involve one or more common questions of fact. Such transfer shall be made by a judicial panel on multidistrict litigation, consisting of seven circuit and district judges appointed by the Chief Justice of the United States, upon determination by the panel that the transfer will promote justice and efficient conduct of such suits. The transfer requires the consent of the court in which the suit is pending, and each action so transferred shall be remanded by the panel at or before the conclusion of the pretrial proceedings to the district from which it was transferred. The panel may separate any claim, cross-claim, counterclaim, or third-party claim and remand any of such claims before the remainder of the action is remanded.

The coordinated or consolidated pretrial proceedings shall be conducted by a judge or judges assigned by the judicial panel. The panel may request, for this purpose, the temporary assignment of a circuit or district judge to the transferee district by the Chief Justice of the United States or the chief judge of the circuit. Proceedings for the transfer of an action may be initiated by the judicial panel by notice to the parties in all of the actions concerned of the manner, time, and place of the hearing to determine whether the transfer shall be made. The concurrence of four members of the panel shall be necessary to any action of the panel. When actions have been transferred by order of the panel, no district court refusing to consent to the transfer of related litigation may make any order for or permit discovery in conflict with the discovery proceedings in the transferred actions.

At present, there is no specific provision governing the conduct of discovery and pretrial proceedings on a consolidated basis. The massive national discovery program, which was established in response to the unprecedented number of electrical equipment treble damage actions, was instituted under the authority of Supreme Court rule-making power, which in turn resulted in a delegation of authority to a coordinating committee of judges for the purpose of working out an appropriate procedure for handling common discovery problems. The bill is an outgrowth of the experience gained under this national discovery program, and is an apparent attempt to codify some of the steps taken thereunder. (For a general discussion of the program, see Neal and Goldberg, "The Electrical Equipment Antitrust Cases; Novel Judicial Administration," 50 A.B.A.J. 621 (1964).)

This legislation was recommended by the Judicial Conference of the United States. The Department of Justice favors its enactment but suggests that it be amended in two respects.

# MULTIDISTRICT LITIGATION

We believe that Government prosecutions under the antitrust laws should be excluded from the scope of the measure. If the bill applied to such antitrust actions, it is anticipated that numerous private plaintiffs would file treble damage suits immediately following the filing of a Government suit. In consequence, Government suits filed by this Department would almost certainly be substantially delayed, often to the disadvantage of injured competitors who are awaiting the outcome of the Government suit upon which to predicate their damage actions. Furthermore, there is no need for participation of injured competitors at this stage since section 5(b) of the Clayton Act (15 U.S.C. 16(b)) tolls the running of the statute of limitations on their damage suits while the Government litigation is proceeding. Private plaintiffs may use discovery to uncover information relating only to damages or information that we have already obtained through the use of grand juries, civil investigative demands or informal interviews. Moreover, if we wish to avoid such delay, we may be forced to share with private plaintiffs information already in our possession that we prefer to keep confidential and to relinquish the control of a consolidated discovery proceeding to a private plaintiff's attorney.

While exempting the Government from this legislation may occasionally burden defendants because they may have to answer similar questions posed both by the Government and by private parties, this is justified by the importance to the public of securing relief in antitrust cases as quickly as possible. To treat the Government differently is not arbitrary, for the purpose of the governmental suit normally differs from that of a private suit; the Government seeks to protect the public from competitive injury, while private parties are primarily interested in recovering damages for injuries already suffered. We therefore recommend that the Government's civil antitrust suits be exempted from this legislation. On the other hand, the Government's damage suits should be included, for the Government's purpose in bringing such a suit is the same as that of a private party. Accordingly, it is suggested that a new subsection (g) be added to section 1 of the bill to read as follows:

"(g) Nothing in this section shall apply to any action in which the United States is a complainant arising under the antitrust laws. 'Antitrust laws' as used herein include those acts referred to in the Act of October 15, 1914, as amended (38 Stat. 730; 15 U.S.C. 12), and also include the Act of June 19, 1936 (49 Stat. 1526; 15 U.S.C. 13, 13a, and 13b) and the Act of September 26, 1914, as added March 21, 1938 (52 Stat. 116, 117, 15 U.S.C. 56); but shall not include section 4A of the Act of October 15, 1914, as added July 7, 1955 (69 Stat. 282; 15 U.S.C. 15a)."

Also, we believe that the provision of the bill which requires the consent of the district court from which an action is transferred should be deleted. To require such consent seems superfluous since seven circuit and district judges must consider the proposed transfer and four members of the panel approve it before it can take place. Requiring the consent of the transferor district judge would give a veto power and in essence require voluntary cooperation of all in order to consolidate discovery proceedings.

The Bureau of the Budget has advised that there is no objection to the submission of this report from the standpoint of the administration's program.

Sincerely,

RAMSEY CLARK,
*Deputy Attorney General.*

**1905**