**BEFORE THE**
**JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

RECEIVED ... APR 21 P

**In re Cintas Corp.**
**Overtime Pay Arbitration Litigation**

**MDL Docket No. 1781**

**DECLARATION OF MARK C. DOSKER**
**SUBMITTED WITH RESPONSE BY CINTAS CORPORATION IN OPPOSITION TO MOTION TO TRANSFER AND CONSOLIDATE PURSUANT TO 28 U.S.C. §1407**

I, MARK C. DOSKER, declare as follows:

1. I am an attorney at law licensed to practice before all state and federal courts located in the State of California, before the Supreme Court of the United States of America and before various other federal appeals courts and federal district courts, and I am a partner in the law firm of Squire, Sanders & Dempsey L.L.P. I am lead counsel of record for Cintas Corporation ("Cintas") in the action entitled *Veliz et al v. Cintas Corporation*, Case No. C-03-1180 (N.D. Cal.) (hereinafter "the Veliz Action"). I am also lead counsel for Cintas in the 70 Petition proceedings which are the subject of the motion which is pending before this Panel, and I am also lead counsel for Cintas in the proceedings before this Panel. The matters set forth below are within my personal knowledge, and if called upon as a witness, I could and would testify competently thereto.

2. Attached as Exhibit 3 to the Request for Judicial Notice submitted herewith is a true and correct copy of excerpts of the Reporter's Transcript of Proceedings of the October 18, 2005 hearing in the Veliz Action. The plaintiffs in the Veliz Action who are now Respondents in the 70 Petition proceedings which are the subject of the pending motion, through their counsel in the Veliz Action, announced at that hearing that they do not intend to arbitrate in accordance with the terms of their enforceable agreements with Cintas, in that they will not comply with the place-of-arbitration terms in their agreements, by announcing that they will instead seek to proceed in a single arbitration in San Francisco before an arbitrator in San Francisco (the Honorable Bruce Meyerson), rather than in the separate places required as to each Respondent in his or her arbitration agreement. Exhibit 3 to Request for Judicial Notice at 87:15-18.



3. In a teleconference on March 1, 2006 in which I participated, those persons again stated unequivocally through an attorney who is their counsel in the Veliz Action -- Michael Rubin of Altshuler, Berzon, Nussbaum, Rubin & Demain -- that they do not intend to arbitrate in accordance with the terms of their enforceable agreements with Cintas, by stating that they will seek to proceed in a single arbitration in San Francisco, instead of complying with the place-of-arbitration terms in each of their individual agreements.

4. Attached as Exhibit 1 hereto is a true and correct copy of the Declaration of Jonnie Hogel (including Exhibits thereto) which is a part of the record in the Veliz Action as Docket No. 292 in the Veliz Action ("Hogel Declaration"). Because the font of some of the exhibits to the Hogel Declaration is hard to read when printed from the Court's e-filing system, I have inserted after those exhibits a clean copy.

5. Attached as Exhibit 2 hereto is a true and correct copy of a letter dated March 21, 2005 from Michael Rubin, of Altshuler, Berzon, Nussbaum, Rubin & Demain, to the counsel for the plaintiffs in a class action lawsuit entitled Pichler et al v. UNITE et al, which is pending in the United States District Court for the Eastern District of Pennsylvania, Case No. 04-cv-02841. In it, Michael Rubin (who is co-lead counsel for the plaintiffs in the Veliz Action) states, *inter alia*, that his "law firm has a long-standing attorney-client relationship with UNITE-HERE; and pursuant to that relationship, all communications with UNITE-HERE regarding the matters addressed in your subpoena are subject to the attorney-client privilege as well as work-product protection." Michael Rubin also states that "[i]n response to your previous request, we fully cooperated in providing redacted copies of our bills to UNITE-HERE pertaining to the *Veliz* litigation, which confirm that UNITE-HERE paid us to perform legal services in that litigation."

6. Attached as Exhibit 3 hereto is a true and correct copy of a document served in Pichler et al v. UNITE et al, , signed by Michael Rubin, entitled "Objections to Subpoena Duces Tecum on Behalf of Altshuler, Berzon, Nussbaum, Rubin & Demain." In this document, consistent with what is stated in Exhibit 2 hereto, Michael Rubin's law firm objects on attorney-client privilege grounds to each of eight document requests relating to the connection -- in the bringing and handling and payment for the Veliz Action -- between UNITE and/or the International Brotherhood of Teamsters ("IBT") on the one hand, and on the other hand Michael Rubin's law firm Altshuler, Berzon, Nussbaum, Rubin & Demain (hereinafter "the Altshuler firm.")

7. Attached as Exhibit 4 hereto is a true and correct copy of a document served in Pichler et al v. UNITE et al, , entitled "Objections on Behalf of Defendants UNITE and Raynor to Plaintiffs' Subpoena Duces Tecum Dated January 31, 2005." In this document, consistent with what is stated in Exhibit 2 hereto and Exhibit 3 hereto, each of UNITE and Bruce Raynor (the president of UNITE) objects on attorney-client privilege grounds to each of the eight document requests in the subpoena to the Altshuler firm relating to the connection -- in the bringing and handling and payment for the Veliz Action -- between UNITE and/or the International Brotherhood of Teamsters ("IBT") on the one hand, and on the other hand the Altshuler firm.

8. Attached as Exhibit 5 hereto is a true and correct copy of the text (not including attachments) of three e-mails which were transmitted in the late afternoon and early evening of March 29, 2006. Starting with the earliest, at the bottom of the chain and reading upwards, they are as follows: (a) e-mail to Arbitrator Bruce Meyerson and me (and others) from Michael Rubin transmitting the document which is referred to in paragraph 8 of the motion pending

before this Panel; (b) e-mail from me to Arbitrator Bruce Meyerson and Michael Rubin (and others) and (c) Arbitrator Bruce Meyerson's e-mail to Michael Rubin and me (and others).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 26, 2006, at San Francisco, California.

Mark C. Dosker

# Exhibit 1



SQUIRE, SANDERS & DEMPSEY L.L.P.
Mark C. Dosker (CA Bar #114789)
Michael W. Kelly (CA Bar #214038)
Joseph A. Meckes (CA Bar #190279)
Cheryl A. Hipp (OH Bar #0062959)
Angela N. O'Rourke (CA Bar #211912)
Anna L. Endter (CA Bar #221610)
Y. Anna Suh (CA Bar #228632)
One Maritime Plaza, Third Floor
San Francisco, CA 94111-3492
Telephone: +1.415.954.0200
Facsimile: +1.415.393.9887

Attorneys for Defendants
CINTAS CORPORATION and
PLAN ADMINISTRATOR FOR
THE CINTAS PARTNERS' PLAN

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**(OAKLAND DIVISION)**

PAUL VELIZ, et al, On behalf of Themselves and All Others Similarly Situated.

Plaintiffs,

v.

CINTAS CORPORATION, an Ohio corporation; PLAN ADMINISTRATOR for the Cintas Partners' Plan; and DOES 1-25, inclusive,

Defendants.

Case No. 03-01180 (SBA)

CLASS ACTION

E-FILING

**DECLARATION OF JONNIE HOGEL IN SUPPORT OF CINTAS' OPPOSITION TO PLAINTIFFS' MOTION FOR ENFORCEMENT OF THE COURT'S FACILITATED NOTICE ORDER**

Date: October 19, 2004
Time: 1:00 p.m.
Courtroom: 3

Complaint filed: March 19, 2003
Judge: Hon. Saundra B. Armstrong

///

///

///

SQUIRE, SANDERS & DEMPSEY L.L.P.
One Maritime Plaza, Suite 300
San Francisco, CA 94111

I, JONNIE HOGEL, hereby declare as follows:

1. The following statements are based on my personal knowledge and review of business records including reports and data compiled in the course of Cintas' regular business activities. If called as a witness in this action, I could and would testify competently as to the matters set forth herein.

2. I am a Human Resources Analyst at Cintas' Corporate Headquarters in Mason, Ohio. I have been employed with Cintas since 1998.

3. Cintas has a policy and procedure and regular practice for managers at locations around the country to make immediate written reports regarding any union activity targeting their location or their partners. Any such written reports are transmitted via electronic mail, and collateral written materials such as hand bills, flyers, articles, letters, etc. are transmitted via facsimile. In the course of my regular duties, I am a custodian who collects these written reports as well as the collateral materials and maintains them for Cintas in the course of its regularly conducted business activity, for use by Cintas regarding union activity targeting Cintas around the country. I am also familiar with and participate in maintaining other documents and correspondence related to union activity targeting Cintas, and Cintas' response thereto including certain correspondence with employees and collections of materials related to union activity.

4. Among the articles collected as part of Cintas' regular practice of identifying and saving information regarding union activities targeting Cintas, of which I am a custodian, are the following:

a. Attached hereto as Exhibit A is an article from the Daily Labor Report published by the Bureau of National Affairs, 09 DLR C-1 (Jan. 14, 2003), titled "AFL-CIO Convenes Organizing Summit to Find New Ways to Expand Membership." The article quotes the President of the Union of Needletrades, Industrial and Textile Employees ("UNITE") that UNITE would launch a national organizing campaign against Cintas, "to break the back of this employer."

SQUIRE, SANDERS & DEMPSEY L.L.P.
One Maritime Plaza, Suite 300
San Francisco, CA 94111

SanFrancisco/135394.2

- 2 -

59028.00002

DECLARATION OF JONNIE HOGEL IN SUPPORT OF CINTAS' OPPOSITION

b. Attached hereto as Exhibit B is a press release from the PR Newswire published on March 19, 2003. The press release is UNITE's announcement of this lawsuit giving the union credit for "assisting the drivers in filing the suit and in forming a union."

c. Attached hereto as Exhibit C is an article from the Daily Labor Report published by the Bureau of National Affairs, 148 DLR A-11 (Aug. 1, 2003), titled "UNITE Delegates Approve New Campaign to Grow Union Through Increased Organizing." The article states that on June 25, 2003, UNITE and the Teamsters announced a joint effort to organize and represent Cintas employees.

d. Attached hereto as Exhibit D is an article from the Daily Labor Report published by the Bureau of National Affairs, 54 DLR A-6 (March 20, 2003), titled "Lawsuit Alleges Cintas Owes Pay for Overtime Worked by Delivery Drivers." The article characterizes this lawsuit against Cintas is "one volley in an organizing drive spearheaded by UNITE."

e. Attached hereto as Exhibit E is an article from the April 7, 2003 issue of *Business Week* entitled "Labor's New Organization Man" describing a conference call between UNITE President Bruce S. Raynor and the media announcing "an ambitious, $100 million lawsuit against Cintas."

f. Attached hereto as Exhibit F is a document which, as of October 1, 2003, could be downloaded from the UNITE website, www.uniformjustice.org/driver.php with an additional click on "A Message to SSRs from UNITE President Bruce Raynor." The document references the assistance of UNITE in the above-captioned lawsuit against Cintas and provides contact information "[f]or more information about the lawsuit or about how you can become involved in UNITE."

g. Attached hereto as Exhibit G is an article from The (Hayward, CA) Daily Review in which attorney Eileen Goldsmith, with the firm of Altshuler,

SQUIRE, SANDERS & DEMPSEY L.L.P.
One Maritime Plaza, Suite 300
San Francisco, CA 94111

Berzon, Nussbaum, Rubin & Demain, is described as an attorney for plaintiffs suing Cintas and also indicates that Ms. Goldsmith's firm represents UNITE.

h. Attached hereto as Exhibit H is an article dated August 11, 2003 from *In These Times* in which UNITE President Raynor is quoted saying "I don't know how long it will take to bring Cintas down, but mark my words: we will."

i. Attached hereto as Exhibit I is a press release issued by Uniform Justice, an organization that refers to itself as "a joint effort of UNITE HERE and the International Brotherhood of Teamsters." Cintas received this document on October 6, 2004. The document references the above-captioned lawsuit against Cintas and provides contact information "[f]or more information about the lawsuit go to www.cintasovertime.com or call 1-800-851-7783."

j. Attached hereto as Exhibit J is an article which as of October 7, 2004, was posted on the eTrucker.com website, www.etrucker.com/apps/news/article.asp?id=45142. The document refers to the above-captioned lawsuit against Cintas as "assisted by UNITE HERE" and also refers to Lerach, Coughlin, Stoia & Robbins as "one of three law firms representing the case."

5. Cintas employs drivers at 307 different geographical locations in 44 states. Between March 10, 2004 and June 18, 2004, Cintas managers at 24 different locations reported receiving more than 35 complaints from employees complaining about unions trying to get, having, and/or using their personal addresses to visit them, call them, or mail materials to their homes. One privacy related complaint even reported Teamsters representatives videotaping Cintas partners in their personal vehicles arriving for work.

6. From June 11, 2004 through June 18, 2004, 35 different Cintas location managers submitted contemporaneous reports that union representatives from UNITE or the Teamsters were present at their location on one or more occasions distributing flyers, posting signs and/or

SQUIRE, SANDERS & DEMPSEY L.L.P.
One Maritime Plaza, Suite 300
San Francisco, CA 94111

trying to speak to SSRs about joining this lawsuit. From June 11, 2004 through October 1, 2004, 131 different Cintas locations across the country submitted contemporaneous reports that union representatives from UNITE or the Teamsters were present at their location on one or more occasions distributing flyers, posting signs and/or trying to speak to SSRs about joining this lawsuit. Exhibits K and L attached hereto are examples of two kinds of written materials distributed by the union representatives to SSRs during this time period.

7. From September 30, 2004 through October 8, 2004, 53 different Cintas location managers nationwide submitted reports that employees had notified them of receiving a new package of information about this lawsuit by mail from the unions to their homes. Exhibit M attached hereto is an example of the envelope and materials turned in by employees on and after September 30, 2004.

8. Exhibit N attached hereto is a copy of a letter dated June 18, 2004 from President and CEO Scott Farmer which was mailed on June 19, 2004 to individuals consisting only of the active drivers employed by Cintas at that time. Working together with Barbara Strauss, a member of Cintas Corporate MIS, I have compared the list of recipients of this letter with the list of individuals on the Facilitated Notice mailing list and verified that only 2,840 of the individuals on that mailing list also were mailed this Exhibit N.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 8, 2004, at Mason, Ohio.

JONNIE HOGEL

SQUIRE, SANDERS & DEMPSEY L.L.P.
One Maritime Plaza, Suite 300
San Francisco, CA 94111

**EXHIBIT A**

Copyright 2003 The Bureau of National Affairs, Inc.,

DAILY LABOR REPORT

January 14, 2003, Tuesday

09 DLR C-1 (2003)

LENGTH: 3272 words

SECTION: SPECIAL REPORT

TITLE: Organizing:

AFL-CIO CONVENES ORGANIZING SUMMIT TO FIND NEW WAYS TO EXPAND MEMBERSHIP

AUTHOR: By Michelle Amber

TEXT:

Acknowledging that the labor movement will not survive unless it finds new, more successful strategies for organizing, labor leaders and key union organizers convened in Washington, D.C., Jan. 10-11 to brainstorm about ways to win more organizing campaigns and expand the labor movement.

At the end of the day-and-a-half-long "organizing summit" convened by the AFL-CIO, Stewart Acuff, the federation's organizing director, told BNA that the top organizers in America were in "remarkable agreement" about some things that labor needs to do in order to organize at a faster pace. These actions include:

-- being "much more aggressive and indignant" about the erosion of the fundamental right to organize;

-- having a much more strategic approach to organizing;

-- being much more aggressive in efforts to persuade unions to change the way they operate in order to organize more successfully; and

-- "trying to figure out how to win together" through unions cooperating, not competing with each other.

The summit, attended by some 200 organizers and leaders from 39 of the AFL-CIO's 66 affiliated unions, was the first AFL-CIO-sponsored conference in more than 40 years to convene top organizers to discuss what they have been doing wrong and what needs to be changed, according to AFL-CIO President John J. Sweeney. The most recent similar gathering was called in 1959, when then-AFL-CIO President George Meany convened a meeting of union presidents and top organizers to discuss organizing, he said.

Labor Has Done Many Things Wrong.

In opening the summit, Sweeney acknowledged that the labor movement has been doing many things wrong in its organizing program. "We're not spending enough money on organizing, not near enough," he said. "We haven't retooled our organizations [international unions, local unions, central labor bodies, and state federations] from top to bottom to support organizing. We've been developing and implementing tactics, but not strategies. We've been practicing 'situational solidarity' -- developing our own initiatives, but not sharing and coordinating" to build a national program.

Although the AFL-CIO began a "Voice at Work" campaign several years ago to spotlight employer interference in organizing campaigns and involve community activists, religious leaders, and elected officials, Sweeney said that the labor movement hasn't been "working hard enough, if at all, at generating community and political support. The public has

no idea about what employers are doing to destroy the freedom to form and join unions, or, frankly what our unions do to make workers' lives better in the first place," he said. "Even our own members don't have a clue about how employers destroy workers' hopes and campaigns of organizing for a better life."

Sweeney called on the organizers to come up with ways to correct these deficiencies.

During the summit, participants heard from union leaders about ways that some unions have changed their approach to organizing as well as some broad strategies to be considered.

Terry O'Sullivan, the president of the 800,000-member Laborers International Union of North America, told the summit that in 1997 his union decided to decentralize the organizing program with the creation of regional organizing funds (ROF). The ROFs, which are funded through hourly membership contributions of between 5 cents and 15 cents per member, generated $18 million for organizing in 2002, with the international contributing another $11 million.

O'Sullivan said that LIUNA is focusing on expanding the union's market share in its organizing. He noted that at the union's convention in 2002, delegates approved an effort to increase market share 20 percent in every industry where LIUNA represents workers before its next convention in 2006. Each local is held accountable for obtaining its market share goal, which is what is driving the union's organizing. "We have to have significant market share in order to negotiate good wages and benefits," he asserted.

O'Sullivan said the market share focus has caused the ROFs to be more strategic in their organizing. Now, before a campaign is contemplated, the ROF must look at what its effect will be on market share.

Part of strategic organizing, O'Sullivan said, is using the structure of the AFL-CIO. "We never interacted with the state federations or the central labor councils to pull all of labor into our organizing campaigns," he said, nor did the union ask for support from other unions. Now there is a commitment from LIUNA to work with these other bodies in organizing, he said.

Tom Woodruff, executive vice president of the Service Employees International Union, the largest union in the AFL-CIO, said that prior to 1996 fewer than 10 SEIU locals had active organizing programs because they saw organizing as the job of the international union. That changed, he said, when at the union's 1996 convention locals were asked to commit at least 20 percent of their revenues to organizing. In 2000, delegates to the union's convention approved the creation of a special Unity Fund into which locals will pay $1 per member per month for organizing. This year that fund will generate between $45 million and $50 million. Added to what the international and the local unions will be spending on organizing, SEIU will be spending a total of $150 million on organizing in 2003, he said. The union will have some 1,000 full-time organizers and 5,000 member organizers, he added.

Unions Need to Pressure Employers.

The labor movement will not be able to organize workers unless it can find ways to pressure employers so employees don't put their jobs on the line when they try to organize, according to Bruce Raynor, president of the Union of Needletrades, Industrial and Textile Employees.

Politicians Receive Wellstone Award

To honor two politicians for their support of workers' rights to organize, the AFL-CIO presented the inaugural Wellstone award during the organizing summit to former Gov. Howard Dean (D-Vt.) and State Sen. John Burton (D-Calif.). The award is named in honor of the late Sen. Paul Wellstone (D-Minn.), who was killed in a plane crash last year.

Dean received the award for supporting nurses at Fletcher Allen Health Care in Burlington -- Vermont's largest hospital system -- when they were trying to join an affiliate of the American Federation of Teachers (194 DLR A-1, 10/7/02). According to the AFL-CIO, Dean wrote a letter to the nurses saying if he were a nurse he would vote to unionize. He also appeared at a rally with nurses and urged the hospital to honor their choice on whether to join a union. Dean worked as a physician at that hospital before becoming governor.

Burton was honored for his support of legislation in California that provides mediation to resolve contract disputes after a grower recognizes a union representing its workers (191 DLR C-1, 10/2/02). Burton is the president pro tem of the California Senate.

As an example, Raynor said that after a 16-month fight to organize some 1,000 workers of Brylane, a catalog company in Indianapolis, the parties reached an agreement to allow workers at the company's Indiana distribution centers to vote on representation by UNITE in a secret mail-in card/ballot procedure (see related story in this issue). If a majority sends in cards to a third-party neutral, the company will recognize the union, he said.

Raynor said that the only way UNITE was able to get this card-check recognition agreement was because of the pressure the union put on Brylane, which is owned by a French conglomerate. He said the union picketed Gucci stores in the United States, which are owned by the same conglomerate; recruited French unions to put pressure on the company; published a sweatshop catalog; and put on a sweatshop fashion show.

Raynor told the conference participants that labor's failure to organize workers is having a profound effect on America's working families -- "we're letting them down." He laid out a number of things unions need to do in order to grow.

Unions need to allocate resources to organizing, knowing that many projects never will be financially advantageous, he said. Raynor noted that UNITE spent 10 years organizing a group of 100 workers in Atlanta. What that says to employers, he said, is that unions do not make business decisions. What it says to workers is that labor will fight for them as long as it takes.

Labor also has to figure out how to be strategic, Raynor said. "We have failed to make the right to organize a national issue," he said, adding that labor needs to make the issue a "national disgrace." Unions also have to take on large fights with employers, he said, maintaining that there are "not enough fights going on."

UNITE to Begin Large Campaign.

In the next few days, Raynor said that UNITE would be launching a nationwide organizing drive among some 30,000 workers at Cintas Corp., a large supplier of corporate logo uniforms, based in Cincinnati. Raynor called the company the "largest, most anti-union employer" in the industry, adding that it has won 39 decertification elections against unions. UNITE has assigned 50 organizers to the coordinated campaign, he said, which will involve putting pressure on the company, suing them, getting sued, picketing them, and picketing their customers, he said. He added that UNITE would be asking other unions for help in persuading their employers not to use uniforms from Cintas.

The campaign could take many years and UNITE will spend millions of dollars, Raynor said, but the union will continue the campaign until at some point the company will agree to card-check recognition, he said.

"This will be a financial loser," he said, but added that it's the kind of fight unions have to take on. "It's the right thing to do for workers in that industry -- to break the back of this employer," he said.

"We've left alone the most vicious anti-union employers in the country," Raynor said. "Now we have to take on these companies," he added.

Raynor said that unions also have to change the way they operate. He said his union is laying off people in its headquarters as it hires organizers. By the end of the next 12 months, the union will be spending 50 percent of its budget on organizing. "Organizing will be the central theme of our union," he said.

He also said that unions need to develop a renewed sense of solidarity, and workers in one part of the country need to fight for those in other parts of the country. "We have to put our relationships at risk with our employers" in order to organize workers of the same employer in other parts of the country, he said. "We have to insist that our affiliates support each other when called upon to do so. We have to get back to that notion that if you take on one of us you fight all of us." If unions don't use their collective power, they won't have collective power not so many years down the road, he warned.

Collective Bargaining as a 'Public Good.'

Another idea for participants to consider was suggested by Larry Cohen, executive vice president of the Communications Workers of America, who said the labor movement needs to push collective bargaining as a "public good." Whenever people talk about health care or retirement security, labor needs to point out that unions fought for those benefits and won them through collective bargaining, he said. It was because unions fought for pensions that employers started providing them, he said. Twelve million workers have retirement plans at work because of collective bargaining, he added.

Unions need to communicate with their own members about this message that collective bargaining is a public good, Cohen said. Members need to know that because unions represent only 9 percent of the private sector and 35 percent of the public sector, unions are having to strike to protect their health care benefits. "We have to talk to the workers in the shops," he said, adding there is no way to reverse labor's decline unless it takes that message to every workplace.

Cohen recommended that labor select a day to shut down every regional office of the NLRB through civil disobedience, similar to what it did in 1993. On Feb. 11, 1993, several unions staged demonstrations and engaged in civil disobedience at several regional offices around the country. Labor needs to show the public that the NLRB is broken, he said. When employees try to organize, employers tie the cases up, appeal them to the board in Washington, and workers who vote for a union wait for years before they get any answer.

Meanwhile, he said, NLRB is sending letters to governors in New York and New Jersey telling them that recently enacted state laws and executive orders are preempted by federal labor law. New York Gov. George Pataki (R) Sept. 30, 2002, signed legislation prohibiting state funds from being used to discourage or encourage workers from organizing and seeking union representation. The bill was supported by the state AFL-CIO. Earlier, on June 11, 2002, New Jersey Gov. James McGreevey (D) issued an executive order that established the Apparel Procurement Board to regulate the purchase of uniforms for state employees. The order requires vendors and their contractors to adopt a neutrality position in union organizing as well as card check recognition if a majority of workers sign union authorization cards.

Last month, an NLRB official asked the labor commissioners of New York and New Jersey to explain how the states plan to enforce their newly enacted labor neutrality laws and why the state officials think the new laws are not preempted by the National Labor Relations Act (236 DLR A-1, 12/9/02).

Cohen said that labor needs to figure out a solution to fix the rights of workers to organize. One way would be for labor to work to end federal preemption, he said, so laws can be passed state by state. In Canada, he said, individual provinces have passed legislation on first contract arbitration and card-check recognition. "In this country we're banned from doing that." We need to keep pushing governors who have supported us to continue passing laws, not one, not two, but 300, he said.

Acuff told BNA that the point behind Cohen's call for shutting down the NLRB is that labor needs to do something "dramatic" to call attention to the failure of the law in the area of organizing. "It should be dramatic and militant, and should include civil disobedience," he said.

Paul Booth, the executive assistant to the president of AFSCME, told the summit that it is important for organizers from different unions to talk with each other. Unions have a strong interest as competitors and are reluctant to support each other in campaigns. That has to change, he said. Booth also said unions have to stop interfering with each other's organizing drives. "It is inexcusable for any union to try to grow at the expense of another union," he said.

Strategies to Reduce Employer Opposition.

One of several breakout sessions during the conference developed the following recommendations for reducing employer opposition to organizing drives:

-- Union members must be educated about what employers do when workers try to form unions.

-- Unions need to work with coalitions, including community, religious leaders, and organizations such as Jobs with Justice.

-- Unions need to force politicians to support the right to organize, to show up at rallies, and even agree to be arrested with workers.

Marilyn Sneiderman, director of the AFL-CIO's field mobilization department, told the participants they have "to build a strategy to build a movement. It has to be more than a short-term tactic around one campaign," she said. Everyone has to change the climate to build results in organizing. Unions have to build lasting ties with politicians and communities, she said, adding they can't wait until they are in the middle of a struggle to build these relationships.

Until Sweeney took over as president of the AFL-CIO, state federations and central labor councils were not directly involved in organizing campaigns. That is changing and it needs to continue to change, speakers said.

Miguel Contreras, executive secretary-treasurer of the Los Angeles County Federation of Labor, which consists of 350 locals, told the meeting how he changed his central labor council (CLC) to help support organizing in Los Angeles.

Contreras said about six years ago he convened a meeting of union leaders in Los Angeles to discuss the labor situation in the city. Many union leaders didn't know the leaders of other unions and had never worked together, he said. After the meeting, the leaders started working together creating committees for mobilization, organizing, and research, and the CLC assigned staff to the committees. The unions also began creating relationships with politicians -- including getting some of their own members elected -- and with religious leaders such as Cardinal Roger Mahony, the Archbishop of Los Angeles.

All this work paid off when the Service Employees International Union took some 8,000 janitors out on strike in April 2000, he said. The CLC marshaled all its resources, including all the relationships that had been built, adding that both Cardinal Mahony and the Republican mayor of Los Angeles marched with the strikers. Several councilmen that the union had helped get elected agreed to be arrested with the workers, he added.

When the employer threatened to bring in strikebreakers, all the unions pledged to mobilize thousands of members to "shut down downtown LA office buildings," he said. Also, the unions pledged to contribute $125,000 to the janitors because they didn't have a strike fund, he said. The strike was settled before the unions had to take any action.

Where to Go From Here.

In closing the summit, Sweeney said the meeting was just the start of creating a plan to grow the labor movement. "Now we have to figure out how to get the job done."

"We have to make the decision to work together. In many unions, things may have to be done differently. We have to commit to building relationships with our allies. We need to make every organizing campaign a referendum on human rights in America," he said.

Sweeney also said that unions have to challenge "every single politician in every election to support the right to organize. If they don't, we shouldn't endorse them. If they do, we should hold them accountable" to stand with workers during specific organizing drives.

"We have to educate our own members on organizing and politics and remind them that organizing is not just about numbers and dues but human dignity and social justice," Sweeney said.

Acuff told BNA that at its next meeting in February, the AFL-CIO Executive Council will be presented for discussion some proposed steps that unions can take in their organizing efforts, based on the discussions that took place at the summit. He said, however, that there will not be a totally new plan presented. It is not realistic to expect the labor movement to change overnight, he said, adding, it has to be done in steps.

LANGUAGE: ENGLISH

Copyright 2003 The Bureau of National Affairs, Inc.,

DAILY LABOR REPORT

January 14, 2003, Tuesday

09 DLR C-1 (2003)

LENGTH: 3272 words

SECTION: SPECIAL REPORT

TITLE: Organizing:

AFL-CIO CONVENES ORGANIZING SUMMIT TO FIND NEW WAYS TO EXPAND MEMBERSHIP

AUTHOR: By Michelle Amber

TEXT:

Acknowledging that the labor movement will not survive unless it finds new, more successful strategies for organizing, labor leaders and key union organizers convened in Washington, D.C., Jan. 10-11 to brainstorm about ways to win more organizing campaigns and expand the labor movement.

At the end of the day-and-a-half-long "organizing summit" convened by the AFL-CIO, Stewart Acuff, the federation's organizing director, told BNA that the top organizers in America were in "remarkable agreement" about some things that labor needs to do in order to organize at a faster pace. These actions include:

-- being "much more aggressive and indignant" about the erosion of the fundamental right to organize;

-- having a much more strategic approach to organizing;

-- being much more aggressive in efforts to persuade unions to change the way they operate in order to organize more successfully; and

-- "trying to figure out how to win together" through unions cooperating, not competing with each other.

The summit, attended by some 200 organizers and leaders from 39 of the AFL-CIO's 66 affiliated unions, was the first AFL-CIO-sponsored conference in more than 40 years to convene top organizers to discuss what they have been doing wrong and what needs to be changed, according to AFL-CIO President John J. Sweeney. The most recent similar gathering was called in 1959, when then-AFL-CIO President George Meany convened a meeting of union presidents and top organizers to discuss organizing, he said.

Labor Has Done Many Things Wrong.

In opening the summit, Sweeney acknowledged that the labor movement has been doing many things wrong in its organizing program. "We're not spending enough money on organizing, not near enough," he said. "We haven't retooled our organizations [international unions, local unions, central labor bodies, and state federations] from top to bottom to support organizing. We've been developing and implementing tactics, but not strategies. We've been practicing 'situational solidarity' -- developing our own initiatives, but not sharing and coordinating" to build a national program.

Although the AFL-CIO began a "Voice at Work" campaign several years ago to spotlight employer interference in organizing campaigns and involve community activists, religious leaders, and elected officials, Sweeney said that the labor movement hasn't been "working hard enough, if at all, at generating community and political support. The public has

no idea about what employers are doing to destroy the freedom to form and join unions, or, frankly what our unions do to make workers' lives better in the first place," he said. "Even our own members don't have a clue about how employers destroy workers' hopes and campaigns of organizing for a better life."

Sweeney called on the organizers to come up with ways to correct these deficiencies.

During the summit, participants heard from union leaders about ways that some unions have changed their approach to organizing as well as some broad strategies to be considered.

Terry O'Sullivan, the president of the 800,000-member Laborers International Union of North America, told the summit that in 1997 his union decided to decentralize the organizing program with the creation of regional organizing funds (ROF). The ROFs, which are funded through hourly membership contributions of between 5 cents and 15 cents per member, generated $18 million for organizing in 2002, with the international contributing another $11 million.

O'Sullivan said that LIUNA is focusing on expanding the union's market share in its organizing. He noted that at the union's convention in 2002, delegates approved an effort to increase market share 20 percent in every industry where LIUNA represents workers before its next convention in 2006. Each local is held accountable for obtaining its market share goal, which is what is driving the union's organizing. "We have to have significant market share in order to negotiate good wages and benefits," he asserted.

O'Sullivan said the market share focus has caused the ROFs to be more strategic in their organizing. Now, before a campaign is contemplated, the ROF must look at what its effect will be on market share.

Part of strategic organizing, O'Sullivan said, is using the structure of the AFL-CIO. "We never interacted with the state federations or the central labor councils to pull all of labor into our organizing campaigns," he said, nor did the union ask for support from other unions. Now there is a commitment from LIUNA to work with these other bodies in organizing, he said.

Tom Woodruff, executive vice president of the Service Employees International Union, the largest union in the AFL-CIO, said that prior to 1996 fewer than 10 SEIU locals had active organizing programs because they saw organizing as the job of the international union. That changed, he said, when at the union's 1996 convention locals were asked to commit at least 20 percent of their revenues to organizing. In 2000, delegates to the union's convention approved the creation of a special Unity Fund into which locals will pay $1 per member per month for organizing. This year that fund will generate between $45 million and $50 million. Added to what the international and the local unions will be spending on organizing, SEIU will be spending a total of $150 million on organizing in 2003, he said. The union will have some 1,000 full-time organizers and 5,000 member organizers, he added.

Unions Need to Pressure Employers.

The labor movement will not be able to organize workers unless it can find ways to pressure employers so employees don't put their jobs on the line when they try to organize, according to Bruce Raynor, president of the Union of Needletrades, Industrial and Textile Employees.

Politicians Receive Wellstone Award

To honor two politicians for their support of workers' rights to organize, the AFL-CIO presented the inaugural Wellstone award during the organizing summit to former Gov. Howard Dean (D-Vt.) and State Sen. John Burton (D-Calif.). The award is named in honor of the late Sen. Paul Wellstone (D-Minn.), who was killed in a plane crash last year.

Dean received the award for supporting nurses at Fletcher Allen Health Care in Burlington -- Vermont's largest hospital system -- when they were trying to join an affiliate of the American Federation of Teachers (194 DLR A-1, 10/7/02). According to the AFL-CIO, Dean wrote a letter to the nurses saying if he were a nurse he would vote to unionize. He also appeared at a rally with nurses and urged the hospital to honor their choice on whether to join a union. Dean worked as a physician at that hospital before becoming governor.

Burton was honored for his support of legislation in California that provides mediation to resolve contract disputes after a grower recognizes a union representing its workers (191 DLR C-1, 10/2/02). Burton is the president pro tem of the California Senate.

As an example, Raynor said that after a 16-month fight to organize some 1,000 workers of Brylane, a catalog company in Indianapolis, the parties reached an agreement to allow workers at the company's Indiana distribution centers to vote on representation by UNITE in a secret mail-in card/ballot procedure (see related story in this issue). If a majority sends in cards to a third-party neutral, the company will recognize the union, he said.

Raynor said that the only way UNITE was able to get this card-check recognition agreement was because of the pressure the union put on Brylane, which is owned by a French conglomerate. He said the union picketed Gucci stores in the United States, which are owned by the same conglomerate; recruited French unions to put pressure on the company; published a sweatshop catalog; and put on a sweatshop fashion show.

Raynor told the conference participants that labor's failure to organize workers is having a profound effect on America's working families -- "we're letting them down." He laid out a number of things unions need to do in order to grow.

Unions need to allocate resources to organizing, knowing that many projects never will be financially advantageous, he said. Raynor noted that UNITE spent 10 years organizing a group of 100 workers in Atlanta. What that says to employers, he said, is that unions do not make business decisions. What it says to workers is that labor will fight for them as long as it takes.

Labor also has to figure out how to be strategic, Raynor said. "We have failed to make the right to organize a national issue," he said, adding that labor needs to make the issue a "national disgrace." Unions also have to take on large fights with employers, he said, maintaining that there are "not enough fights going on."

UNITE to Begin Large Campaign

In the next few days, Raynor said that UNITE would be launching a nationwide organizing drive among some 30,000 workers at Cintas Corp., a large supplier of corporate logo uniforms, based in Cincinnati. Raynor called the company the "largest, most anti-union employer" in the industry, adding that it has won 39 decertification elections against unions. UNITE has assigned 50 organizers to the coordinated campaign, he said, which will involve putting pressure on the company, suing them, getting sued, picketing them, and picketing their customers, he said. He added that UNITE would be asking other unions for help in persuading their employers not to use uniforms from Cintas.

The campaign could take many years and UNITE will spend millions of dollars, Raynor said, but the union will continue the campaign until at some point the company will agree to card-check recognition, he said.

"This will be a financial loser," he said, but added that it's the kind of fight unions have to take on. "It's the right thing to do for workers in that industry -- to break the back of this employer," he said.

"We've left alone the most vicious anti-union employers in the country," Raynor said. "Now we have to take on these companies," he added.

Raynor said that unions also have to change the way they operate. He said his union is laying off people in its headquarters as it hires organizers. By the end of the next 12 months, the union will be spending 50 percent of its budget on organizing. "Organizing will be the central theme of our union," he said.

He also said that unions need to develop a renewed sense of solidarity, and workers in one part of the country need to fight for those in other parts of the country. "We have to put our relationships at risk with our employers" in order to organize workers of the same employer in other parts of the country, he said. "We have to insist that our affiliates support each other when called upon to do so. We have to get back to that notion that if you take on one of us you fight all of us." If unions don't use their collective power, they won't have collective power not so many years down the road, he warned.

Collective Bargaining as a 'Public Good.'

Another idea for participants to consider was suggested by Larry Cohen, executive vice president of the Communications Workers of America, who said the labor movement needs to push collective bargaining as a "public good." Whenever people talk about health care or retirement security, labor needs to point out that unions fought for those benefits and won them through collective bargaining, he said. It was because unions fought for pensions that employers started providing them, he said. Twelve million workers have retirement plans at work because of collective bargaining, he added.

Unions need to communicate with their own members about this message that collective bargaining is a public good, Cohen said. Members need to know that because unions represent only 9 percent of the private sector and 35 percent of the public sector, unions are having to strike to protect their health care benefits. "We have to talk to the workers in the shops," he said, adding there is no way to reverse labor's decline unless it takes that message to every workplace.

Cohen recommended that labor select a day to shut down every regional office of the NLRB through civil disobedience, similar to what it did in 1993. On Feb. 11, 1993, several unions staged demonstrations and engaged in civil disobedience at several regional offices around the country. Labor needs to show the public that the NLRB is broken, he said. When employees try to organize, employers tie the cases up, appeal them to the board in Washington, and workers who vote for a union wait for years before they get any answer.

Meanwhile, he said, NLRB is sending letters to governors in New York and New Jersey telling them that recently enacted state laws and executive orders are preempted by federal labor law. New York Gov. George Pataki (R) Sept. 30, 2002, signed legislation prohibiting state funds from being used to discourage or encourage workers from organizing and seeking union representation. The bill was supported by the state AFL-CIO. Earlier, on June 11, 2002, New Jersey Gov. James McGreevey (D) issued an executive order that established the Apparel Procurement Board to regulate the purchase of uniforms for state employees. The order requires vendors and their contractors to adopt a neutrality position in union organizing as well as card check recognition if a majority of workers sign union authorization cards.

Last month, an NLRB official asked the labor commissioners of New York and New Jersey to explain how the states plan to enforce their newly enacted labor neutrality laws and why the state officials think the new laws are not preempted by the National Labor Relations Act (236 DLR A-1, 12/9/02).

Cohen said that labor needs to figure out a solution to fix the rights of workers to organize. One way would be for labor to work to end federal preemption, he said, so laws can be passed state by state. In Canada, he said, individual provinces have passed legislation on first contract arbitration and card-check recognition. "In this country we're banned from doing that." We need to keep pushing governors who have supported us to continue passing laws, not one, not two, but 300, he said.

Acuff told BNA that the point behind Cohen's call for shutting down the NLRB is that labor needs to do something "dramatic" to call attention to the failure of the law in the area of organizing. "It should be dramatic and militant, and should include civil disobedience," he said.

Paul Booth, the executive assistant to the president of AFSCME, told the summit that it is important for organizers from different unions to talk with each other. Unions have a strong interest as competitors and are reluctant to support each other in campaigns. That has to change, he said. Booth also said unions have to stop interfering with each other's organizing drives. "It is inexcusable for any union to try to grow at the expense of another union," he said.

Strategies to Reduce Employer Opposition.

One of several breakout sessions during the conference developed the following recommendations for reducing employer opposition to organizing drives:

-- Union members must be educated about what employers do when workers try to form unions.

-- Unions need to work with coalitions, including community, religious leaders, and organizations such as Jobs with Justice.

-- Unions need to force politicians to support the right to organize, to show up at rallies, and even agree to be arrested with workers.

Marilyn Sneiderman, director of the AFL-CIO's field mobilization department, told the participants they have "to build a strategy to build a movement. It has to be more than a short-term tactic around one campaign," she said. Everyone has to change the climate to build results in organizing. Unions have to build lasting ties with politicians and communities, she said, adding they can't wait until they are in the middle of a struggle to build these relationships.

Until Sweeney took over as president of the AFL-CIO, state federations and central labor councils were not directly involved in organizing campaigns. That is changing and it needs to continue to change, speakers said.

Miguel Contreras, executive secretary-treasurer of the Los Angeles County Federation of Labor, which consists of 350 locals, told the meeting how he changed his central labor council (CLC) to help support organizing in Los Angeles.

Contreras said about six years ago he convened a meeting of union leaders in Los Angeles to discuss the labor situation in the city. Many union leaders didn't know the leaders of other unions and had never worked together, he said. After the meeting, the leaders started working together creating committees for mobilization, organizing, and research, and the CLC assigned staff to the committees. The unions also began creating relationships with politicians -- including getting some of their own members elected -- and with religious leaders such as Cardinal Roger Mahony, the Archbishop of Los Angeles.

All this work paid off when the Service Employees International Union took some 8,000 janitors out on strike in April 2000, he said. The CLC marshaled all its resources, including all the relationships that had been built, adding that both Cardinal Mahony and the Republican mayor of Los Angeles marched with the strikers. Several councilmen that the union had helped get elected agreed to be arrested with the workers, he added.

When the employer threatened to bring in strikebreakers, all the unions pledged to mobilize thousands of members to "shut down downtown LA office buildings," he said. Also, the unions pledged to contribute $125,000 to the janitors because they didn't have a strike fund, he said. The strike was settled before the unions had to take any action.

Where to Go From Here.

In closing the summit, Sweeney said the meeting was just the start of creating a plan to grow the labor movement. "Now we have to figure out how to get the job done."

"We have to make the decision to work together. In many unions, things may have to be done differently. We have to commit to building relationships with our allies. We need to make every organizing campaign a referendum on human rights in America," he said.

Sweeney also said that unions have to challenge "every single politician in every election to support the right to organize. If they don't, we shouldn't endorse them. If they do, we should hold them accountable" to stand with workers during specific organizing drives.

"We have to educate our own members on organizing and politics and remind them that organizing is not just about numbers and dues but human dignity and social justice," Sweeney said.

Acuff told BNA that at its next meeting in February, the AFL-CIO Executive Council will be presented for discussion some proposed steps that unions can take in their organizing efforts, based on the discussions that took place at the summit. He said, however, that there will not be a totally new plan presented. It is not realistic to expect the labor movement to change overnight, he said, adding, it has to be done in steps.

LANGUAGE: ENGLISH

**EXHIBIT B**

4 of 4 DOCUMENTS

Copyright 2003 PR Newswire Association, Inc.
PR Newswire

March 19, 2003, Wednesday

**SECTION:** FINANCIAL NEWS

**DISTRIBUTION:** TO BUSINESS, LABOR AND LEGAL AFFAIRS EDITORS

**LENGTH:** 853 words

**HEADLINE:** Class Action Lawsuit Says Laundry Giant Cintas Cheated Workers Out of Tens of Millions in Overtime Pay;
Violations of Federal Fair Labor Standards Act and State Laws in California, Illinois, Michigan and New Jersey Could Cost Company $75 to $100 Million

**DATELINE:** SAN FRANCISCO, Calif., March 19

**BODY:**

Attorneys for a group of Cintas employees this morning filed a lawsuit in federal district court charging that the company has deliberately withheld tens of millions of dollars in overtime pay from them over the last three years. The workers, drivers of delivery and route sales trucks, say Cintas deliberately misclassified thousands of workers as exempt employees in order to avoid paying overtime required by state and federal laws.

The lawsuit, which was filed in U.S. District Court for the Northern District of California, eventually may involve as many as 3,500 workers formerly or currently employed by the company and could cost Cintas $75 to $100 million dollars.

The drivers filing suit are delivery and service representatives who have been routinely required to work unpaid overtime for the industry behemoth. Cintas, based in Ohio, makes, rents and launders uniforms for a wide range of industries.

"Cintas has made millions of dollars in unearned profits at the expense of some of its hardest-working employees," said Bruçe Raynor, president of the Union of Needletrades, Industrial and Textile Employees (UNITE,) which is assisting the drivers in filing the suit and in forming a union.

All workers are entitled to overtime premiums under the Fair Labor Standards Act (FLSA) unless they are specifically exempted. The FLSA contains narrow exemptions for executive, administrative, professional, and outside sales employees, who can be required to work more than 40 hours a week without being paid overtime. Whether a worker is exempt depends on the work performed, not the job title assigned by an employer. Most state statutes track the federal law, although some (like California and New Jersey) give workers even greater protections. The drivers argue that their jobs driving trucks, delivering uniforms and servicing existing contracts do not make them exempt, and that they should be paid at the legal rate for all hours worked.

The suit also charges that Cintas actions are in violation of California's Unfair Competition Act. In addition to California, the named plaintiffs include workers in Illinois, Michigan, and New Jersey. The suit is being brought on behalf of all Cintas drivers nationwide, including former drivers.

Cintas is the largest uniform rental provider and industrial launderer in North America. With 27,000 employees -- 17,000 of them non-managerial -- the company operates 170 laundry plants, 103 depots, 10 cleanroom laundries, 14 manufacturing facilities, seven distribution centers and 36 first aid facilities across the United States and Canada. A publicly traded company with 2002 profits of $234 million from $2.27 billion in sales, Cintas controls a 30 percent share of the uniform market.

A report recently released by the union shows that Cintas -- a publicly held company traded on the NASDAQ -- recorded its 33rd consecutive year of growth in 2002. The giant corporation's customers include Chevron, Delta Airlines,

Exxon, Firestone, Ford Motor Company, General Motors, Hershey, Northwest Airlines, Kraft Foods, Sears, and UPS. Over 40 additional lawsuits have been filed against the company for racial, sexual, age and disability discrimination.

A union spokesperson said, "Cintas executives are the kind of business people who give corporate CEOs a bad name," noting that CEO Robert Kohlhepp received a $51,000 raise last year and his salary is now $490,000. COO Scott Farmer received a $71,000 raise, he said, and now makes $450,000, and gained an additional $1.3 million by selling company stock.

UNITE this year filed 80 charges against the company for violations of labor laws. Cintas has also come under attack for discriminating against employees. A jury in Kansas City found that Cintas had illegally paid Beth Merrill less than male employees and fired her for fighting back, awarding Merrill $224,000 in damages. Suits have been filed against the company for race and age discrimination.

Cintas founder and chairman Richard T. Farmer, the report says, is so opposed to unions that he makes hefty political contributions to counter those of unions. Between the 2000 and 2001 elections cycles, Farmer and his wife gave $1.3 million dollars to the Republican Party, the second largest donation to the GOP during that period.

The company, UNITE says, has a long history of anti-unionism. In 1999, Cintas bought out a heavily unionized competitor -- Unitog -- and promptly closed all but one of Unitog's unionized facilities, throwing thousands of union members out of work. In Hopewell, Virginia, Cintas acquired Metropolitan Uniform Services, where employees had been union for 28 years, and then tried to decertify the union by promising the workers higher wages and better benefits, unlawful conduct under U.S. labor laws.

SOURCE UNITE

CONTACT: Pat Lewis, +1-202-842-3100, for UNITE, or Jen Roitman of UNITE, +1-646-734-4054

URL: http://www.prnewswire.com

**LOAD-DATE:** March 20, 2003

**EXHIBIT C**

Copyright 2003 The Bureau of National Affairs, Inc.,

DAILY LABOR REPORT

August 1, 2003, Friday

148 DLR A-11 (2003)

LENGTH: 766 words

SECTION: NEWS

TITLE: Unions:

UNITE DELEGATES APPROVE NEW CAMPAIGN TO GROW UNION THROUGH INCREASED ORGANIZING

AUTHOR: By Michelle Amber

TEXT:

Delegates to the second constitutional convention of the Union of Needletrades, Industrial, and Textile Employees the week of July 21 approved a "campaign for the future" plan that is aimed at expanding the union through increased organizing.

The goals of the campaign are to double organizing resources, increase coordinated bargaining in key industries, increase member mobilization in organizing and bargaining through solidarity actions, and defend the union's core industries, union officials said.

UNITE President Bruce Raynor told BNA July 31 that major components of the plan call for a substantial dues increase to be used almost exclusively for organizing; a commitment by the union's locals to engage in mobilization of members to support organizing and bargaining throughout the union through demonstrations, boycotts, and corporate campaigns; building alliances with community, civil rights groups, and others; and reducing the number of UNITE locals through mergers around industrial and/or geographical lines.

In addition, the 250,000-member union has committed to organizing 25,000 new members per year for each of the next four years, Raynor said. That goal represents a significant increase from the 56,000 employees organized during the last four years, he noted.

By the end of next year, the union plans to spend $24 million annually on organizing efforts, double the amount it currently spends, according to Raynor.

Dues Increase Approved.

To help finance the plan, delegates at the Las Vegas convention also approved a significant increase in dues. Beginning in October, members who pay monthly dues will pay $2 more per month in each of the next four years. Those who pay weekly dues will increase their dues by 50 cents a week, according to UNITE Vice President Susan Cowell. The dues increase will raise about $1.6 million by the end of the four-year period or about $400,000 each year, she said.

The full amount of the dues increase will be targeted to the new campaign and will be used not only for organizing but for corporate research as well as coordinated bargaining, she said. The international, which "leads organizing and corporate campaigns," will keep $1.30 of the increase, while the locals will keep 70 cents.

The portion that is kept by the affiliates will be dedicated to organizing and coordinated bargaining, as well as to internal organizing, particularly in right-to-work states where UNITE has a presence. "Every penny will be dedicated to the new program to build strength," Cowell said.

In order to increase the resources for organizing, the union is limiting expenditures in other areas such as reducing staff in administrative departments. Cowell added that the union also recently sold its headquarters building for $23 million (103 DLR A-11, 5/29/03).

According to Raynor, the union currently is organizing primarily in four sectors: laundries; distribution and retail apparel; apparel and textile manufacturing; and disability services. UNITE and the Teamsters June 25 announced they were launching a joint organizing effort to represent approximately 17,000 union-eligible employees at Cintas Corp., the Cincinnati-based supplier of uniforms (123 DLR A-12, 6/26/03).

In order to expand membership and get more power at the bargaining table, the union plans to engage in more coordinated bargaining, and will try to negotiate common expiration dates, Raynor said. If UNITE has good relationships with a company at 10 locations but the employer is fighting with the union at one, the employer will have to take on employees at all 11 locations, he said. Through coordinated bargaining, one group will be able to support fellow union members at another bargaining table, he added.

The union also is streamlining operations by combining locals. In New York, the union intends to reduce the 11 metropolitan area locals to five, organized along industrial lines, and in other areas, locals are merging along regional lines.

In other action at the convention, delegates voted to formally change the union's name to the acronym UNITE in recognition of its evolving jurisdiction in laundries and other industries.

Delegates also voted to establish a retiree organization that would be involved in politics as well as in the new organizing effort. The effort is aimed at building on the 250,000 retirees' loyalty to their union, Cowell explained. The organization would be funded through the payment of dues by the retirees.

LANGUAGE: ENGLISH

Copyright 2003 The Bureau of National Affairs, Inc.,

DAILY LABOR REPORT

August 1, 2003, Friday

148 DLR A-11 (2003)

LENGTH: 766 words

SECTION: NEWS

TITLE: Unions:

UNITE DELEGATES APPROVE NEW CAMPAIGN TO GROW UNION THROUGH INCREASED ORGANIZING

AUTHOR: By Michelle Amber

TEXT:

Delegates to the second constitutional convention of the Union of Needletrades, Industrial, and Textile Employees the week of July 21 approved a "campaign for the future" plan that is aimed at expanding the union through increased organizing.

The goals of the campaign are to double organizing resources, increase coordinated bargaining in key industries, increase member mobilization in organizing and bargaining through solidarity actions, and defend the union's core industries, union officials said.

UNITE President Bruce Raynor told BNA July 31 that major components of the plan call for a substantial dues increase to be used almost exclusively for organizing; a commitment by the union's locals to engage in mobilization of members to support organizing and bargaining throughout the union through demonstrations, boycotts, and corporate campaigns; building alliances with community, civil rights groups, and others; and reducing the number of UNITE locals through mergers around industrial and/or geographical lines.

In addition, the 250,000-member union has committed to organizing 25,000 new members per year for each of the next four years, Raynor said. That goal represents a significant increase from the 56,000 employees organized during the last four years, he noted.

By the end of next year, the union plans to spend $24 million annually on organizing efforts, double the amount it currently spends, according to Raynor.

Dues Increase Approved.

To help finance the plan, delegates at the Las Vegas convention also approved a significant increase in dues. Beginning in October, members who pay monthly dues will pay $2 more per month in each of the next four years. Those who pay weekly dues will increase their dues by 50 cents a week, according to UNITE Vice President Susan Cowell. The dues increase will raise about $1.6 million by the end of the four-year period or about $400,000 each year, she said.

The full amount of the dues increase will be targeted to the new campaign and will be used not only for organizing but for corporate research as well as coordinated bargaining, she said. The international, which "leads organizing and corporate campaigns," will keep $1.30 of the increase, while the locals will keep 70 cents.

The portion that is kept by the affiliates will be dedicated to organizing and coordinated bargaining, as well as to internal organizing, particularly in right-to-work states where UNITE has a presence. "Every penny will be dedicated to the new program to build strength," Cowell said.

In order to increase the resources for organizing, the union is limiting expenditures in other areas such as reducing staff in administrative departments. Cowell added that the union also recently sold its headquarters building for $23 million (103 DLR A-11, 5/29/03).

According to Raynor, the union currently is organizing primarily in four sectors: laundries; distribution and retail apparel; apparel and textile manufacturing; and disability services. UNITE and the Teamsters June 25 announced they were launching a joint organizing effort to represent approximately 17,000 union-eligible employees at Cintas Corp., the Cincinnati-based supplier of uniforms (123 DLR A-12, 6/26/03).

In order to expand membership and get more power at the bargaining table, the union plans to engage in more coordinated bargaining, and will try to negotiate common expiration dates, Raynor said. If UNITE has good relationships with a company at 10 locations but the employer is fighting with the union at one, the employer will have to take on employees at all 11 locations, he said. Through coordinated bargaining, one group will be able to support fellow union members at another bargaining table, he added.

The union also is streamlining operations by combining locals. In New York, the union intends to reduce the 11 metropolitan area locals to five, organized along industrial lines, and in other areas, locals are merging along regional lines.

In other action at the convention, delegates voted to formally change the union's name to the acronym UNITE in recognition of its evolving jurisdiction in laundries and other industries.

Delegates also voted to establish a retiree organization that would be involved in politics as well as in the new organizing effort. The effort is aimed at building on the 250,000 retirees' loyalty to their union, Cowell explained. The organization would be funded through the payment of dues by the retirees.

LANGUAGE: ENGLISH

**EXHIBIT D**

Copyright 2003 The Bureau of National Affairs, Inc.,

DAILY LABOR REPORT

March 20, 2003, Thursday

54 DLR A-6 (2003)

LENGTH: 681 words

SECTION: NEWS

TITLE: FLSA:

LAWSUIT ALLEGES CINTAS OWES PAY FOR OVERTIME WORKED BY DELIVERY DRIVERS

TEXT:

A lawsuit filed March 19 in federal district court in San Francisco alleges Cintas Corp., the Cincinnati-based corporate uniform supplier, withheld millions of dollars in overtime pay to delivery drivers over the past three years (Veliz v. Cintas Corp., N.D. Cal., No. 03-1180, complaint filed 3/19/03).

Karen Carnahan, vice president and treasurer of Cintas said company officials will not be able to comment on the lawsuit until they have had time to review it in detail, except to say that, "we feel very confident that we are paying our route drivers ... properly and fairly."

She said the lawsuit is a tactic by the Union of Needletrades, Industrial, and Textile Employees to influence Cintas employees. "The union is attempting again to pressure the company into unionizing our workforce against our employees' wishes," Carnahan said.

The suit claims Cintas violated the Fair Labor Standards Act and California's Unfair Competition Act by deliberately misclassifying its delivery drivers as exempt from the statutes' overtime requirements, according to Scott A. Kronland, an attorney for the plaintiffs, truck drivers who worked for Cintas.

Plaintiffs include former workers in California, Illinois, Michigan, and New Jersey, but it is being brought on behalf of all Cintas drivers nationwide, including former drivers, said Kronland, who is with Altshuler, Berzon, Nussbaum, Rubin & Demain in San Francisco.

The suit estimates at least 3,400 former and current Cintas employees could fall within the plaintiff class of delivery drivers employed by the company as "service sales representatives." Cintas has about 27,000 employees nationwide.

The suit is the largest of its kind involving laundry truck drivers, said Bruce Raynor, president of UNITE, which is assisting the drivers in filing the lawsuit. If the employees prevail in their lawsuit, he estimated, it could cost Cintas $75 million to $100 million.

"This company has saved millions and millions of dollars by cheating its own workers," Raynor said in a telephone press conference from San Francisco.

Raynor said Cintas drivers are typically required to work 60- to 70-hour weeks delivering Cintas products to clients. He added that they are denied rest periods and are paid a salary plus a commission, based on the amount of uniforms delivered. Such commission-based pay arrangements are typical in the uniform delivery business, Raynor said.

The suit is one volley in an organizing drive spearheaded by UNITE on behalf of the 17,000 laundry employees at Cintas. In January, Raynor outlined plans for the drive at an AFL-CIO "organizing summit" in Washington, D.C., saying that the union is prepared to spend millions of dollars over many years to accomplish its goal of representing the Cintas workers (9 DLR C-1, 1/14/03).

Raynor described Cintas as the, "largest, most anti-union employer" in the industry, claiming the company has threatened and fired pro-union employees, hired "an army" of security guards to stop employees from distributing pro-union leaflets, and engaged in "a campaign of fear and intimidation straight out of a 1930s novel."

He called on unions representing employees that work for companies using Cintas products to support the drive, and at the March 19 press conference, said UNITE has received "tremendous support" from other unions in its Cintas campaign.

At the same press conference, plaintiff Tade L. Wasmer said he worked as a laundry truck driver for Cintas in Illinois from 1998 until 2002 and never worked less than 50 hours per week. He often worked much more than that, Wasmer said, and was never paid for it.

"That's just four or five hours of personal time down the drain," Wasmer said.

He typically started work at around 6 a.m. and ended after 5 p.m., with weekly take-home pay averaging $550, he said. He tried to get Cintas to pay him for his overtime hours, but, "they just refused to pay me, they just seemed to feel it was my job," Wasmer said.

LANGUAGE: ENGLISH

Copyright 2003 The Bureau of National Affairs, Inc.,

DAILY LABOR REPORT

March 20, 2003, Thursday

54 DLR A-6 (2003)

LENGTH: 681 words

SECTION: NEWS

TITLE: FLSA:

LAWSUIT ALLEGES CINTAS OWES PAY FOR OVERTIME WORKED BY DELIVERY DRIVERS

TEXT:

A lawsuit filed March 19 in federal district court in San Francisco alleges Cintas Corp., the Cincinnati-based corporate uniform supplier, withheld millions of dollars in overtime pay to delivery drivers over the past three years (Veliz v. Cintas Corp., N.D. Cal., No. 03-1180, complaint filed 3/19/03).

Karen Carnahan, vice president and treasurer of Cintas said company officials will not be able to comment on the lawsuit until they have had time to review it in detail, except to say that, "we feel very confident that we are paying our route drivers ... properly and fairly."

She said the lawsuit is a tactic by the Union of Needletrades, Industrial, and Textile Employees to influence Cintas employees. "The union is attempting again to pressure the company into unionizing our workforce against our employees' wishes," Carnahan said.

The suit claims Cintas violated the Fair Labor Standards Act and California's Unfair Competition Act by deliberately misclassifying its delivery drivers as exempt from the statutes' overtime requirements, according to Scott A. Kronland, an attorney for the plaintiffs, truck drivers who worked for Cintas.

Plaintiffs include former workers in California, Illinois, Michigan, and New Jersey, but it is being brought on behalf of all Cintas drivers nationwide, including former drivers, said Kronland, who is with Altshuler, Berzon, Nussbaum, Rubin & Demain in San Francisco.

The suit estimates at least 3,400 former and current Cintas employees could fall within the plaintiff class of delivery drivers employed by the company as "service sales representatives." Cintas has about 27,000 employees nationwide.

The suit is the largest of its kind involving laundry truck drivers, said Bruce Raynor, president of UNITE, which is assisting the drivers in filing the lawsuit. If the employees prevail in their lawsuit, he estimated, it could cost Cintas $75 million to $100 million.

"This company has saved millions and millions of dollars by cheating its own workers," Raynor said in a telephone press conference from San Francisco.

Raynor said Cintas drivers are typically required to work 60- to 70-hour weeks delivering Cintas products to clients. He added that they are denied rest periods and are paid a salary plus a commission, based on the amount of uniforms delivered. Such commission-based pay arrangements are typical in the uniform delivery business, Raynor said.

The suit is one volley in an organizing drive spearheaded by UNITE on behalf of the 17,000 laundry employees at Cintas. In January, Raynor outlined plans for the drive at an AFL-CIO "organizing summit" in Washington, D.C., saying that the union is prepared to spend millions of dollars over many years to accomplish its goal of representing the Cintas workers (9 DLR C-1, 1/14/03).

Raynor described Cintas as the, "largest, most anti-union employer" in the industry, claiming the company has threatened and fired pro-union employees, hired "an army" of security guards to stop employees from distributing pro-union leaflets, and engaged in "a campaign of fear and intimidation straight out of a 1930s novel."

He called on unions representing employees that work for companies using Cintas products to support the drive, and at the March 19 press conference, said UNITE has received "tremendous support" from other unions in its Cintas campaign.

At the same press conference, plaintiff Tade L. Wasmer said he worked as a laundry truck driver for Cintas in Illinois from 1998 until 2002 and never worked less than 50 hours per week. He often worked much more than that, Wasmer said, and was never paid for it.

"That's just four or five hours of personal time down the drain," Wasmer said.

He typically started work at around 6 a.m. and ended after 5 p.m., with weekly take-home pay averaging $550, he said. He tried to get Cintas to pay him for his overtime hours, but, "they just refused to pay me, they just seemed to feel it was my job," Wasmer said.

LANGUAGE: ENGLISH

**EXHIBIT E**

UNIONS

# LABOR'S NEW ORGANIZATION MAN

## Bruce Raynor is reinvigorating the troubled garment workers' union. Could he be the successor to AFL-CIO chief Sweeney?

Bruce S. Raynor was on a roll. On Mar. 19, the president of the Union of Needletrades, Industrial & Textile Employees (UNITE) held a conference call for reporters to announce an ambitious, $100 million lawsuit against Cintas Corp., the country's leading commercial laundry company. The class action charges that the largest nonunion Cintas fails to pay overtime to thousands of drivers who pick up laundry from hotels, restaurants, and other customers. Raynor let Cintas workers and UNITE organizers do most of the talking, only stepping in to blast Cintas for "dragging down standards in the industry by paying subpar wages." A Cintas official denies the overtime charge and insists the company pays competitive wages.

It's bold tactics like the Cintas lawsuit that are turning Raynor into a rising star in the labor movement and a potential successor to AFL-CIO President John J. Sweeney, whose term expires in two years. When Raynor became the president of UNITE in 2001 he took over a union that had been badly battered by the offshore exodus of more than a million garment and textile jobs.

But Raynor has reversed the decline with some aggressive tactics. The Cintas suit, for example, is part of a national recruitment drive he kicked off in January to sign up 17,000 Cintas workers. His approach: tapping the strength of UNITE's mostly minority and immigrant membership by getting them to reach out to recruits with similar backgrounds. By focusing on low-wage industries such as laundry and retail distribution that aren't subject to trade pressure, Raynor has reinvigorated the flagging union. "The laundry campaign offers a model of how unions can organize an entire industry," says former AFL-CIO Organizing Director Richard Bensinger, who has advised Raynor on recruitment.

**REINVENTING A UNION**

*New recruits in laundry and distribution, which represented 14% of UNITE's 1998 membership, have offset big losses in apparel and textiles which totaled 64% in 1998.*

2003 MEMBERSHIP
MISCELLANEOUS 24%
APPAREL & TEXTILES 42%
DISTRIBUTION 16%
LAUNDRY 18%
Data: UNITE

**LOOK FOR THE UNION WORKERS**

Low-wage industries such as retail distribution are key for Raynor

Raynor's moves counter the view that unions lack relevance to American workers. They also stand as a sharp rebuke to most labor leaders, who have fewer troubles than UNITE, yet who still haven't taken the difficult steps needed to spur growth. In February, Raynor helped prod the adoption of a new AFL-CIO governing body with four other successful union leaders, including two other possible successors to Sweeney, hotel workers' President John W. Wilhelm and service employees' President Andy Stern. They all believe vigorous action can reverse labor's decline. "I'm convinced that the labor movement has the resources to grow," says Raynor.

If UNITE can sign up tens of thousands of members, Raynor reasons, so can other unions. UNITE lost more than 200,000 members through the late 1990s, cutting its ranks to 250,000, largely because of offshore competition. Raynor, 53, set out to reverse the trend well before he was elected president. A wire-thin, intensely driven man who got a BA in labor relations from Cornell University, he spent most of his career recruiting thousands of low-wage workers in the union-unfriendly South.

Then, in 1998, Raynor launched a national recruitment drive in commercial laundry. He saw that the industry couldn't be moved offshore and that outsourcing was creating thousands of jobs at fast-growing companies such as Cintas. Its workers also resemble UNITE members, who are 80% nonwhite and immigrant and typically earn $8 an hour.

Raynor prodded UNITE to focus more resources on recruitment and less on servicing current members. It now spends more than 40% of its budget on organizing, up from 20% in 1995, and Raynor vows to lift that above 50%. By contrast, many unions today still devote less than 5% to recruitment.

Using organizers who can speak to workers in their native language, UNITE has signed up 30,000 new laundry members since 1998. It now represents 27% of the industry, enough to lift members' wages by up to 25%, to about $9 an hour, and to give them medical benefits. It's a track record other unions will be studying.

*By Aaron Bernstein in Washington*

PHOTOGRAPH BY NELSON CHENAULT; CHART BY LAUREL DAUNIS-ALLEN/BW

Workplace

UNIONS

# LABOR'S NEW ORGANIZATION MAN

Bruce Raynor is reinvigorating the troubled garment workers' union. Could he be the successor to AFL-CIO chief Sweeney?

Bruce S. Raynor was on a roll. On Mar. 19, the president of the Union of Needletrades, Industrial & Textile Employees (UNITE) held a conference call for reporters to announce an ambitious, $100 million lawsuit against Cintas Corp., the country's leading commercial laundry company. The class action charges that the largely nonunion Cintas fails to pay overtime to thousands of drivers who pick up laundry from hotels, restaurants, and other customers. Raynor let Cintas workers and UNITE organizers do most of the talking, only stepping in to blast Cintas for "dragging down standards in the industry by paying subpar wages." A Cintas official denies the overtime charge and insists the company pays competitive wages.

It's bold tactics like the Cintas lawsuit that are turning Raynor into a rising star in the labor movement and a potential successor to AFL-CIO President John J. Sweeney, whose term expires in two years. When Raynor became the president of UNITE in 2001, he took over a union that had been badly battered by the offshore exodus of more than a million garment and textile jobs.

But Raynor has reversed the decline with some aggressive tactics. The Cintas suit, for example, is part of a national recruitment drive he kicked off in January to sign up 17,000 Cintas workers. His approach: tapping the strength of UNITE's mostly minority and immigrant membership by getting them to reach out to recruits with similar backgrounds. By focusing on low-wage industries such as laundry and retail distribution that aren't subject to trade pressure, Raynor has reinvigorated the flagging union. "The laundry campaign offers a model of how unions can organize an entire industry," says former AFL-CIO Organizing Director Richard Bensinger, who has advised Raynor on recruitment.

### LOOK FOR THE UNION WORKERS

Low-wage industries such as retail distribution are key for Raynor

Raynor's moves counter the view that unions lack relevance to American workers. They also stand as a sharp rebuke to most labor leaders, who have fewer troubles than UNITE, yet who still haven't taken the difficult steps needed to spur growth. In February, Raynor helped prod the adoption of a new AFL-CIO governing body with four other successful union leaders, including two other possible successors to Sweeney, hotel workers' President John W. Wilhelm and service employees' President Andy Stern. They all believe vigorous action can reverse labor's decline. "I'm convinced that the labor movement has the resources to grow," says Raynor.

If UNITE can sign up tens of thousands of members, Raynor reasons, so can other unions. UNITE lost more than 200,000 members through the late 1990s, cutting its ranks to 250,000, largely because of offshore competition. Raynor, 53, set out to reverse the trend well before he was elected president. A wire-thin, intensely driven man who got a BA in labor relations from Cornell University, he spent most of his career recruiting thousands of low-wage workers in the union-unfriendly South.

Then, in 1998, Raynor launched a national recruitment drive in commercial laundry. He saw that the industry couldn't be moved offshore and that outsourcing was creating thousands of jobs at fast-growing companies such as Cintas. Its workers also resemble UNITE members, who are 80% nonwhite and immigrant and typically earn $8 an hour.

Raynor prodded UNITE to focus more resources on recruitment and less on servicing current members. It now spends more than 40% of its budget on organizing, up from 20% in 1995, and Raynor vows to lift that above 50%. By contrast, many unions today still devote less than 5% to recruitment.

Using organizers who can speak to workers in their native language, UNITE has signed up 30,000 new laundry members since 1998. It now represents 27% of the industry, enough to lift members' wages by up to 25%, to about $9 an hour, and to give them medical benefits. It's a track record other unions will be studying.

*By Aaron Bernstein in Washington*

**REINVENTING A UNION**

*New recruits in laundry and distribution, which represented 14% of UNITE's 1998 membership, have offset big losses in apparel and textiles, which totaled 64% in 1998.*

2003 MEMBERSHIP
MISCELLANEOUS 24%
APPAREL & TEXTILES 42%
DISTRIBUTION 16%
LAUNDRY 18%

Data: UNITE

PHOTOGRAPH BY NELSON CHENAULT; CHART BY LAUREL DAUNIS-ALLEN/BW

**EXHIBIT F**



Dear Cintas SSR

Since January, many of you and your co-workers have been talking with UNITE organizers about addressing problems you face on the job. While some SSRs' concerns are specific to a bad manager or a certain location, all of you have continually expressed frustration over regularly working more than forty hours in a week without overtime pay. Overtime pay is a right, not a privilege. It's time that you were paid what the law says you deserve.

On Wednesday, March 19, UNITE assisted hundreds of Cintas SSRs in filing a national class action lawsuit against the company to collect unpaid overtime. Based on the information we have gathered, SSRs nationwide may be owed millions in overtime pay. If the court certifies this as a class action suit, any award resulting from this lawsuit will apply to all eligible drivers who choose to participate, not just the SSRs who filed it.

Cintas managers may have told you that you don't qualify for overtime because you are a salaried and commissioned outside salesperson. That may not be true. Cintas SSRs in California recently settled a lawsuit for $10 million in back wages over this issue, as did drivers at Pepsi Bottling in New Jersey. Pepsi treated its drivers as salaried and commissioned outside salespeople and was ordered to pay $17.0 million to its New Jersey drivers.

These are examples of what is possible when working people act together to address problems they share. Any one person will have a hard time affecting a $2 billion company like Cintas. Working together, our chance for success grows tremendously. UNITE has the experience and expertise to help you hold Cintas accountable.

Join with Cintas employees across North America in UNITE to create real solutions on the job with a union contract. For more information about the lawsuit or about how you can become involved in UNITE, [illegible] or fill out the form below.

Sincerely,

Bruce Raynor
President

| Yes, I'd like more information about the overtime lawsuit against Cintas Corporation | |
|---|---|
| An * indicates a required field | |
| | |
| *First Name | |
| *Last Name | |
| City | |
| *State | |
| ZIP | |
| Phone | |
| *Plant Location | |
| *Email | |

Dear Cintas SSR,

Since January, many of you and your co-workers have been talking with UNITE organizers about addressing problems you face on the job. While some SSRs' concerns are specific to a bad manager or a certain location, all of you have continually expressed frustration over regularly working more than forty hours in a week without overtime pay. Overtime pay is a right, not a privilege. It's time that you were paid what the law says you deserve.

On Wednesday, March 19, UNITE assisted hundreds of Cintas SSRs in filing a national class action lawsuit against the company to collect unpaid overtime. Based on the information we have gathered, SSRs nationwide may be owed millions in overtime pay. If the court certifies this as a class action suit, any award resulting from this lawsuit will apply to all eligible drivers who choose to participate, not just the SSRs who filed it.

Cintas managers may have told you that you don't qualify for overtime because you are a salaried and commissioned outside salesperson. That may not be true. Cintas SSRs in California recently settled a lawsuit for $10 million in back wages over this issue, as did drivers at Pepsi Bottling in New Jersey. Pepsi treated its drivers as salaried and commissioned outside salespeople and was ordered to pay $17.3 million to its New Jersey drivers.

These are examples of what is possible when working people act together to address problems they share. Alone, one person will have a hard time affecting a $2 billion company like Cintas. Working together, our chance for success grows tremendously. UNITE has the experience and expertise to help you hold Cintas accountable.

Join with Cintas employees across North America in UNITE to create real solutions on the job with a union contract. For more information about the lawsuit or about how you can become involved in UNITE, contact us or fill out the form below.

Sincerely,

Bruce Raynor
President

Yes, I'd like more information about the overtime lawsuit against Cintas Corporation

An * indicates a required field

| | |
|---|---|
| *First Name | |
| *Last Name | |
| City | |
| *State | |
| ZIP | |
| Phone | |
| *Plant Location | |
| *Email | |



**EXHIBIT G**

Daily Review, The (Hayward, CA)

July 26, 2003
Section: Local & Regional News

Laundry contract is all washed up

Michelle Meyers, STAFF WRITER

HAYWARD -- A uniform supplier that's the subject of the first legal challenge under Hayward's 1999 living-wage law all but sev ered ties with the city by choosing not to compete for its laundry services contract.

Two production workers at Cintas Corp.'s San Leandro facility filed a class-ac tion lawsuit last month claiming the Cincinnati-based company, which used to have the laundry services contract, was breaking the city's law by not paying them enough or giving them enough days off. The suit also alleges Cintas violated its contract with the city, in which it agreed to abide by Hayward's law. A couple of weeks after the filing, Cintas notified the city that it would not be competing for the expired contract and stopped providing its services somewhat abruptly, said Purchasing Manager Ralph Costa.

Cintas still provides the city with first-aid kit supplies, but not under a con tract subject to the living-wage law, he added. This week, Cintas responded in Alameda County Superior Court to the lawsuit, denying that it violated any laws, calling the living-wage law "unconstitutional" and as serting that the plaintiffs are acting as agents of a union campaign against the corporation.

Cintas spokesman Wade Gates said the company can't elaborate on the pending litigation, but maintained that the company has a "long-standing practice of complying with all laws and local ordinances" and that its actions "have been and continue to be proper and legal."

Plaintiffs' lawyer Eileen Goldsmith, whose San Francisco firm also represents the Union of Needletrades, Industrial and Textile Employees, or UNITE!, admitted that union researchers discovered the alleged violation.

"So what?" she said. "It doesn't mean they weren't entitled to the wages they were entitled to." Goldsmith added that her clients are pretty savvy, and are well aware of what they're doing. "Cintas unilaterally terminated its $100,000 contract with the city rather than pay its employees a living wage," she said.

Six other companies bid for the city's laundry contract, which pays about $100,000 annually to wash floor mats, shop towels and soiled clothing worn by field workers. Burbank-based Aramark, which has a distribution center in Hayward, was the winner. Costa said that under normal circumstances, when a uniform contract changes hands, there is usually about a three-week transition period in which services carry over until the new provider gets employees measured. That didn't happen in this case, which wreaked a bit of havoc on the 50-some city field workers whose clothes are professionally laundered. They had to settle for loaner uniforms provided by Aramark. At the city's wastewater treatment plant, for example, plant operator Sam Turner has had to settle for long- sleeved coveralls while the cooler, custom-fit uniforms are on order.

"One day we came in and there were no uniforms," said Turner, shop steward for Service Employees International Union Local 790. "We just went about our business, but they kind of slapped us upside the head." Turner emphasized the importance of the laundry con tract to plant workers who are constantly exposed to bacteria. "We can't take those clothes home and expose our families to that," he said.

Cintas, which had $2.3 billion in sales last year, had been providing Hayward with laundry services since at least 1997, Costa said. The business the city hired was called Unitog before Cintas bought it. Hayward's living-wage law, adjusted annually for the cost of living, requires wages of at least $9.26 per hour with benefits and $10.71 per hour without benefits. Plaintiffs Francisca Amaral and Nelva Hernandez allege that they get just $8.20 and $7.10 per hour, respectively. Michelle Meyers covers Hay ward, Cherryland and Fairview. Call her at (510) 293-2463 or e-mail mmeyers@angnewspapers.com .

(c) 2003 The Daily Review. All rights reserved. Reproduced with the permission of Media NewsGroup, Inc. by NewsBank, Inc.

Daily Review, The (Hayward, CA)

July 26, 2003
Section: Local & Regional News

Laundry contract is all washed up

Michelle Meyers, STAFF WRITER

HAYWARD -- A uniform supplier that's the subject of the first legal challenge under Hayward's 1999 living-wage law all but sev ered ties with the city by choosing not to compete for its laundry services contract.

Two production workers at Cintas Corp.'s San Leandro facility filed a class-ac tion lawsuit last month claiming the Cincinnati-based company, which used to have the laundry services contract, was breaking the city's law by not paying them enough or giving them enough days off. The suit also alleges Cintas violated its contract with the city, in which it agreed to abide by Hayward's law. A couple of weeks after the filing, Cintas notified the city that it would not be competing for the expired contract and stopped providing its services somewhat abruptly, said Purchasing Manager Ralph Costa.

Cintas still provides the city with first-aid kit supplies, but not under a con tract subject to the living-wage law, he added. This week, Cintas responded in Alameda County Superior Court to the lawsuit, denying that it violated any laws, calling the living-wage law "unconstitutional" and as serting that the plaintiffs are acting as agents of a union campaign against the corporation.

Cintas spokesman Wade Gates said the company can't elaborate on the pending litigation, but maintained that the company has a "long-standing practice of complying with all laws and local ordinances" and that its actions "have been and continue to be proper and legal."

Plaintiffs' lawyer Eileen Goldsmith, whose San Francisco firm also represents the Union of Needletrades, Industrial and Textile Employees, or UNITE!, admitted that union researchers discovered the alleged violation.

"So what?" she said. "It doesn't mean they weren't entitled to the wages they were entitled to." Goldsmith added that her clients are pretty savvy, and are well aware of what they're doing. "Cintas unilaterally terminated its $100,000 contract with the city rather than pay its employees a living wage," she said.

Six other companies bid for the city's laundry contract, which pays about $100,000 annually to wash floor mats, shop towels and soiled clothing worn by field workers. Burbank-based Aramark, which has a distribution center in Hayward, was the winner. Costa said that under normal circumstances, when a uniform contract changes hands, there is usually about a three-week transition period in which services carry over until the new provider gets employees measured. That didn't happen in this case, which wreaked a bit of havoc on the 50-some city field workers whose clothes are professionally laundered. They had to settle for loaner uniforms provided by Aramark. At the city's wastewater treatment plant, for example, plant operator Sam Turner has had to settle for long- sleeved coveralls while the cooler, custom-fit uniforms are on order.

"One day we came in and there were no uniforms," said Turner, shop steward for Service Employees International Union Local 790. "We just went about our business, but they kind of slapped us upside the head." Turner emphasized the importance of the laundry con tract to plant workers who are constantly exposed to bacteria. "We can't take those clothes home and expose our families to that," he said.

Cintas, which had $2.3 billion in sales last year, had been providing Hayward with laundry services since at least 1997, Costa said. The business the city hired was called Unitog before Cintas bought it. Hayward's living-wage law, adjusted annually for the cost of living, requires wages of at least $9.26 per hour with benefits and $10.71 per hour without benefits. Plaintiffs Francisca Amaral and Nelva Hernandez allege that they get just $8.20 and $7.10 per hour, respectively. Michelle Meyers covers Hay ward, Cherryland and Fairview. Call her at (510) 293-2463 or e-mail mmeyers@angnewspapers.com .

(c) 2003 The Daily Review. All rights reserved. Reproduced with the permission of Media NewsGroup, Inc. by NewsBank, Inc.

**EXHIBIT H**





IN THESE TIMES
HOME
SEARCH

RADIO THE ITT LIST POLLS NEWSLETTER JOBS STORE ME

FEATURES > AUGUST 11, 2003

# Hung Out To Dry

## Unions fight back against antilabor laundry giant Cintas

By David Moberg

ARTICLE TC

Printable vers
Email to a frie
Discuss this a

Full contents
Past issues

MEMBERSH TOOLS

New Registrat
Log In
Forgot Passw

Get your free me access discussio exclusive content

ADVERTISE

Hundreds of union activists, a few dressed as coffee cups emblazoned with "hypocrisy" and "cup of sweat," marched in front of a Starbuck's coffee shop on Chicago's fashionable North Michigan Avenue last May. They were protesting the decision by the image-conscious coffee shop chain, whose corporate code of conduct calls for respecting employees, to sign a contract for floor mats and other supplies with Cintas, the fast-growing, highly profitable, and historically anti-union company that dominates the industrial laundry and uniform business.

Last January, UNITE, the union born in the apparel and textile industry, launched a campaign to organize 17,000 workers at Cintas's 340 facilities across the country. When a union organizer called on Santa Ana Ventura, who hangs shirts on hangers at a suburban Cintas laundry, she and her husband decided it was a "good thing" to join the union. Ventura, a 49-year old immigrant from a poor, rural Mexican family, had worked at Cintas since 1997, and she had often spoken out against what she saw as management's lack of respect for workers. "I've seen the injustices at Cintas," she told the crowd at Starbuck's. "They fire workers unjustly. We want better pay, better benefits, and dignity. I am here today because I have no health insurance, and I want insurance."

The next day, instead of being given her usual three new boxes of hangers for her work, Ventura was given a larger-than-usual pile of old hangers that would have been much more difficult to use. When she questioned her supervisor, the plant manager sent her home. UNITE organizers filed a complaint with the National Labor Relations Board (NLRB)—one of at least 117 charges submitted since

January—and later brought U.S. Rep. Luis Gutierrez to protest at the plant. Ventura was permitted to return to work after three days without pay (unlike seven other workers around the country, whom UNITE charges Cintas has fired for their union activity). But Cintas managers subsequently organized anti-union meetings at work, threatened workers with layoffs, punished leaders like Ventura, and created an atmosphere of intimidation toward union supporters. "Many [employees] are very scared because they're terrorized," Ventura says. But she perseveres, she adds with a hearty laugh, "because I want the union to win."

Cintas founder and chairman Richard T. Farmer just as certainly wants the union to lose. After 33 years of continuous growth (the company made a profit of $249.3 million on sales of $2.69 billion in the fiscal year that ended in May), Cintas has taken over smaller companies that supply and launder uniforms, towels, mats, and related workplace supplies for giant companies like UPS, state and local government employees, and thousands of mom-and-pop businesses. As it has expanded, Cintas has selectively closed facilities already represented by unions. With the assistance of anti-union consultants, the company has mounted 49 successful—but often unlawful—campaigns to decertify unions (mainly Teamster locals representing drivers who are also salesmen), eliminating all but 700 unionists from the company. Farmer, the second largest individual contributor to the national Republican Party for each of the last two election cycles, has given the GOP almost $2.8 million since 1988—largely to counteract union influence in the Democratic Party, he told the *Columbus Dispatch*.

In a cutthroat industry that exploits new immigrant workers, Cintas has not always been the worst employer. But because of its size and aggressiveness, it has been a major obstacle to efforts to improve working conditions across the industry. Cintas has "every ailment you could look for in a company," says UNITE President Bruce Raynor. "[It is] viciously anti-union, treats workers like dogs, discriminates on the basis of race and sex, beats up small businesses who are customers, violates overtime and wage and human rights laws, trashes health and safety on the job. It is such a compelling case. Cintas will recognize the union or destroy itself as a company."

Since 1998 UNITE has quadrupled the number of unionized industrial laundry workers to 40,000. UNITE now represents about one-fourth of hourly employees in the industry. The union has boosted wages, won company-paid health insurance, expanded other benefits, and given workers a voice in the laundry industry through an aggressive organizing strategy. It has combined community pressure—mobilizing clergy, politicians, community groups, and customers—with vigorous employee organizing to demand "card check" recognition of the union. In other words, rather than go through the NLRB election procedures—which give employers greater opportunities to intimidate workers in anti-union campaigns and then to fight further over negotiating a contract if the union wins—UNITE typically fights to win promises of employer neutrality and, preferably, acknowledgement of

Ads by Goooooog

Cintas Uniforr Rental
Full-Service Program - Laur Repairs & More Get Info on Cin
www.cintas.com

Uniforms (In stock)
Pants, shirts, s ties, badges Sa clothing, coats, vests, hats
Firehouseinternatio

Discount Cint Uniform
New & used selection. aff C Uniform for sal
www.ebay.com

cutting linen c
cost reduction uniforms linens laundry cleane
www.denormandie.

AUTHOR BIO

David Moberg, editor of *In The* has been on the the magazine si began publishin joining *In These* he completed h a Ph.D. in anthr the University o and worked for *Newsweek*. Re has received fel from the John D Catherine T. Ma Foundation and Nation Institute

the union on the basis of large majorities of employees signing union cards. Often workers strike, in conjunction with a comprehensive community support campaign, to win recognition. "The way you get a union is by acting like a union," argues Liz Gres, who oversees the 30 organizers now focused on seven major Cintas markets. "We're pushing people to do what they can," from distributing leaflets and protesting at work to bringing in a microwave oven plastered with UNITE stickers to a poorly equipped Cintas lunchroom.

Cintas employs 17,000 blue-collar workers, so organizing the company would have a major impact on the standards of the entire industry. Raynor says he hopes to organize the company nationally, not shop by shop. Cintas spokespeople insist that the union's demand for employer neutrality and a card check will "rob individuals of their rights to free elections," but the company has not taken up Raynor's proposal to discuss "a fair process" for decision-making, even though 90 members of Congress wrote to Farmer urging the company to be neutral and recognize the union through a card check. UNITE has proved to be a formidable foe in organizing showdowns. Last year the union won a neutrality agreement from Brylane executives in its campaign to organize the company's apparel distribution center. That followed a year-long, global pressure campaign in which union organizers sent Brylane customers lookalike Christmas catalogs featuring injured Brylane workers and sweatshop workers from around the world posing in Brylane products and telling their stories.

UNITE began organizing all Cintas workers in January and filed a $100 million lawsuit. It had already won a similar $10 million lawsuit in California on behalf of drivers who were improperly denied overtime pay. In late June the union and the Teamsters announced a joint effort to organize Cintas, with the Teamsters focusing on the drivers. Unlike the mostly female and new immigrant shop workers, who typically make $6.50 to $9.50 an hour, the mainly male drivers typically make at least $30,000 a year. But the two groups have compelling common interests. Mike Camiso, a 27-year old former Cintas driver now organizing for the Teamsters, says Cintas "treats you like robots and works you to death." Teamster national organizing director Jeff Farmer says, "Yes, the make-up of the workforce is different, but the common denominator is a company that chews up workers and spits them out."

Martha Cuervo and Emperatriz Reyna, both veterans at a small uniform sewing plant in Chicago that Cintas took over, have felt the gnawing management style of their new bosses. When their small employer was bought out about five years ago, Cuervo says, Cintas reduced the quality of health insurance coverage, shifted insurance costs to workers, reduced piecework bonuses (both now make around $6 an hour), cut and more inconveniently scheduled vacations and holidays, eliminated the defined-benefit pension plan, and stopped providing free coffee. With the union and the employees working as a team, Reyna says, Cintas will have to take their demands, including a just wage, more seriously. "They've never

research on the global economy

STORE

Order the Bush poster today! N Free shipping.

Enter your subsc and get *In These* delivered every t for less than $1

YOUR INFO

Full Name
Address
City
State
Zip
E-Mail Address

TERM

2-yr, 52-issu
1-yr, 26-issu

PAYMENT

Credit Card
Bill Me

listened to us before," she says.

Now with Teamster cooperation, UNITE is hitting the company from many directions. The union cannot legally organize a formal boycott of Cintas by its customers, but it does inform them about the company's record and urges businesses—as well as public employers responsive to political pressure—to exercise their judgment. At least seven unions have agreed to use their influence to shift employers to unionized or less controversial, more law-abiding suppliers. Already a few big businesses—like Hart, Schaffner and Marx, Levi's of Canada, and the auto parts maker Lear Corp.—have used their discretion to sever ties to Cintas. The company recently dropped a bid to renew its contract with the city of Hayward, California, after UNITE helped launch a lawsuit charging that Cintas violated the city's living-wage law.

UNITE and the Teamsters are also stepping up pressure on Cintas by highlighting its public policy abuses, including the company's environmental and workplace safety violations and its failure to provide jobs promised in exchange for public financial and tax assistance. "We see widespread environmental violations everywhere," says UNITE health and safety director Eric Frumin. "They don't care what they pump into sewer systems. They have widespread OSHA violations as well. This is not a well-managed company when it comes to worker safety and the environment. They're reckless." Despite rising injury rates in the industry, including frequent problems with repetitive trauma injuries, Cintas lobbied to overturn the workplace ergonomic standards established at the close of the Clinton administration. To keep the pressure on the company, UNITE has organized protests when Cintas executives address business groups or corporate recruiters come to college campuses. It has also mobilized support for workers striking for recognition of an independent union at a Mexican plant that produces for Cintas.

The AFL-CIO and other unions have made major commitments to support the Cintas campaign, one of the larger quasi-industrial organizing efforts now underway and an unusual example of a cooperative drive involving two unions. It is an important test for UNITE, which underscored its commitment to organizing at its recent convention by raising dues and pledging within two years to spend 60 percent of its budget on organizing. UNITE has a history of fighting as long as it takes to win, as evidenced by the 25 years it took to organize Pillowtex in North Carolina. "I don't know how long it will take to bring Cintas down," Raynor says, "but mark my words: We will."

permalink | email to a friend | printer friendly | subscribe

**Reader Comments**

read this!

Posted by brian on August 11, 2003 at 2:42 PM

---

Teamsters organizer's are not in the union and will be fired if they tried. I bet the list list of union supporters is the same, non union organizers. Also the AFL-CIO biggest supporter SEIU. I dare you to track their record of charges filed by employees at the EEOC. Most Labor organization are not the way to go these day. Oh goodness don't be an africa american in the low wage work force thses day , Why? because unions now are supporting ilegal workers and targeting those low wage black workers jobs for ilegals that they feel won't changle their racist leadership. why don't unions organize white colar workers who are losing pensions and healthcare instead of people who need every dime.

Posted by Mr. Decal on August 11, 2003 at 5:40 PM

---

Three men I used to work with at the discount department store I work at (not Wal-mart, K-mart, Target) left the company to go work for Cintas. They are all driverds, and all appreciate the work much better then they're old job. All three of them we're managers at the store...a store in which managers non-union, salaried workers. At the store, they were only paid for 40 hours of work per week, but sometimes worked more than 60. The store is open 24 hours, so it was not uncommon. The most extreme I had seen, was on of them going in at 10 PM and not leaving till 10 AM. That's 12 hours of work...4 of which they were not paid for. Since moving to Cintas, they enjoy their work a great deal more. They do work hard, as is expected at such a job...and the 40 hours they are paid for is for the 40 hours they work. They do not work weekends...they have their birthday and all major holidays off. The store in which I work at, and which they used to work at only closes once a year...Christmas.

Posted by Franco Vitella on August 11, 2003 at 11:16 PM

---

What an abolutely biased piece of reporting. This is NOT a journalistic article. This is a editorial that borders on being a vendetta. Just another fine example of a liberal "journalist" giving the industry a bad name. As an educated man I am embarrased for the author.

Posted by alan on August 15, 2003 at 7:11 AM

---

I Support the Cintas workers in their effort to unionize and to seek better working conditions. If these big corporations had their way we would all go back to the bad old days of the sweatshops of the 20's and 30's. As a retired Teamster I understand throughly what a good union contract and decent wages and health care is all about. It appears that Cintas is taking the low road instead of treating their workforce fairly.

Posted by David wheeler on August 15, 2003 at 4:04 PM

---

While you are brining up the crimes of starbucks, maybe you could do an article about things they have done closer to home. I don't know if you remember Lemon Knot Cookies that used to be served there, but they were made by Judy's Bakery in Evanston IL. THey decided to back out of their contract with judy's fo the Lemon Knots, illegally, causing Judy and her bakery to go deep into debt, and now her dream is ruined, and she, her bakery and her husband are out of buisness.

Posted by Mike on August 17, 2003 at 9:50 PM

---

Hung Out To Dry: Unions fight back against antilabor laundry giant Cintas -- In These Ti... Page 6 of 6

Hi, This was a great article keep up the good work, in exposing this kind of slavery in the USA

Posted by christine on October 4, 2003 at 12:03 PM

---

Commenting is not available in this weblog entry.

Site Map | Contact Us | Jobs | Submissions | Advertising | Low Bandwidth / Mobile
© 2004 In These Times | Privacy Policy | Powered by Expression Engine | Syndicate / RSS

http://www.inthesetimes.com/site/main/article/hung_out_to_dry/ 10/4/2004

# EXHIBIT I



UNIFORM
justice!
www.uniformjustice.org

A joint effort of UNITE HERE and the Teamsters

FOR IMMEDIATE RELEASE

Contact: Galen Munroe
(202) 624-6911

**OVER 1300 CURRENT AND FORMER CINTAS DRIVERS JOIN NATIONWIDE OVERTIME LAWSUIT**

*--Cintas drivers may receive millions of dollars in unpaid overtime--*

Seeking restitution for unpaid overtime, over 1,300 current and former route drivers at Cintas – the nation's largest uniform rental supplier – have signed on to a class action lawsuit. The suit, filed in federal court in California in March 2003, charges that Cintas violated the Fair Labor Standards Act (FLSA) by failing to pay overtime to drivers working over 40 hours a week.

In April 2004, a federal judge ordered notification of thousands of current and former Cintas route drivers of their right to join the lawsuit. It is estimated that up to 10,000 drivers may have been misclassified as exempt from overtime in violation of federal law. To date, current and former drivers in over 40 states have joined the suit.

"When I found out about how we were short-changed on overtime, I signed onto the law suit right away. I worked too hard to make Cintas successful to let them get away with cheating on my pay" said Former Cintas SSR Wayne Lovitt from San Diego, California.

Cintas settled a similar overtime lawsuit filed by California drivers for $10 million in February 2003. The current suit, covering drivers nationwide, could cost Cintas up to $100 million. Drivers have until October 21, 2004 to sign on to the lawsuit.

For more information on the lawsuit go to www.cintasovertime.com or call 1-800-851-7783.

Uniform Justice is a joint effort of UNITE HERE and the International Brotherhood of Teamsters. UNITE HERE is the newly merged union of hospitality, gaming, apparel, textile and laundry workers. The new union represents nearly half a million workers in the U.S., Canada and Puerto Rico. The International Brotherhood of Teamsters represents more than 1.4 million members throughout North America. UNITE HERE and the Teamsters represent more than 1/3 of workers in the uniform and laundry industry.



UNIFORM
justice!
www.uniformjustice.org

A joint effort of UNITE HERE and the Teamsters

FOR IMMEDIATE RELEASE

Contact: Galen Munroe
(202) 624-6911

# OVER 1300 CURRENT AND FORMER CINTAS DRIVERS JOIN NATIONWIDE OVERTIME LAWSUIT

*--Cintas drivers may receive millions of dollars in unpaid overtime--*

Seeking restitution for unpaid overtime, over 1,300 current and former route drivers at Cintas – the nation's largest uniform rental supplier – have signed on to a class action lawsuit. The suit, filed in federal court in California in March 2003, charges that Cintas violated the Fair Labor Standards Act (FLSA) by failing to pay overtime to drivers working over 40 hours a week.

In April 2004, a federal judge ordered notification of thousands of current and former Cintas route drivers of their right to join the lawsuit. It is estimated that up to 10,000 drivers may have been misclassified as exempt from overtime in violation of federal law. To date, current and former drivers in over 40 states have joined the suit.

"When I found out about how we were short-changed on overtime, I signed onto the law suit right away. I worked too hard to make Cintas successful to let them get away with cheating on my pay" said Former Cintas SSR Wayne Lovitt from San Diego, California.

Cintas settled a similar overtime lawsuit filed by California drivers for $10 million in February 2003. The current suit, covering drivers nationwide, could cost Cintas up to $100 million. Drivers have until October 21, 2004 to sign on to the lawsuit.

For more information on the lawsuit go to www.cintasovertime.com or call 1-800-851-7783.

Uniform Justice is a joint effort of UNITE HERE and the International Brotherhood of Teamsters. UNITE HERE is the newly merged union of hospitality, gaming, apparel, textile and laundry workers. The new union represents nearly half a million workers in the U.S., Canada and Puerto Rico. The International Brotherhood of Teamsters represents more than 1.4 million members throughout North America. UNITE HERE and the Teamsters represent more than 1/3 of workers in the uniform and laundry industry.

# EXHIBIT J



everything trucking
eTrucker

Register For Free Email / Log In

TOOLS CAREER BUSINESS NEWS COMMUNITY FREETIME EQUIPMENT

Trucking Headlines

# Oct. 21 deadline for Cintas class action lawsuit

*By Jill Dunn*

Former and current Cintas drivers have until Oct. 21 to sign onto a nationwide class action lawsuit that alleges the uniform rental supplier violated overtime laws.

The lawsuit is assisted by UNITE HERE, a recently merged union of hospitality, gaming, apparel, textile and laundry workers. UNITE HERE and the Teamsters represent more than a third of all workers in the uniform and laundry industry, according to a Teamsters statement.

More than 1,400 people in 42 states who have worked as Cintas delivery truck drivers have joined the suit, according to the law firm of Lerach, Coughlin, Stoia & Robbins. The San Diego firm is one of three law firms representing the case.

The suit was filed March 2003 in the U.S. District Court for the Northern District of California.

The Ohio-based company stated on its website that the suit is meant only to discredit and harass Cintas and that the company's payment system is legal and fair.

"Recently, the Teamsters have been exaggerating the facts surrounding the lawsuit and approaching our service sales representatives while on their routes," Cintas said in a statement. "Their aggressive efforts are nothing more than an extension of their campaign to pressure the company into a 'Card Check/Neutrality' agreement."

The suit could cost Cintas $100 million, the Teamsters stated. Drivers who have worked for Cintas since March 19, 2000, can join the suit.

Drivers who drove trucks weighing more than 10,000 pounds or who regularly drove interstate routes for Cintas will not receive a consent to sue notice by mail, according to information posted on a website Lerach, Coughlin, Stoia & Robbins created to provide information about the case.

But those drivers may still be eligible for overtime pay and may file a consent to sue form to join this lawsuit. More information is available at www.cintasovertime.com.

Send this page to a friend 

Recent Articles:
10/5/2004- : Florida extends waivers for emergency trucks
10/5/2004- : New intermodal contract is kinder to carriers
10/4/2004- : Diesel rises another 4 cents
10/3/2004- : Goodyear seeks 2004 Highway Heroes
10/2/2004- : Washington state driver wins Harley in eTrucker sweepstakes
10/1/2004- : Year-long stay of hours rule becomes law
10/1/2004- : Freightliner to retrofit Detroit Diesel engines as needed
9/30/2004- : EPA lauds West Coast projects to cut emissions
9/29/2004- : Illinois lowers truck fee, restores sales tax exemption

eTrucker POLL

Q. Owner-operators: I buy aftermarket parts...
- Regularly
- Only for substantial price savings
- Only for certain components or brands
- Only if they won't void warranties
- Rarely, if ever

More "Trucking stories:

High-tech manuf Industries buys T
Illinois Tollway tr double or more i
Transportation S reaches record h
TA to buy Rip Gr interstate travel c
Oct. 21 deadline class action laws
Michigan conside truck length
Florida extends v emergency truck
New intermodal c kinder to carriers
Diesel rises anot
Goodyear seeks Heroes
Washington state Harley in eTrucke sweepstakes
Year-long stay of becomes law
Freightliner to ret Diesel engines a
EPA lauds West to cut emissions
Driving school ov probation for brib

eTrucker

Q. If my truck person, it wou
- A movie sta
- An Olympic
- A hopeless

**Archived Stories:**
9/27/2004 $2 a gallon: Diesel surges 10 cents to new record
9/27/2004 U.S.-Mexico border stations to receive $44 million
9/27/2004 Ranked first in dealer service, International looks to market share
9/27/2004 Art Institute of Dallas wins cab redesign contest at GATS
9/25/2004 GATS continues to grow
9/24/2004 California toughens emission standards
9/24/2004 Crack about women drivers prompts GATS fund-raiser
9/24/2004 U.S. House votes against foreign truck exemptions
9/23/2004 Con-Way enlists in Highway Watch program
9/23/2004 ATA honors Con-Way safety director
9/22/2004 Kansas driver is ATA's Truck Driver of the Year
9/22/2004 ATA honors three fleets with top safety records
9/22/2004 Florida hopes to open U.S. 90 as I-10 detour
9/21/2004 FMCSA says stay of hours ruling is necessary
9/21/2004 Volunteers needed to haul relief supplies

○ An intensiv patient
○ My worst e

**Also in News**
Business News
Top News Storie
New Products
Industry Briefs
Monthly Focus
Chaplain's Corn
Money for Miles
Any Questions?
Tire Tips
Fondly Faye

home | tools | career | business | news | community | free time | equipment | about this site | magazine subscriptions | feedback | contact us | employment privacy policy | our partners | advertise here | media kit | member benefits

© Copyright 2004 etrucker.com.
1-800-633-5953

**EXHIBIT K**



CINTAS SSRs:
You May Be Owed Thousands of Dollars In Back Pay

Cintas SSRs have filed a **nationwide** lawsuit to claim tens of millions of dollars in unpaid overtime. This is your chance to be paid for the long, hard hours you work.

If you've worked more than 40 hours a week, you may have been underpaid.

Cintas settled a lawsuit for unpaid overtime with California SSRs for **$10 MILLION.** SSRs received up to **$15,000** each as a result of the lawsuit.

A United States District Court Judge has ordered that all current and former SSRs be notified of the federal overtime lawsuit and invited to 'opt in'. You **must** opt in to be eligible for overtime under federal law. You will NOT be personally responsible for any attorneys' fees.

This is your right. Federal law prohibits Cintas from punishing you in anyway for participating in this lawsuit.

**Don't wait another second! The chance to join the lawsuit is strictly time limited. Fill out the attached form & return Immediately.**

For more information:
800-851-7783
www.cintasovertime.com

TEAMSTERS
ORGANIZING
FOR
POWER

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

**PAUL VELIZ**, et al, On behalf of Themselves and All Others Similarly Situated.

Plaintiffs,
Vs
**CINTAS CORPORATION**, et al.
Defendants.

No. C 03-1180 SBA

**CONSENT TO SUE**

I am a current or former employee of Cintas Corporation, and I hereby consent to sue Cintas Corporation for unpaid overtime premiums under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §216(b).

I worked in the position of ____________________ for Cintas Corporation in ____________________ (City), ____________ (State)

from on or about ______________ (Month), ____________ (Year), to on or about ______________ (Month), ____________ (Year).

I hereby designate Altshuler, Berzon, Nussbaum & Demain, Traber & Voorhees, and Lerach, Coughlin, Stoia & Robbins, LLP, to represent me in this action.

Dated: ____________, 2004 Signed: ______________________________ (Signature)

Name (Print Legibly) ______________________________

Address ______________________________ (City) ____________ (State) ____________ (Zip Code)

Telephone: ____________________ Email Address: ______________________________

Name

Address

City, State, ZIP

Please place
37 cents
postage here

Return to: Veliz – Overtime Lawsuit, Lerach, Coughlin, Stoia & Robbins, LLP,
401 B Street, Suite 1700
San Diego, CA 92101-4297





**EXHIBIT M**



NITEHERE!
Seventh Avenue
rk, NY 10001

URGENT!
Time is Running Out
For Overtime Lawsuit

Pierre J. Landry

REDACTED





**UNITE HERE!**
BRUCE RAYNOR
General President

JAMES P. HOFFA
General President

September 23, 2004

To all Current and Former Cintas Drivers:

By now you should be aware of the overtime lawsuit involving SSRs at Cintas facilities across the country. To date, over **1,300** current and former SSRs in over **40** states have joined the lawsuit.

Cintas settled a similar lawsuit for unpaid overtime with California SSRs for $10 million in February 2003. SSRs received up to **$15,000** each as a result.

You have a **legal right** to claim overtime payments that you are owed. Federal law **strictly prohibits** Cintas from punishing you in anyway for participating in this lawsuit.

It is time for you to enjoy the money that you have already earned. Plaintiffs in the class-action lawsuit will incur **no** legal fees.

There is only a short amount of time left for you to join this lawsuit. If you are interested in claiming your unpaid overtime wages, fill out the enclosed Consent to Sue form and return it immediately.

For more information, go to www.cintasovertime.com or call 1-800-851-7783.

In unity,

James P. Hoffa
General President

Bruce Raynor
General President

JPH/ig
Attachment

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PAUL VELIZ, et al, On behalf of Themselves and All Others Similarly Situated.

Plaintiffs,

vs.

CINTAS CORPORATION, et al.

Defendants.

_______________________________/

No. C 03-1180 SBA

CONSENT TO SUE

I am a current or former employee of Cintas Corporation, and I hereby consent to sue Cintas Corporation for unpaid overtime premiums under the federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. §216(b).

I worked in the position of ___________________________ for Cintas Corporation in _________________________ (City), _____ (State) from on or about ____________ (Month), _______ (Year), to on or about _______________ (Month), _______ (Year).

I hereby designate Altshuler, Berzon, Nussbaum, Rubin & Demain, Traber & Voorhees, and Lerach, Coughlin, Stoia & Robbins, LLP, to represent me in this action.

Dated: ______________________, 2004

Signed: ______________________________ (Signature)

Name (Print Legibly) ______________________________________________

Address ______________________________________________

______________________________________________
(City) (State) (Zip Code)

Telephone: ____________________________________

Email Address: ____________________________________

Return to: Veliz - Overtime Lawsuit, Lerach, Coughlin, Stoia & Robbins, LLP, 401 B Street, Suite 1700, San Diego, CA 92101-4297, to be received by ____________ **[date to be filled in later].**

**EXHIBIT N**



June 18, 2004

John Doe
101 Circle Drive
Anytown, OH  45040

Dear John,

On March 27, 2003, you received a communication to all SSRs about a nationwide class-action suit filed in California by lawyers assisted by UNITE, a union that's been leading an all-out campaign to discredit, embarrass and harass Cintas and all of our partners.  Recently, the Teamsters have been pushing this lawsuit by appearing at our locations and approaching SSRs on their routes.  The Teamsters have been passing out flyers and other materials that alter a Notice of the lawsuit and Consent Form that were carefully worded by the Court and posted by Cintas at the locations on June 8, 2004.  The Teamsters' aggressive efforts are an attempt to create dissension between the SSRs and Cintas for the unions' own purposes.

The suit alleges that the company's method of paying SSRs is illegal.  However, we firmly believe that it is legal, fair, rewards good performance and offers opportunities to people with drive, ambition and spirit.  The unions seem to oppose a pay system that, based on all the information we have, places our SSRs at or near the top of the pay scale for comparable jobs in the industry.  We will continue to fight this suit vigorously.

We've achieved some great success in protecting the privacy of our partners during the course of our opposition to this lawsuit in the court system.  The union-assisted lawyers asked the court to order Cintas to provide them the personal information of SSRs including social security number, home address and telephone number.  The union-assisted lawyers wanted all of this personal information about you with no restrictions about who else would see it and how it could be used.

Cintas' legal counsel strongly objected to releasing your personal information because we respect your privacy and want to prevent unwanted intrusions into your personal life.  I'm glad to say, we were successful in preventing access to the most sensitive personal information and in limiting both who will see it and what they can do with it.   First, by the Court's order, the unions are not to have access to this information.  Second, no one will have access to your social security number.

However, the Court did rule that Cintas will be forced to relinquish to the union-assisted lawyers the home mailing addresses for SSRs who are potential members of the class named in this suit. The potential members of the class do not include: (i) SSRs that as part of their duties cross state lines to make deliveries, (ii) SSRs that as part of their duties operate a vehicle with an average gross weight in excess of 10,000 pounds, or (iii) SSRs who work or worked as an STC (unless before being an STC they otherwise qualified as a potential class member).  As a result, not all of the SSRs will receive the mailing or be eligible to participate in the suit.  Of course, the decision of whether or not to participate in the suit as a plaintiff is a personal decision between an SSR and his or her family and Cintas assures you that decision will not result in any ill effects on an SSR's career.

The plaintiffs' lawyers are permitted to use the home mailing information of the potential members of the class for the sole and limited purpose of mailing, to those listed, a specific communication approved by the Court relating to this lawsuit. Access to telephone numbers is limited to very special cases where the mailing is returned to the lawyers by the Post Office as undeliverable.

If you think that your home mailing information is being used for other than this court approved limited purpose, feel free to let your GM know so that we can inform our attorneys and the Court. We hope our strong objections protect you from unwanted intrusions into your personal lives. We will continue to protect your personal information.

As the leadership of these unions continue to say and prove, they have no concern for our company or our customers. Union leaders have publicly stated that they will do anything, say anything and spend any amount of their members' dues money to harass companies that don't agree to their demands. As the unions' true motives come to light, we think everyone will see the allegations of this lawsuit for what they really are, baseless.

Over the years, Cintas has focused on building firm relationships with its partners – relationships that are based on mutual trust and respect. Together, we have built one of America's most successful and *"Most Admired"* companies – as determined by Fortune Magazine for the fourth consecutive year – with talented partners and loyal customers. We will continue to fight to preserve and enhance what together we have built.

Very truly yours,

Scott

Scott D. Farmer
President and Chief Executive Officer

**EXHIBIT L**

CINTAS PARTNERS SAY
Overtime Pay is the Law!
TOGETHER WE CAN WIN
UNIFORM
justice!

LOS SOCIOS DE CINTAS DICEN:
¡El pago de horas extras es la ley!
UNIFORME

# Exhibit 2

ALTSHULER, BERZON, NUSSBAUM, RUBIN & DEMAIN
ATTORNEYS AT LAW
177 POST STREET, SUITE 300
SAN FRANCISCO, CALIFORNIA 94108
(415) 421-7151
FAX (415) 362-8064
www.altshulerberzon.com

FRED H. ALTSHULER
STEPHEN P. BERZON
BARBARA J. CHISHOLM
JEFFREY B. DEMAIN
REBEKAH B. EVENSON
EILEEN B. GOLDSMITH
LAURA P. JURAN
SCOTT A. KRONLAND
DOROTHEA K. LANGSAM
DANIELLE E. LEONARD
STACEY M. LEYTON
LINDA LYE
PETER D. NUSSBAUM
DANIEL T. PURTELL
MICHAEL RUBIN
PEDER J. THOREEN
JONATHAN WEISSGLASS

SCOTT L. SHUCHART*
FELLOW

March 21, 2005

*Via Facsimile and U.S. Mail*
David Picker
Spector Gadon & Rosen
Seven Penn Center
1635 Market Street, 7th Floor
Philadelphia, PA 19103
Facsimile: 215/241-8844

Re: *Pichler v. UNITE*
United States Dist. Ct., E.D. PA., Case No. 04-2841

Dear Mr. Picker:

We received your March 17, 2005 letter concerning Altshuler, Berzon's objections to your third-party subpoena. We do not agree with the factual statements or legal conclusions asserted in your letter. Contrary to your assertions, our law firm has a long-standing attorney-client relationship with UNITE-HERE; and pursuant to that relationship, all communications with UNITE-HERE regarding the matters addressed in your subpoena are subject to the attorney-client privilege as well as work-product protection. Moreover, it would be unduly burdensome to search through all of our files and to prepare privilege logs concerning any such documents that might exist.

In response to your previous request, we fully cooperated in providing redacted copies of our bills to UNITE-HERE pertaining to the *Veliz* litigation, which confirm that UNITE-HERE paid us to perform legal services in that litigation. We understood that you would be withdrawing your subpoena upon the production of those redacted documents. While you apparently do not agree with that position, for the reasons stated in our objections we do not believe a court would compel us to respond further to your subpoena duces tecum in light of the burden and the intrusion on the attorney-client relationship.

Sincerely,

Michael Rubin

MR/hlm
*ADMITTED IN MASSACHUSETTS ONLY

# Exhibit 3

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

ELIZABETH PICHLER, KATHLEEN KELLY, RUSSELL CHRISTIAN, DEBORAH BROWN, SETH NYE, HOLLY MARTSEN, KEVIN QUINN, JOSE L. SABASTRO, DEBORAH A. SABASTRO, THOMAS RILEY, AMY RILEY, RUSSELL DAUBERT and CARRI DAUBERT, on behalf of themselves and those similarly situated,

Plaintiffs,

v.

UNITE (UNION OF NEEDLETRADES, INDUSTRIAL & TEXTILE EMPLOYEES AFL-CIO), a New York unincorporated association; BRUCE RAYNOR, a New York resident; INTERNATIONAL BROTHERHOOD OF TEAMSTERS AFL-CIO; and DOES 1-10,

Defendants.

Eastern District of Pennsylvania
CIVIL ACTION NO. 04-CV-2841

**OBJECTIONS TO SUBPOENA DUCES TECUM ON BEHALF OF ALTSHULER, BERZON, NUSSBAUM, RUBIN & DEMAIN**

Pursuant to Rule 45 of the Federal Rules of Civil Procedure, Altshuler, Berzon, Nussbaum, Rubin & Demain ( "Altshuler Berzon") hereby objects to plaintiffs' Subpoena Duces Tecum dated January 27, 2005 as follows:

GENERAL OBJECTIONS

The following general objections and statements apply to each of the particular requests listed in the Subpoena and are hereby incorporated within each response set forth below:

1. Altshuler Berzon objects to the Subpoena to the extent it calls for information and/or documents protected by the attorney-client privilege, the common interest privilege, the work product doctrine, or any other privileges, protections, or doctrines of similar effect. If Altshuler Berzon inadvertently produces any information or documents protected by the attorney-client privilege, the common interest privilege, the work-product doctrine, or any other privilege or

protection, such production is not intended to and shall not operate as a waiver of any applicable privilege with respect to that document and/or information, or any other document and/or information.

2. Altshuler Berzon objects to the Subpoena to the extent it calls for information and/or documents containing or constituting proprietary, confidential, and/or trade secret information.

3. Altshuler Berzon objects to the Definitions and Instructions of the Subpoena to the extent they seek to impose obligations different from, or in excess of, those created by the Federal Rules of Civil Procedure and the Local Rules. To the extent Altshuler Berzon makes a response to this subpoena, such responses are made pursuant to, and as limited by, the Federal Rules of Civil Procedure and the Local Rules.

4. Altshuler Berzon objects to the Subpoena to the extent it fails to describe the documents requested with reasonable particularity. In responding to the Subpoena, Altshuler Berzon does not waive any objections as to vagueness, ambiguity, undue burden, or invasiveness.

5. Altshuler Berzon objects to the Subpoena to the extent it is overly broad as to time and that compliance would be unduly burdensome, expensive, annoying, or oppressive.

6. Altshuler Berzon objects to the Subpoena on the grounds that plaintiffs waived any right to obtain production of the documents requested by agreeing with Altshuler Berzon upon a limited production by Altshuler Berzon and/or UNITE HERE in full satisfaction of the request, which Altshuler Berzon and/or UNITE HERE provided.

7. Altshuler Berzon objects to the Subpoena to the extent it requires production of documents that are neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

8. Altshuler Berzon's responses herein are based on facts presently known to it and represent a diligent and good faith effort to comply with the Subpoena. Altshuler Berzon 's investigation into the matters specified are continuing. Accordingly, Altshuler Berzon, reserves its right to supplement, alter or change their responses and objections to the Subpoena and to produce additional responsive information and/or documents, if any, that Altshuler Berzon has in its possession, custody, or control at the time the Subpoena was propounded.

9. Altshuler Berzon's production of any information and/or documents is not a waiver of any of the objections set forth herein or an admission or acknowledgment that such information and/or documents are relevant to the subject matter of this action.

10. Altshuler Berzon will not produce documents not currently in its possession, custody, or control. Consistent with applicable law, Altshuler Berzon construes the Subpoena as requiring it to engage in a reasonable and diligent search of its files most likely to contain responsive

documents or information about the specific matters at issue.

11. Altshuler Berzon objects to the subpoena as unduly burdensome and oppressive in providing insufficient time for a response.

SPECIFIC OBJECTIONS

DOCUMENT REQUEST NO. 1
All documents relating to UNITE's and IBT's involvement in efforts to recruit employees of Cintas Corp. ("Cintas") to participate in the *Veliz* Lawsuit.

RESPONSE TO DOCUMENT REQUEST NO. 1:
In addition to each of the general objections set forth above that are incorporated by reference herein, Altshuler Berzon also objects to this Request on the grounds that it is vague, ambiguous and unintelligible. Altshuler Berzon specifically objects to this request on the grounds that documents identified by this request are protected from disclosure by the attorney client privilege and work product doctrine. Altshuler Berzon further objects to this request an unduly burdensome and oppressive in that the same documents can be requested from the parties to the *Pichler* action.

DOCUMENT REQUEST NO. 2:
All documents relating to UNITE's and IBT's support or assistance to the plaintiffs in the *Veliz* Lawsuit, or their attorneys in their prosecution of that case.

RESPONSE TO DOCUMENT REQUEST NO. 2:
In addition to each of the general objections set forth above that are incorporated by reference herein, Altshuler Berzon also objects to this Request on the grounds that it is vague, ambiguous and unintelligible. Altshuler Berzon specifically objects to this request on the grounds that documents identified by this request are protected from disclosure by the attorney client privilege and work product doctrine. Altshuler Berzon further objects to this request an unduly burdensome and oppressive in that the same documents can be requested from the parties to the *Pichler* action.

DOCUMENT REQUEST NO. 3:
All documents relating to UNITE's and IBT's involvement in the *Veliz* Lawsuit.

RESPONSE TO DOCUMENT REQUEST NO. 3:
In addition to each of the general objections set forth above that are incorporated by reference herein, Altshuler Berzon also objects to this Request on the grounds that it is overly broad, unduly burdensome and oppressive. Altshuler Berzon specifically objects to this request on the grounds that documents identified by this request are protected from disclosure by the attorney client privilege and work product doctrine. Altshuler Berzon further objects to this request an

unduly burdensome and oppressive in that the same documents can be requested from the parties to the *Pichler* action.

DOCUMENT REQUEST NO. 4:
All fliers, leaflets, pamphlets or other materials by UNITE or IBT concerning the *Veliz* Lawsuit, and documents relating to the preparation, production and/or distribution of such materials.

RESPONSE TO DOCUMENT REQUEST NO. 4:
In addition to each of the general objections set forth above that are incorporated by reference herein, also objects to this Request on the grounds that it is overly broad, unduly burdensome, vague and ambiguous, seeks documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Altshuler Berzon specifically objects to this request on the grounds that documents identified by this request are protected from disclosure by the attorney client privilege and work product doctrine. Altshuler Berzon further objects to this request an unduly burdensome and oppressive in that the same documents can be requested from the parties to the *Pichler* action.

DOCUMENT REQUEST NO. 5:
All documents relating to the payment of moneys by UNITE or IBT in connection with the *Veliz* Lawsuit, including but not limited to, payments made to the plaintiffs' attorneys in the *Veliz* Lawsuit.

RESPONSE TO DOCUMENT REQUEST NO. 5:
In addition to each of the general objections set forth above that are incorporated by reference herein, Altshuler Berzon specifically objects to this request on the grounds that documents identified by this request are protected from disclosure by the attorney client privilege and work product doctrine. Altshuler Berzon further objects to this request an unduly burdensome and oppressive in that the same documents can be requested from the parties to the *Pichler* action.

DOCUMENT REQUEST NO. 6:
All documents the plaintiffs' attorneys in the *Veliz* Lawsuit received from, or sent to, IBT or UNITE in connection with the *Veliz* Lawsuit.

RESPONSE TO DOCUMENT REQUEST NO. 6:
In addition to each of the general objections set forth above that are incorporated by reference herein, Altshuler Berzon also objects to this Request on the grounds that it is overly broad, unduly burdensome, expensive, annoying and oppressive, vague and ambiguous, seeks documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and seeks documents that are unreasonably cumulative or duplicative. Altshuler Berzon specifically objects to this request on the grounds that documents identified by this request are protected from disclosure by the attorney client privilege and work product doctrine. Altshuler Berzon further objects to this request an unduly burdensome and oppressive in that the same documents can be requested from the parties to the *Pichler* action.

DOCUMENT REQUEST NO 7:
All orders or stipulations entered in the *Veliz* Lawsuit concerning the confidentiality of the names or addresses of current or former employees of Cintas or potential class members in the *Veliz* Lawsuit.

RESPONSE TO DOCUMENT REQUEST NO. 7:
In addition to each of the general objections set forth above that are incorporated by reference herein, Altshuler Berzon also objects to this Request on the grounds that it is overly broad, unduly burdensome, expensive, annoying and oppressive, vague and ambiguous, and seeks documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence in this litigation. Altshuler Berzon further objects to this request on the ground that all orders or stipulations in the *Veliz* lawsuit are available from the Court's on-line docket.

DOCUMENT REQUEST NO 8:
All documents the plaintiffs or their attorneys in the *Veliz* Lawsuit gave to or shared with IBT or UNITE that reveal, disclose or identify the names or addresses of current or former employees of Cintas or potential class members in the *Veliz* Lawsuit.

RESPONSE TO DOCUMENT REQUEST NO. 8:
In addition to each of the general objections set forth above that are incorporated by reference herein, Altshuler Berzon also objects to this Request on the grounds that it is overly broad, unduly burdensome, expensive, annoying and oppressive, vague and ambiguous, and seeks documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence in this litigation. Altshuler Berzon specifically objects to this request on the grounds that documents identified by this request are protected from disclosure by the attorney client privilege and work product doctrine. Altshuler Berzon further objects to this request an unduly burdensome and oppressive in that the same documents can be requested from the parties to the *Pichler* action.

Dated: March 14, 2005

Michael Rubin
Scott A. Kronland
ALTSHULER, BERZON, NUSSBAUM,
RUBIN & DEMAIN

By: ______________________
Michael Rubin

Attorneys for Altshuler, Berzon, Nussbaum,
Rubin & Demain

**PROOF OF SERVICE**

**CASE:** *Pichler, et al. v. UNITE, et al.*

**CASE NO:** N.D. Cal. No. ___________ (E.D. Penn. No. 04-CV-2841)

I am employed in the City and County of San Francisco, California. I am over the age of eighteen years and not a party to the within action; my business address is 177 Post Street, Suite 300, San Francisco, California 94108. On March 14, 2005, I served the following document(s):

**Objections to Subpoena Duces Tecum**
**On Behalf of Altshuler, Berzon, Nussbaum, Rubin & Demain**

on the parties, through their attorneys of record, by placing true copies thereof in sealed envelopes addressed as shown below for service as designated below:

A. By Federal Express: I am readily familiar with the practice of Altshuler, Berzon for the collection of overnight courier mail and I caused each such envelope to be delivered to Federal Express Corporation at San Francisco, California, with whom we have a direct billing account, to be delivered to the office of the addressee on the next business day. I deposited this package at the Kearny Street location.

B. By First Class Mail: I am readily familiar with the practice of Altshuler, Berzon for the collection and processing of correspondence for mailing with the United States Postal Service. I caused each such envelope, with first-class postage thereon fully prepaid, to be deposited in a recognized place of deposit of the U.S. Mail in San Francisco, California, for collection and mailing to the office of the addressee on the date shown herein.

| | **ADDRESSEE** | **PARTY** |
|---|---|---|
| A | James Bucci<br>Spector Gadon & Rosen, P.C.<br>1635 Market Street, 7th Floor<br>Philadelphia, PA 19103 | Plaintiffs |
| B | Mark Featherman<br>Willig Williams and Davidson<br>1845 Walnut Street, 24th Floor<br>Philadelphia, PA 19103 | Defendants UNITE and Bruce Raynor |
| B | Tom Kennedy<br>Kennedy, Schwartz & Cure, PC<br>113 University Place, 7th Floor<br>New York, NY 10003 | Defendants UNITE and Bruce Raynor |

| | | |
|---|---|---|
| B | Joseph E. Kolick, Jr.<br>Dickstein, Shapiro, Morin & Oshinsky<br>2101 L Street, N.W.<br>Washington, D.C. 20037-1526 | Defendant International Brotherhood of Teamsters, AFL-CIO |
| B | Thomas Kohn<br>Markowitz and Richman<br>121 South Broad Street, Suite 1100<br>Philadelphia, PA 19107 | Defendant International Brotherhood of Teamsters, AFL-CIO |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this March 14, 2005, at San Francisco, California.

Holly Miller